Sarah Stellberg (Idaho Bar # 10538)
Laurence J. ("Laird") Lucas (Idaho Bar # 4733)
Advocates for the West
P.O. Box 1612
Boise, Idaho 83701
(208) 342-7024
sstellberg@advocateswest.org
llucas@advocateswest.org

Ashley Bruner (*Pro Hac Vice* Pending)
Center for Biological Diversity
P.O. Box 1178
Flagstaff, Arizona 86002
(928) 666-0731
abruner@biologicaldiversity.org

Hannah Connor (*Pro Hac Vice* Pending)
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, FL 33731
(202) 681-1676
hconnor@biologicaldiversity.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, WESTERN WATERSHEDS PROJECT, and WILDEARTH GUARDIANS, | Case No. 1:21-cv-182 |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| UNITED STATES BUREAU OF LAND MANAGEMENT; MARY D'AVERSA, in her official capacity as District Manager for the Bureau of Land Management Idaho Falls District; UNITED STATES DEPARTMENT OF THE INTERIOR, | |
| Defendants. | |

## INTRODUCTION

1.    Plaintiffs Center for Biological Diversity (Center), Western Watersheds Project (WWP), and WildEarth Guardians challenge the decision and analysis of the United States Department of Interior's Bureau of Land Management (BLM) for the Caldwell Canyon Mine, an open-pit phosphate mine proposed in Caribou County, Idaho. Relying on a May 2019 Final Environmental Impact Statement (FEIS), BLM signed a Record of Decision (ROD) approving the Caldwell Canyon Mine on August 14, 2019. This action will allow P4 Production, LLC (P4), a subsidiary of Bayer AG, to develop and mine approximately 1,559 acres of important, currently undeveloped land essential for sage-grouse and other species over more than 40 years for the purpose of producing the brand-name pesticide Roundup.

2.    Glyphosate dimethylammonium salt (glyphosate) is an herbicide manufactured by German multinational pharmaceutical and life sciences company Bayer AG for use as the active ingredient in "Roundup" brand herbicides. The World Health Organization's cancer-research arm considers glyphosate a probable carcinogen, and the United States Environmental Protection Agency (EPA) recently determined that glyphosate is likely to adversely affect 93 percent of all threatened and endangered species. Elemental phosphorus, which is necessary to manufacture glyphosate, is produced using phosphate ore extracted from a phosphate mine—in this case the Caldwell Canyon Mine—that is then processed—in this case at the Soda Springs Plant in Soda Springs, Idaho.

3.    This suit challenges BLM's cursory analysis of the environmental impacts of that extraction and refinement process on public lands, wildlife, downstream waters, Tribal lands, and nearby communities for generations to come. BLM's analysis in the FEIS and ROD violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, for several reasons.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF    2

4.      First, BLM failed to take a hard look at potential selenium pollution from the Caldwell Canyon Mine. Selenium, which is toxic at high concentrations, has killed hundreds of livestock in southeast Idaho, and has caused deformities and other adverse effects in birds, aquatic animals, and other wildlife. As EPA identified in its comments to BLM on the Draft Environmental Impact Statement (DEIS), the mine will release dust contaminated with selenium into the ambient environment. Those dust particles are a concern because of the high likelihood that they will contaminate nearby lands and waters, including the Blackfoot River that runs at the feet of this mine and already exceeds state water quality standards for selenium. Yet, even with these significant pollution concerns, BLM did not adequately disclose how it analyzed fugitive dust emissions, how those emissions will impact the Blackfoot River, or whether there are alternatives to mitigate those emissions.

5.      Second, BLM failed to consider the cumulative effects of phosphate mining, and in particular, selenium contamination, in its environmental analysis. P4 will build the Caldwell Canyon Mine in an area that has already been impacted by decades of phosphate mining. Southeast Idaho is the second largest producer of phosphate in the United States. In total, at least 30 phosphate mines have disturbed approximately 17,000 acres of land in this region since the early 20th century and have caused significant selenium contamination, both of surface water and groundwater. There are over 10 federal hazardous waste—or Superfund—sites in the area. Nonetheless, BLM prepared only a cursory analysis of the cumulative effects of the Caldwell Canyon Mine when combined with the impacts of other past, present, and future mining projects.

6.      Third, BLM entirely failed to consider the indirect effects from ore processing, including the potential for radioactive waste and ground water pollution. Ore from Caldwell Canyon will be processed at the Soda Springs Plant, which was listed as a Superfund site in

1990. Remediation efforts at the Soda Springs Plant, which are ongoing, have focused on addressing soil contaminated with radionuclides and metals (arsenic and beryllium), and groundwater contaminated with selenium, cadmium, sulfates, and fluorides—contamination that has left the property and impacted nearby surface water. Despite the fact that further deterioration of air, surface water, and ground water quality is reasonably foreseeable from processing phosphate ore at this Soda Springs Plant, BLM failed to analyze those impacts or use them to inform reasonable alternatives to this project.

7.      Fourth, BLM failed to take a hard look at the mine's impact on Greater sage-grouse, an iconic western bird species whose population has plummeted rangewide in recent decades. Greater sage-grouse narrowly avoided listing pursuant to the Endangered Species Act (ESA) in 2010 and 2015, and despite federal commitments to improve protections for the bird, populations have only further declined since that time. The Caldwell Canyon Mine would impair roughly 1,000 acres of Greater sage-grouse habitat, including sensitive breeding and nesting grounds for the small and declining East Idaho Uplands sage-grouse population. Nonetheless, the EIS failed to meaningfully analyze the direct, indirect, and cumulative impacts of this project on local and regional populations of Greater sage-grouse.

8.      Finally, without regard for its obligations under NEPA, BLM only reviewed a very narrow set of alternatives to the project—limiting the consideration of available options to mitigate harms from this project and preventing the public from meaningfully analyzing the project and BLM from making an informed choice. BLM's review also unlawfully excluded alternatives proposed in public comments, including by Plaintiffs WWP and the Center, without adequate consideration and reasoned explanation.

9.      Accordingly, Plaintiffs request that the Court declare that BLM's FEIS and ROD for the Caldwell Canyon Mine are arbitrary, capricious, and not in accordance with NEPA and the APA; vacate and set aside BLM's FEIS and ROD approving the Caldwell Canyon Mine; and enjoin BLM from authorizing any further action associated with the Caldwell Canyon Mine until it complies with the statutory and regulatory demands of NEPA and the APA.

## JURISDICTION AND VENUE

10.      Plaintiffs bring this action pursuant to the judicial review provisions of the APA, 5 U.S.C. §§ 701–706.

11.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and may issue a declaratory judgment, injunctive relief, and further relief requested by Plaintiffs pursuant to 28 U.S.C. §§ 2201–02.

12.      Plaintiffs also seek an award of costs and expenses, including attorneys' fees, costs, and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412.

13.      Venue is proper in this Court under 28 U.S.C. § 1391(e) because Plaintiff WWP resides in the district, with its headquarters in Hailey, Idaho; the events or omissions giving rise to the claims in this case occurred in Idaho; and Defendant D'Aversa resides in this district.

14.      Pursuant to Local Rule 3.1, this case is properly assigned to the Southern Division because Plaintiff WWP is headquartered in Hailey, which is in Blaine County.

## PARTIES

15.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit 501(c)(3) corporation headquartered in Tucson, Arizona, with offices in several states and Mexico. The Center has approximately 84,333 members throughout the United States and the world, including 533 members in Idaho. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and waters, and public health

through science, policy, and environmental law. Based on the understanding that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked, the Center is working to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for a healthy, livable future for us all.

16.     Plaintiff WESTERN WATERSHEDS PROJECT is a non-profit 501(c)(3) corporation headquartered in Hailey, Idaho. WWP has more than 12,000 members and supporters throughout the United States. Through education, public policy initiatives, and legal advocacy, WWP works to protect and restore western watersheds and wildlife. WWP has a direct interest in mineral development that occurs in areas with sensitive wildlife populations and important wildlife habitat.

17.     Plaintiff WILDEARTH GUARDIANS is a non-profit organization headquartered in Santa Fe, New Mexico that is dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the West. WildEarth Guardians has more than 7,000 members. WildEarth Guardians advocates for public land management that protects wildlife and their habitat, including the protection and restoration of sagebrush habitats to protect the Greater sage-grouse and other sagebrush-dependent species.

18.     All Plaintiff groups bring this action on their own behalf, and on behalf of their members who derive scientific, aesthetic, recreational, and spiritual benefits from the natural lands, wildlife, and waters around the Caldwell Canyon area and in Soda Springs, Idaho. These uses include hiking, camping, backpacking, fishing, boating, and viewing and enjoying wildlife and the surrounding natural environment in the area.

19.     Plaintiffs' members and staff are, for example, concerned with protecting the wildlife, plants, scenery, air quality, water quality, and other natural values of Idaho, as well as

their own health. Members and staff of Plaintiffs' organizations regularly use and enjoy public lands for recreational and aesthetic purposes both near and including the Caldwell Canyon Mine area and near the Soda Springs Plant. They intend to continue doing so.

20.     In the Caldwell Canyon area, for instance, Plaintiffs' members and staff regularly engage in flyfishing and boating on the Blackfoot River and its side channels, and they intend to continue doing so. Plaintiffs' members and staff also regularly engage in the following activities in the Caldwell Canyon area, which they intend to continue: hiking; camping; photography; and wildlife observation, including looking for sage-grouse. Plaintiffs' members and staff have also visited the Dry Valley Mine, where overburden from the Caldwell Canyon Mine will be placed.

21.     In the area of the Soda Springs Plant, which will process ore from the Caldwell Canyon Mine, Plaintiffs' members and staff have, for instance, recreated at Hooper Springs Park, where they have drunk the water; picnicked, including for family reunions; birded; hiked; took pictures; watched wildlife; and rested during long car drives. Plaintiffs' members and staff intend to continue to visit the park and the Soda Springs area.

22.     These uses are incompatible with the development of the Caldwell Canyon Mine as approved by BLM, and Plaintiffs' members' and staffs' interests will be harmed if the mine is constructed and operated as it has been approved. For example, they will no longer be able to recreate at the mine site if it is developed.

23.     In addition, pollution from the Caldwell Canyon Mine will diminish Plaintiffs' members' and staffs' ability to enjoy the aesthetic qualities and recreational opportunities of the affected areas. Plaintiffs' members and staff are concerned that recreating near the mine site will impact their health and that they will observe fewer wildlife in the area. Pollution from the Caldwell Canyon Mine will also impact the Blackfoot River. Plaintiffs' members and staff have

worked to reduce the impacts of phosphate mining and are concerned about negative impacts related to these mining practices, including fish and wildlife deformities caused by selenium pollution. Plaintiffs have members and staff that are concerned that they will see and catch fewer fish because of the mine development. Plaintiffs also have members and staff that do not eat the fish they catch from the Blackfoot River because of concern that mining has contaminated the fish. This concern will continue and be exacerbated if the Caldwell Canyon Mine is developed. In addition, Plaintiffs have members and staff that no longer drink water from Hooper Springs Park because of concern that it is polluted by the Soda Springs Plant. This concern will continue and be exacerbated if the Plant processes ore from the Caldwell Canyon Mine. Plaintiffs have members and staff that are also concerned that pollution from the Soda Springs Plant will diminish their enjoyment of Hooper Springs Park because of concern about how pollution from the Soda Springs Plant impacts their health, vegetation, and wildlife.

24.     In sum, Plaintiffs, their members, and the children, grandchildren, and future descendants of their members will be significantly and irreparably injured by the construction and operation of the Caldwell Canyon Mine. Plaintiffs' members and staff seek to protect the wildlife, scenery, air quality, and other natural values of the region from the direct, indirect, and cumulative impacts of the Caldwell Canyon Mine so that they can continue using and enjoying the area.

25.     Defendants' decision regarding the Caldwell Canyon Mine harms Plaintiffs' interests and the interests of their members because the development will destroy wildlife habitat and vegetation, further impact the already impaired Blackfoot River, degrade groundwater quality, increase air emissions, and diminish Plaintiffs' staffs' and members' enjoyment of the area. BLM's failure to comply with NEPA harms Plaintiffs, their members, and their staff by

denying them the right to informed decision making and public disclosure, as well as the right to meaningfully participate in the decision-making process. The relief sought, including declaratory and injunctive relief, will redress Plaintiffs', their staffs', and their members' injuries.

26.    Defendant BLM is a federal agency within the Department of the Interior. BLM is responsible for managing approximately 12 million acres of land in Idaho, nearly a quarter of the state's total land area. BLM decides whether to approve activities necessary for phosphate mining on lands it administers, including rights-of-way, phosphate use permits, lease modifications, and mining activities on leased lands.

27.    Defendant Mary D'Aversa is the District Manager for the BLM Idaho Falls District. Ms. D'Aversa is the BLM official who signed and is responsible for the challenged ROD and FEIS. Ms. D'Aversa is sued in her official capacity.

28.    Defendant United States Department of the Interior is a federal agency responsible for managing about five hundred million acres of federal public lands across the United States. The Department of the Interior, through its sub-agency BLM, decides whether to approve activities necessary for phosphate mining on lands it administers, including rights-of-way, phosphate use permits, lease modifications, and mining activities on leased lands.

## LEGAL BACKGROUND

### I.    National Environmental Policy Act

29.    NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (1978, as amended). It serves twin goals. First, it aims to ensure that federal agencies carefully consider detailed information regarding the environmental impact of a proposed action *before* reaching a decision on the action. Second, it ensures that information about the impacts is

made available to members of the public so that they can play a role in the decision-making process.

30.     The Council on Environmental Quality (CEQ) has adopted regulations governing the implementation of NEPA. The regulations relevant to the action challenged in this case are CEQ's 1978 regulations (as amended in 1986 and 2005) that were in force when BLM both initiated and completed the NEPA process for the Caldwell Canyon Mine. Although CEQ issued a final rulemaking in July 2020 fundamentally rewriting those regulations, the new rules only apply "to any NEPA process begun after September 14, 2020," or where an agency has chosen to "apply the regulations . . . to ongoing activities" and thus do not govern here. 40 C.F.R. § 1506.13 (2020).

31.     NEPA and its implementing regulations require federal agencies to prepare an environmental impact statement (EIS) for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c)(i); 40 C.F.R. § 1501.4 (1978, as amended). The "human environment" is defined "comprehensively to include the natural and physical environment and the relationship of people with that environment." 40 C.F.R. § 1508.14 (1978, as amended).

32.     An EIS must describe: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitment of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(c)(i)–(v).

33.   NEPA requires the agency to take a "hard look" at all direct, indirect, and cumulative environmental effects of the proposed action and its alternatives. 40 C.F.R. §§ 1502.14, 1502.16 (1978, as amended); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Direct effects are those that are "caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a) (1978, as amended). Indirect effects are those that are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). A cumulative effect is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7. "Effects" are synonymous with "impacts." *Id.* § 1508.8.

34.   The "heart of the [EIS]" is an agency's consideration of alternatives to the proposed action. *Id.* § 1502.14. An agency must, among other things, "[r]igorously explore and objectively evaluate all reasonable alternatives" to the actions considered in the EIS, including a baseline alternative of taking "no action." *Id.* § 1502.14(a), (d). In the draft EIS, the action agency must identify its preferred alternative(s) unless prohibited by another law. *Id.* § 1502.14(e). For alternatives that the action agency eliminates from detailed review, the agency must "briefly discuss the reasons for their having been eliminated." *Id.* § 1502.14(a).

35.   Public review and comment on DEISs are required by CEQ regulations. Federal agencies are required to "[e]ncourage and facilitate public involvement" "to the fullest extent possible." *Id.* § 1500.2(d); *see also id.* § 1506.6(a) (requiring "diligent efforts [from agencies] to involve the public in preparing and implementing their NEPA procedures"). At a minimum, the public must be given 45 days to review and comment on a DEIS. *Id.* § 1506.10(c).

36.     After completing and considering an EIS, the agency shall prepare a "concise public [ROD]" that states the agency's decision, identifies all alternatives considered, and "state[s] whether all practicable means to avoid or minimize environmental harm from the alternative selected have been adopted." *Id*. § 1505.2.

## II.     BLM Mineral Leasing

37.     BLM issues leases for mineral development on the lands it administers. For known deposits of a leasable mineral, such as phosphate, BLM issues "competitive leases" through a bidding process. 43 C.F.R. § 3501.10(d).

38.     Existing leaseholders can obtain leases of Federal lands that adjoin their leases through either a "fringe acreage lease" or "lease modification." *Id.* § 3501.1(e), (f). A "fringe acreage lease" is a new Federal lease, and BLM can impose different terms and conditions from the original Federal lease. *Id.* § 3510.21. A "lease modification" adds acreage to an existing lease, with the additional acreage subject to the same terms and conditions as the original lease. *Id.*

39.     BLM regulations also govern how leaseholders extract minerals. One of the purposes of BLM's regulations is "to promote operating practices which will avoid, minimize or correct damage to the environment—land, water, and air—and avoid, minimize or correct hazards to public health and safety." *Id.* § 3590.0-1. To this end, "[m]ining operations shall be conducted in a manner to yield the ultimate maximum recovery of the mineral deposits, *consistent with the protection and use of other natural resources and the protection and preservation of the environment—land, water, and air.*" *Id.* § 3594.1(a) (emphasis added).

40.     "Ultimate maximum recovery" is also defined and "does not in any way restrict the authorized officer's authority to ensure the conservative [sic] of the mineral resource and protection of other resources." *Id.* § 3590.0-5(h).

## III.   Administrative Procedure Act

41.     Claims under NEPA are brought pursuant to the APA, 5 U.S.C. §§ 701–706.

42.     The APA allows persons and organizations to challenge final agency actions in federal courts. *Id.* §§ 702, 704. Under 5 U.S.C. § 706, "the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." The APA further declares that a court shall hold unlawful and set aside agency actions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.* § 706(2)(A).

43.     BLM's issuance of a FEIS and ROD is a final agency action reviewable under the APA. *See id.* § 704.

## FACTUAL BACKGROUND

## I.   Background on Phosphate Mining

44.     Southeast Idaho—a portion of which is referred to as Idaho's phosphate patch—is the second largest producer of phosphate in the United States behind Florida. In total, at least 30 phosphate mines have disturbed approximately 17,000 acres of land in southeast Idaho since the early 20th century, with roughly 7,000 additional acres slated for development, and another 50,000 acres identified as containing potentially profitable phosphate ore.

45.     Phosphate mining in Idaho has caused significant selenium contamination. The rock above or layered between the phosphate ore, called overburden, often contains selenium, which is poisonous in large concentrations. Precipitation runoff from the overburden transports

selenium to groundwater and surface water. Mining operations also generate fugitive dust that is contaminated with selenium, which can impact surface waters and other resources. The Blackfoot River and several of its tributaries are contaminated above state water quality standards for selenium.

46.     Once released to the environment, selenium can concentrate, or bioaccumulate, in plants and animals. Between 1996 and 2012, over 600 head of livestock died from selenium poisoning in the vicinity of phosphate mines in southeastern Idaho. Selenium contamination has also caused adverse effects, including deformities and even mortality, in birds, aquatic animals, and other wildlife.

47.     Phosphate mines are so contaminated that they often become federal hazardous waste sites. EPA's Superfund program—established under the Comprehensive Environmental Response, Compensation, and Liability Act— has assessed at least sixteen contamination sites in southeastern Idaho for cleanup. At least thirteen of these sites are now designated Superfund sites.

## II.     Background on Greater Sage-Grouse

48.     The Greater sage-grouse (*Centrocercus urophasianus*) is North America's largest grouse, best known for spectacular courtship displays where males gather in spring on traditional breeding grounds (known as leks) and strut with their chests puffed out and spiky tails spread, hoping to attract females. The "greater sage grouse is a sagebrush-obligate bird, meaning that it relies on sagebrush for its survival year-round." *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 565–66 (9th Cir. 2016).

49.     Greater sage-grouse once numbered in the millions across the western United States and Canada, but loss and fragmentation of their native sagebrush habitats have caused

populations to decline precipitously over the last century. Current sage-grouse numbers are estimated to be less than five percent of historic population levels.

50.     The United States Fish and Wildlife Service ("Service") determined in 2010 that ESA listing for the Greater sage-grouse was "warranted, but precluded" by higher priority species. *See* 75 Fed. Reg. 13,910 (March 5, 2010). The Service identified the primary threats to the species as habitat loss and fragmentation, coupled with a lack of adequate regulatory mechanisms to protect habitat across the bird's range. *Id.*

51.     The 2010 ESA listing decision specifically identified mining as a threat to Greater sage-grouse. Mining destroys and fragments habitat; impairs movement between seasonal use areas; increases ambient noise levels that interrupt normal breeding, nesting, and feeding behavior; facilitates the spread of invasive plants that increase the severity and frequency of habitat-destroying wildfires; and increases bird mortality through vehicle collisions and by introducing perching structures for sage-grouse predators. Restoration of disturbed sagebrush, even where required, "is difficult to achieve and disturbed sites may never return to suitability for sage-grouse."

52.     Federal lands comprise over sixty percent of the sage-grouse's range, making federal land management decisions key to ensuring persistence of the species. Thus, in response to the Service's 2010 "warranted, but precluded" finding, BLM and the United States Forest Service undertook a large-scale planning effort to increase federal protections for sage-grouse and avoid having to list the Greater sage-grouse under the ESA. This process resulted in the adoption, in 2015, of 98 revised or amended Resource Management Plans and Forest Plans across the sage-grouse range in ten western states. Citing the heightened protections under those

2015 plans, the Service determined in October 2015 that ESA listing of sage-grouse was not warranted. 80 Fed. Reg. 59,858 (Oct. 2, 2015).

**III.     Caldwell Canyon Mine**

53.     P4, a subsidiary of Bayer AG, seeks to develop the Caldwell Canyon Mine in southeast Idaho (see Figure 1) to recover phosphate to produce the herbicide glyphosate for use in Roundup products. Surface ownership in the proposed mine area includes a mix of private, state endowment, and federal public lands. The phosphate deposits at issue are owned predominantly by the federal government and managed by BLM, which issued leases granting the exclusive rights to develop its mineral estate in accordance with a BLM-approved mine plan (federal leases IDI-0000002, IDI-0014080, IDI-0013738, IDI-037319, IDI-037306).



**Figure 1.** Project Location for Caldwell Canyon Mine, BLM FEIS at 2.

54.     In 2016, P4 submitted to BLM and the Idaho Department of Lands a phosphate mine and reclamation plan to develop the Caldwell Canyon Mine. P4 later revised and resubmitted the plan to BLM on March 27, 2017, and then submitted additional refinements on June 27, 2018. The plan outlines P4's proposal for development, mining operations, water management, environmental management, and closure and reclamation.

55.     Also on March 27, 2017, P4 submitted an application to modify the boundaries of the federal leases to recover additional phosphate ore.

56.     Combined, the phosphate mine and reclamation plan and lease modifications would allow P4 to:

- Mine federal leases for phosphate ore;

- Enlarge two federal leases by approximately 700 acres to recover additional ore;

- Install a power transmission line;

- Construct haul roads and improve a service access road;

- Construct ponds and water handling facilities; and

- Develop infrastructure to handle, store, and ship ore, including extension of a railroad.

## IV.   Caldwell Canyon Mine's Environmental Impacts

57.     As approved, the Caldwell Canyon Mine will disturb approximately 1,559 acres of previously undeveloped land. P4 will construct two new open pits (North Pit and South Pit) from which it will extract phosphate ore. P4 proposes to use trucks to haul the ore from the pits on a newly constructed two-mile long road to an ore stockpile at the currently inactive Dry Valley Mine. From this location, P4 will haul the ore daily by trains up to 130 rail cars long to the Soda Springs Plant, also owned by Bayer AG, for processing.

58.     Both the land disturbance and the mining and transportation activities will impact wildlife by disrupting their movement through the project area due to noise, human activity, and habitat loss; and through injury or mortality from collision with mining equipment. The big game species that will be affected are mule deer, elk, and moose. Other potentially impacted species include the Greater sage-grouse, Columbian sharp-tailed grouse, gray wolf, pygmy rabbit, bald eagle and other raptors, and the northern leopard frog.

59.     In particular, the Caldwell Canyon Mine area contains habitat for the isolated and declining East Idaho Uplands Greater sage-grouse population. The project would result in the loss or modification of over 1,000 acres of designated habitat for this population of sage-grouse, within a region that is already suffering from significant anthropogenic disturbance. The project area also contains at least five sage-grouse "leks" (breeding grounds) and surrounding nesting habitat where birds are particularly susceptible to human disturbance. The project threatens numerous harms to Greater sage-grouse, including by destroying and fragmenting habitat; impairing movement between seasonal use areas; increasing ambient noise levels that interrupt normal breeding, nesting, and feeding behavior; facilitating the spread of invasive plants that increase the severity and frequency of habitat-destroying wildfires; and increasing bird mortality through vehicle collisions and by introducing perching structures for sage-grouse predators.

60.     Caldwell Canyon is also located along a 350-mile-long wildlife corridor that connects Yellowstone National Park and Grand Teton National Park and the northern Rocky Mountains to the northeast of the mine site with the High Uintas Wilderness in northeastern Utah and the southern Rocky Mountains. The United States Forest Service has designated this corridor—which provides critical pathways for ungulates such as deer, elk, and pronghorn, as well as predators like wolves and cougars—as regionally significant.

61.     The mine may also impact the Canada lynx and the North American wolverine. The Canada lynx is considered threatened pursuant to the ESA. The North American wolverine is proposed for listing as threatened under the Act. BLM prepared a biological assessment on April 29, 2019, to assess the potential impacts and concluded that the project "may affect but is not likely to adversely affect" both species. The Service concurred with this determination on May 21, 2019.

62.     Mining activities are expected to adversely impact water. The mine pits will permanently eliminate five springs and lower groundwater levels, resulting in small decreases in stream flows. The mining operation will also contaminate both surface water and groundwater, which is a significant concern. For groundwater, mining activities will generate selenium and manganese groundwater plumes. In addition, surface water, including the Blackfoot River, may be impacted by airborne dust containing selenium. Selenium levels in the Blackfoot River already exceed state water quality standards.

63.     The Soda Springs Plant, which will process the ore from Caldwell Canyon, is a federal Superfund site. The plant was listed on the national priorities list in 1990 due to concern that groundwater contaminated with selenium, cadmium, sulfates, and fluoride was flowing south from the property towards the town of Soda Springs. Subsequent investigation also identified potential exposures to employees and community member from radionuclides and metals (arsenic and beryllium). In September of 2018, EPA found that groundwater contamination at the Soda Springs Plant is contributing to surface water contamination in several streams and creeks that exceed Idaho water quality standards. EPA stated that remediation of selenium contamination has been slower than expected and groundwater standards "will not be

achieved in the foreseeable future." Contaminated groundwater extends beyond the property

boundary of the Soda Springs Plant.

**V.      BLM's NEPA Process for the Caldwell Canyon Mine**

    **A.  Caldwell Canyon Mine DEIS**

64.      In 2017, after receiving P4's mine and reclamation plan, and application to

modify the federal leases, BLM published a Notice of Intent to prepare a DEIS. BLM published

its DEIS in November of 2018.

65.      BLM's purpose and need for the DEIS was to evaluate and respond to P4's mine

and reclamation plan, to allow P4 to recover phosphate ore using an economically viable method

in accordance with federal laws and regulations governing mineral leases. The DEIS only

contained a cursory analysis of the Caldwell Canyon Mine's environmental impacts. While, for

example, the DEIS credits the mine with preserving jobs and tax revenue, it does not even

provide basic information such as how much ore P4 will mine, and thus how much ore will be

processed at the Soda Springs Plant.

66.      In the DEIS, BLM identified three alternatives: the no action alternative; P4's

proposed alternative; and Alternative 1, which would require a geosynthetic membrane in select

locations to reduce the risk of groundwater contamination.

67.      BLM made the DEIS available for public comment for the minimum time period

of 45 days, despite a federal government-wide shutdown and two major federal holidays

occurring in the middle of that period (the comment period ran from November 30, 2018 to

January 14, 2019; the government shutdown occurred from December 22, 2018 to January 25,

2019). During the shutdown, certain government websites with relevant information were down

and Federal staff were unavailable to answer public questions. Plaintiff WWP raised this issue

and while relevant regulations allow for public comment period extensions, BLM only granted an extension to WWP rather than reopening the public comment period.

68.     In January of 2019, during the government shutdown, Plaintiffs WWP and the Center submitted detailed comments expressing concerns regarding the scope and depth of the DEIS's analysis. These comments also incorporated comments made by Yellowstone to Uintas Connection and Kiesha's Preserve. In their comment letter, WWP and the Center expressed concern that the DEIS did not analyze the effects from or even acknowledge the Soda Springs Plant, which will process the ore from the Caldwell Canyon Mine. WWP and the Center also asked BLM to consider the cumulative impacts of the Project on habitat, wildlife, water quality, and human communities when added to the high concentration of phosphate mines in the area, several of which are now Superfund sites. Incorporated comments asked BLM to consider selenium contamination generated by other mines in the area. WWP and the Center further commented on BLM's alternatives analysis by identifying the narrow scope of alternatives and suggesting different alternatives, including the alternative of not modifying the existing lease and/or issuing a fringe acreage lease instead, to better protect Greater sage-grouse and other surface resources. WWP and the Center further noted that the DEIS contains insufficient information to determine whether the project will comply with the Clean Water Act. The comments also raised concerns with BLM's analysis of impacts to Greater sage-grouse.

69.     EPA also submitted comments to BLM on the DEIS. EPA noted that the DEIS "lacks sufficient detail to understand the existing conditions and environmental effects" of the proposed Caldwell Canyon Mine. According to EPA, the DEIS did not provide information regarding surface water conditions and the relevant water quality standards. EPA noted that surface water in the area regularly exceeds water quality standards for aluminum (Blackfoot

River, Slug Creek, Chick Creek, springs), selenium (Blackfoot River, Chicken Creek),

manganese (Chicken Creek, Dry Valley Creek), and total dissolved solids (Caldwell Creek,

Chicken Creek, Dry Valley Creek, and springs). According to EPA, however, the DEIS did not

analyze the existing conditions of these streams and whether mining in the area has contributed

to the water quality exceedances. EPA asked BLM to consider and discuss the effects of the

mine in relation to EPA-approved water quality standards, including the selenium criterion that

the state adopted and submitted to EPA for approval. Regarding the Blackfoot River, EPA asked

BLM to disclose or discuss its model showing that fugitive dust contaminated with selenium

would not impact this already impaired waterbody. EPA also recommended that BLM model

fugitive dust emissions on a seasonal basis, in addition to the annual estimate already conducted,

because an annual estimate could underestimate the effects of deposition of selenium on the

Blackfoot River.

      70.    Other commenters similarly critiqued the omissions and inaccuracies in BLM's

analysis and suggested additional alternatives for BLM's consideration.

      71.    On February 14, 2019, Plaintiff WWP submitted supplemental comments on the

DEIS noting additional gaps and deficiencies in BLM's analysis of impacts to Greater sage-

grouse, including BLM's assessment of noise impacts from the mine's construction, operation,

and reclamation.

**B.  Caldwell Canyon Mine FEIS**

      72.    BLM issued its FEIS for the Caldwell Canyon Mine in May of 2019 for a 30-day

availability period during which it accepted public comments.

      73.    In the FEIS, BLM again refused to analyze the indirect effects of processing ore

at the Soda Springs Plant because "[i]t is assumed in the EIS that P4 Production's Soda Springs

[P]lant would continue to operate albeit using a different ore source if Caldwell Canyon was not approved." BLM made this assumption without even disclosing how much ore will be recovered from Caldwell Canyon. BLM also provided no evidence of an alternative source of ore in the FEIS, let alone a source that would allow the plant to operate at the same rate and for the same duration as the Caldwell Canyon Mine. Even further, the City of Soda Springs wrote in comments on the DEIS (as summarized by BLM) that, "[n]o one on behalf of the City of Soda Springs is aware of an alternative source of ore and the City does not believe that such an assumption is reasonable." Elsewhere in the FEIS, BLM contradicted its conclusion that the Caldwell Canyon Mine would not impact operations at the Soda Springs Plant. For example, when evaluating social and economic impacts, BLM credited the proposed Caldwell Canyon Mine with preserving 585 jobs at the Soda Springs Plant, implying that the plant would not operate if BLM did not approve the Caldwell Canyon Mine. BLM did not explain this inconsistency.

74.    BLM's analysis of the cumulative effects of phosphate mining in the area was cursory. Regarding water quality, BLM simply acknowledged that selenium contaminates rivers and creeks at or above state water quality standards and in groundwater above the relevant standards at many mine sites. BLM failed to analyze how selenium contamination from the Caldwell Canyon Mine might interact cumulatively with other sources of selenium contamination to impact the Blackfoot River and other surface waters. In the FEIS, BLM states that mining has contributed to selenium contamination of the Blackfoot River and other streams in the area but failed to catalogue or analyze how different mining and/or other operations have contributed to selenium contamination and why, as required by NEPA. BLM also did not analyze

how or whether pending and/or recently approved mining projects will further contribute to the impairment of the Blackfoot River.

75.     As to alternatives, BLM did not add any alternatives to those included in the DEIS and unreasonably eliminated eight categories of commenter-proposed alternatives from further review. For example, BLM eliminated a proposed alternative to treat contaminated groundwater because it would supposedly have "substantially similar effects to the proposed action," even though the proposed action was projected to contaminate groundwater and would entail only groundwater monitoring, not treatment. Similarly, BLM eliminated a proposed alternative to biologically treat selenium because it "would not reduce impacts" even though BLM acknowledged that the proposed action alternative would result in selenium contamination and only required monitoring of water quality, not treatment.

76.     BLM also failed to address WWP's and the Center's proposed alternative to issue a fringe lease instead of a lease modification, and unreasonably rejected the proposed alternative to disapprove modifying the lease boundaries, to better preserve surface resources such as Greater sage-grouse. BLM reasoned that keeping the current lease boundaries would require a redesign of the pit walls, but never claimed that such a redesign was infeasible. BLM also claimed, without supporting analysis or explanation, that the impacts to sage-grouse from modifying the lease boundaries would be "negligible," even though the lease modification would allow pit construction and blasting noise closer to one of the area's few remaining sage-grouse leks. Finally, BLM asserted that keeping the current lease boundaries would prevent 11.2 million tons of ore from being mined, which would prevent ultimate, maximum recovery and use of all known mineral resources in accordance with 43 C.F.R. § 3594.1. BLM failed to acknowledge that ultimate, maximum recovery must be "consistent with the protection . . . of other natural

resources and the protection and preservation of the environment," *id.*, and "does not in any way restrict the authorized officer's authority to ensure the conservative [sic] of the mineral resource and protection of other resources," *id.* § 3590.0-5(h). BLM also failed to acknowledge its mandate under the Federal Land Policy and Management Act (FLPMA) to manage public lands in a way that harmonizes environmental protection and development. *See* 43 U.S.C. §§ 1701(a)(7), 1702(c) (requiring "multiple use" management, defined as "harmonious and coordinated management of the various resources without permanent impairment" of environmental quality); *id.* § 1701(a)(8) (requiring BLM to manage public lands to protect "environmental" values).

77.    Regarding fugitive dust impacts to the Blackfoot River, BLM stated that "[b]ased on modeling, only a small portion of that dust would be deposited into the Blackfoot River, [sic] it is very unlikely that the dust would increase the selenium concentration in the river water to the acute or chronic aquatic life standards." Despite criticism from EPA on all of the following points, BLM's cursory discussion did not disclose or summarize its modeling methodologies; disclose baseline selenium concentrations in the river; or discuss Idaho's updated water quality standards for selenium. BLM also failed to address EPA's concern that it underestimated the risk of selenium dust contamination by modeling impacts annually, rather than seasonally, because higher deposition rates in summer months may coincide with periods of low flows.

78.    BLM also failed to meaningfully analyze the project's impacts on Greater sage-grouse. While BLM calculated the acreage of sage-grouse habitat that the Caldwell Canyon Mine would destroy, it nowhere explained how this would affect the East Idaho Uplands population that relies on this habitat. BLM merely stated that such habitat loss would have "effects" that are "long-term and moderate"—without explaining the nature of such effects or basis for

characterizing them as only moderate. The FEIS also lacked a reasonable explanation for BLM's conclusion that the lease modification, which would allow further habitat destruction in proximity to known leks, would have merely "negligible" effects on Greater sage-grouse.

79.     The FEIS's analysis of noise impacts was also incomplete. Of the five leks within close proximity of the project area, BLM included a single lek in its noise analysis—the Dry Valley Lek (3C040). The FEIS conceded that one other lek "may experience some level of . . . audible disturbance" but failed to analyze such effects or explain why this lek was excluded from the noise study. For the remaining leks, BLM claimed—without supporting evidence or analysis—that there would be no noise impacts due to noise attenuation, despite the proximity of these leks to the railroad. Finally, while BLM acknowledged that noise levels could cause abandonment of the Dry Valley Lek, the FEIS failed to analyze how losing one of the few remaining leks in this region might impact the long-term viability of the East Idaho Uplands sage-grouse population.

80.     The cumulative effects analysis for Greater sage-grouse was likewise insufficient. While the FEIS contained a generic cumulative effects analysis for "wildlife," that section merely tabulated the total acres of wildlife habitat lost within the analysis area, failing to discuss how any particular past project has impacted any particular wildlife species, as required by NEPA. Furthermore, when commenters requested that BLM evaluate how past mining, road construction, grazing, and other projects have impacted sage-grouse—a fundamental requirement of any NEPA cumulative effects analysis—BLM claimed that this analysis was "outside the scope of the Caldwell Canyon EIS." BLM also failed to analyze the cumulative impacts of other projects planned in the same region, including proposed mines such as the Husky 1 North Dry Ridge, East Smoky Canyon, Dairy Syncline, and Rasmussen Valley.

81.     Plaintiffs WWP and the Center, and others, submitted comments in June 2019 raising these and other errors and inadequacies with the FEIS. BLM failed to rectify them before approving the project.

## C.  Caldwell Canyon Mine ROD

82.     Instead of remedying the FEIS's flaws, BLM issued a ROD on August 14, 2019. The ROD approved the Caldwell Canyon Mine subject to the environmental protection measures and best management practices of Alternative 1 and confirmation from the state of Idaho that the Caldwell Canyon Mine complies with the Clean Water Act and the Idaho Ground Water Quality Rule. The ROD also approved a right-of-way for a haul road. Finally, the ROD recommended approval of a lease modification application to increase federal phosphate lease IDI-000002 by 326.8 acres and IDI-14080 by 368.00 acres. Again, the ROD does not even state how much ore P4 will mine from Caldwell Canyon, and thus how much ore will be processed at the Soda Springs Plant.

## CLAIMS FOR RELIEF

## CLAIM ONE

*(Violation of NEPA: Failure to Analyze Direct, Indirect, and Cumulative Effects)*

83.     Plaintiffs hereby incorporate by reference all preceding paragraphs.

84.     In preparing an EIS, BLM must analyze all direct, indirect, and cumulative effects of the proposed action. 40 C.F.R. § 1502.16(a), (b) (1978, as amended). Direct effects are those that are "caused by the action and occur at the same time and place." *Id.* § 1508.8(a). Indirect effects are those that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). A cumulative effect is "the impact on the environment which results from the incremental impact of the action when added to other

past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7.

85.    BLM violated NEPA by failing to take a hard look at the indirect effects associated with processing ore at the Soda Springs Plant, a designated Superfund site. Indirect effects from ore processing include the potential for air, soil, and groundwater contamination. Potential contaminants of concern include selenium, arsenic, cadmium, and other heavy metals; fluorides; nitrates; and radionuclides. In the FEIS and ROD, BLM acknowledged that Caldwell Canyon Mine ore will be processed at the Soda Springs Plant and would replace phosphate sourced from the Blackfoot Bridge Mine, which is nearing depletion. Nevertheless, BLM stated that it was not required to consider indirect effects from the ore processing because it claimed that the Soda Springs Plant will continue to operate using a different ore source regardless of whether Caldwell Canyon is mined or not, an assumption that the City of Soda Springs said was unreasonable. BLM offered no evidence of an ore source that would perfectly replace Caldwell Canyon Mine ore and that claim is contradicted by the information BLM relied upon in making its decision. Indeed, elsewhere in the FEIS and ROD, BLM credited the Caldwell Canyon Mine with preserving jobs and allowing the Soda Springs Plant to continue operating.

86.    Furthermore, BLM failed to take a hard look at the direct and indirect effects of airborne selenium dust generated by the Caldwell Canyon Mine on the Blackfoot River. The Blackfoot River is impaired for selenium pursuant to 33 U.S.C. § 1313(d) because selenium concentrations in the river exceed Idaho water quality standards. The Idaho Department of Environmental Quality lowered the chronic aquatic life criterion for selenium to make it more protective for aquatic life and submitted that revision to EPA for approval on August 24, 2018. EPA approved Idaho's revised chronic water quality standard on July 9, 2019.

87.     In the FEIS, BLM stated that modeling indicates that "only a small portion of [selenium] dust would be deposited into the Blackfoot River, [and that] it is very unlikely that the dust would increase the selenium concentration in the river water to the [water quality standards established by the Idaho Department of Environmental Quality]."

88.     BLM's analysis of selenium dust deposition on the Blackfoot River was arbitrary, capricious, and an abuse of discretion. BLM characterized the potential for such impacts as "negligible," but neither disclosed nor summarized its fugitive dust model for the public. BLM also failed to disclose how far selenium levels were projected to increase in the Blackfoot River or whether it had accounted for already elevated baseline levels. BLM also performed its modelling on an annual basis, likely underestimating the effects of selenium deposition during dry summer months. Finally, BLM failed to consider Idaho's revised chronic aquatic life criterion for selenium or gauge the effects of the Caldwell Canyon Mine against this lower standard.

89.     BLM further failed to analyze how selenium contamination from the Caldwell Canyon Mine might interact cumulatively with other past, present, and reasonably foreseeable sources of selenium contamination on the Blackfoot River and other surface waters. In the FEIS, BLM states that mining has contributed to selenium contamination of the Blackfoot River and other streams in the area but failed to catalogue or analyze how different mining and/or other operations have contributed to selenium contamination and why, as required by NEPA. BLM also did not analyze how pending and/or recently approved mining projects will further contribute to the impairment of the Blackfoot River.

90.     BLM also violated NEPA by failing to take a hard look at the direct, indirect, and cumulative effects of the Caldwell Canyon Mine on Greater sage-grouse, including by:

    a.      failing to take a "hard look" at the impacts of habitat loss on the East Idaho Uplands sage-grouse population or explain the basis for characterizing such effects as merely "moderate";

    b.      failing to explain its basis for concluding that the lease modification would have merely "negligible" effects on Greater sage-grouse;

    c.      failing to take a hard look at possible noise impacts to leks within the project area;

    d.      failing to analyze how loss of a project-area lek might impact the long-term viability of the East Idaho Uplands sage-grouse population; and

    e.      failing to analyze the cumulative impacts of the Caldwell Canyon Mine when combined with other past, present, and future threats to Greater sage-grouse.

91.      BLM's failure to take a hard look at the direct, indirect, and cumulative effects of the Caldwell Canyon Mine was therefore arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA and its regulations, in violation of the APA. 5 U.S.C. § 706(2)(A).

## CLAIM TWO

(*Violation of NEPA: Failure to Consider a Reasonable Range of Alternatives*)

92.      Plaintiffs hereby incorporate by reference all preceding paragraphs.

93.      In preparing an EIS, BLM must "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action. 40 C.F.R. § 1502.14(a) (1978, as amended). BLM must also "briefly discuss the reasons" for eliminating alternatives from the detailed review. *Id.* § 1502.14(a). An agency may properly reject "alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area" or "which have substantially similar consequences" to alternatives actually considered. *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180-81 (9th Cir. 1990).

94.     In the DEIS, BLM analyzed three alternatives: the no action alternative; P4's proposed alternative; and Alternative 1, which requires a geosynthetic membrane in select locations to reduce the risk of groundwater contamination.

95.     BLM's analysis of alternatives was arbitrary, capricious, and an abuse of discretion. BLM failed to provide a true range of alternatives that would allow it and the public to weigh the costs and benefits of different mitigation measures. Aside from the "no action" alternative, BLM only evaluated a slightly modified alternative to P4's proposal, which only varied from the proposed alternative in that it would require installation of a geosynthetic membrane in select locations. BLM's alternatives analysis did not inform decisionmakers or the public of the range of other available mitigation measures to avoid, for example, impacts to water quality or Greater sage-grouse, as required under NEPA. 40 C.F.R. § 1502.1.

96.     In the FEIS, BLM also improperly ignored or rejected other reasonable alternatives proposed in public comments. First, BLM failed to explain why it did not consider the viable alternative of issuing a fringe lease, rather than a lease modification, which would allow it to impose more stringent lease stipulations for protection of Greater sage-grouse and other resources.

97.     Second, BLM unreasonably eliminated eight categories of alternatives from detailed review because they "would not reduce impacts" or would have a "negligible impact" or "substantially similar" effects to the proposed action. BLM did not provide any support for these conclusions and they are contradicted by the information BLM relied upon in making its decision, which shows that the rejected alternatives would have materially reduced the project's environmental impacts.

98.     Third, citing 43 C.F.R. § 3594.1, BLM also eliminated alternatives because they would not result in the "ultimate maximum recovery of the mineral deposits." This decision was arbitrary, capricious, and an abuse of discretion, because it was based on a flawed legal premise. BLM regulations also require that mining operations protect and preserve the environment: "[m]ining operations shall be conducted in a manner to yield the ultimate maximum recovery of the mineral deposits, *consistent with the protection and use of other natural resources and the protection and preservation of the environment—land, water, and air*." 43 C.F.R. § 3594.1 (emphasis added). BLM also failed to acknowledge its mandate under FLPMA to manage public lands in a way that harmonizes environmental protection and development. *See* 43 U.S.C. §§ 1701(a)(7), 1702(c) (requiring "multiple use" management, defined as "harmonious and coordinated management of the various resources" without "permanent impairment" of environmental quality); *id.* § 1701(a)(8) (requiring BLM to manage public lands to protect "environmental" values). Thus, BLM could not reasonably reject a viable alternative simply because it would not allow for ultimate maximum recovery of phosphate.

99.     BLM's failure to consider a reasonable range of alternatives for the Caldwell Canyon Mine was therefore arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA and its regulations, in violation of the APA. 5 U.S.C. § 706(2)(A).

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare that BLM's FEIS and ROD approving the Caldwell Canyon Mine are arbitrary, capricious, and not in accordance with NEPA and the APA;

B.     Vacate and set aside BLM's FEIS and ROD approving the Caldwell Canyon Mine;

C.       Enjoin BLM from authorizing any further action associated with the Caldwell Canyon

Mine until it lawfully complies with the statutory and regulatory demands of NEPA and the

APA;

D.       Award to Plaintiffs their costs, expenses, expert witness fees, and reasonable attorneys'

fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

E.       Grant Plaintiffs such further relief as may be just, proper, and equitable.


DATED this 27th day of April, 2021.

/s/ Sarah Stellberg
_____

Sarah Stellberg (Idaho Bar # 10538)
Laurence J. ("Laird") Lucas (ISB # 4733)
Advocates for the West
P.O. Box 1612
Boise, Idaho 83701
(208) 342-7024
sstellberg@advocateswest.org
llucas@advocateswest.org

Ashley Bruner (*Pro Hac Vice* Pending)
Center for Biological Diversity
P.O. Box 1178
Flagstaff, Arizona 86002
(928) 666-0731
abruner@biologicaldiversity.org

Hannah Connor (*Pro Hac Vice* Pending)
Center for Biological Diversity
P.O. Box 2155
St. Petersburg, Florida 33731
(202) 681-1676
hconnor@biologicaldiversity.org

*Attorneys for Plaintiffs*