JOSHUA D. HURWIT (ID Bar No. 9527)
United States Attorney
CHRISTINE G. ENGLAND (ID Bar No. 11390)
Assistant United States Attorney
District of Idaho
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Telephone: (208) 334-1211
Facsimile: (208) 334-9375
Email: Christine.England@usdoj.gov

TODD KIM
Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

**PAUL A. TURCKE** (ID Bar No. 4759)          **SONYA J. SHEA** (CA Bar No. 305917)
**SHANNON BOYLAN** (DC Bar No. 1724269)      Trial Attorney
Trial Attorneys                               Environmental Defense Section
Natural Resources Section                     999 18th Street
P.O. Box 7611                                 South Terrace, Suite 370
Washington, D.C. 20044                        Denver, CO 80202
Telephone: (202) 353-1389 (Turcke)           Telephone: (303) 844-7231
          (202) 598-9584 (Boylan)            Facsimile: (303) 844-1350
Facsimile: (202) 305-0275                     Email: Sonya.Shea@usdoj.gov
Email: Paul.Turcke@usdoj.gov
          Shannon.Boylan@usdoj.gov

*Attorneys for Defendants*

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>               Plaintiffs,<br><br>    vs.<br><br>UNITED STATES BUREAU OF LAND MANAGEMENT; et al.,<br><br>               Defendants,<br>  and<br><br>P4 PRODUCTION, L.L.C.,<br><br>            Intervenor-Defendant. | Case No. 4:21-cv-00182-BLW<br><br><br>**DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [ECF. NO. 58]** |

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 2

STANDARD OF REVIEW ........................................................................................ 6

ARGUMENT .............................................................................................................. 6

I.     BLM'S ENVIRONMENTAL ANALYSIS COMPLIED WITH NEPA ............... 6

     A.     BLM Adequately Considered Effects Related to the Soda Springs Processing Plant. ............................................................................... 8

     B.     BLM Adequately Considered Impacts to Sage-Grouse. .......................... 11

          1.     BLM considered and disclosed direct and indirect effects on sage-grouse habitat and populations. ............................................ 12

          2.     BLM adequately analyzed the Project's cumulative impacts to sage-grouse. ............................................................................. 16

     C.     BLM Adequately Analyzed the Project's Impacts on Water Resources. ................................................................................................ 18

          1.     BLM adequately analyzed the effects of selenium-contaminated fugitive dust. ...................................................... 19

               a.     BLM disclosed methods and uncertainties of modeling impacts from selenium-contaminated fugitive dust. ................................................................... 19

               b.     BLM disclosed existing impacts to surface waters and rationally concluded that the Project's fugitive dust is unlikely to impact surface waters. ........................ 21

          2.     BLM adequately analyzed the Project's cumulative effects to water resources ............................................................................ 23

     D.     BLM Considered the Required Range of Alternatives. ............................ 25

II.     BLM'S APPROVAL OF THE MINE PLAN AND SUBSEQUENT RIGHTS OF WAY COMPLIED WITH RELEVANT SAGE-GROUSE REQUIREMENTS ............................................................................................ 29

III.     PLAINTIFFS CANNOT PREVAIL ON THEIR CLEAN WATER ACT CLAIM ...................................................................................................... 32

A.      Plaintiffs' Clean Water Act Claim Is Not Cognizable............................. 32

B.      Plaintiffs' Claim Concerning Point-Source Discharges Must Be
        Dismissed.................................................................................................. 35

C.      Plaintiffs Waived Their CWA Claim by Failing to Raise the Issue in
        Comments. ................................................................................................ 36

D.      Even if Plaintiffs' CWA Claim Is Justiciable, BLM Complied with
        CWA Section 313. .................................................................................... 37

        1.      BLM's consideration of the Project's compliance was
                reasonable. .................................................................................... 37

        2.      BLM's authorizations did not violate state laws.......................... 38

                a.      Selenium from fugitive dust will not violate Idaho's
                        antidegradation policy........................................................ 39

                b.      Idaho's nonpoint-source rules lack Plaintiffs' alleged
                        "requirement.".................................................................... 40

                c.      Fugitive dust from ore stockpiles does not violate
                        state law. ............................................................................ 40

                d.      The point-source discharges alleged by Plaintiffs do
                        not violate water quality standards. ................................... 41

CONCLUSION AND REMEDY ................................................................................ 43

# TABLE OF AUTHORITIES

## Cases

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
   67 F.3d 723 (9th Cir. 1995) ................................................................................ 25

*Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993) ............................................................................. 44

*Arbaugh v. Y&H Corp.*,
   546 U.S. 500 (2006) ............................................................................................. 33

*Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*,
   126 F.3d 1158 (9th Cir. 1997) ........................................................................... 7, 8

*Bahr v. Regan*,
   6 F.4th 1059, 1082 (9th Cir. 2021) ..................................................................... 36

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
   462 U.S. 87 (1983) ................................................................................................. 6

*Burbank Anti-Noise Grp. v. Goldschmidt*,
   623 F.2d 115 (9th Cir. 1980) .............................................................................. 10

*Cal. Cmtys. Against Toxics v. EPA*,
   688 F.3d 989 (9th Cir. 2012) .............................................................................. 44

*California v. Block*,
   690 F.2d 753 (9th Cir. 1982) .......................................................................... 7, 25

*Cent. Sierra Env't Res. Ctr. v. Stanislaus Nat'l Forest*,
   30 F.4th 929, 932 (9th Cir. 2022) ....................................................................... 32

*Cent. Sierra Env't Res. Ctr. v. Stanislaus Nat'l Forest*,
   304 F. Supp. 3d (E.D. Cal. 2018) ........................................................................ 35

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
   123 F.3d 1142 (9th Cir. 1997) ...................................................................... 25, 27

*City of Olmstead Falls v. EPA*,
   233 F. Supp. 2d 890 (N.D. Ohio 2002) ............................................................... 35

*City of Sausalito v. O'Neill*,
   386 F.3d 1186 (9th Cir. 2004) ......................................................................... 6, 26

*Colo. Wild, Inc. v. U.S. Forest Serv.*,
   122 F. Supp. 2d 1190 (D. Colo. 2000) ................................................................ 35

*Ctr. For Biological Diversity v. Wagner*,
   No. 08-302-CL, 2009 WL 2176049 (D. Or. June 29, 2009) ................................ 35

*Edwardsen v. U.S. Dep't of Interior*,
   268 F.3d 781 (9th Cir. 2001) ........................................................................ 17, 23

*EPA v. Cal. ex rel. State Water Res. Control Bd.*,
  426 U.S. 200 (1976) ................................................................. 33

*FAA v. Cooper*,
  566 U.S. 284 (2012) ................................................................. 35

*Glacier Fish Co.v. Pritzker*,
  832 F.3d 1113 (9th Cir. 2016) ................................................. 36

*Great Basin Res. Watch v. BLM*,
  844 F.3d 1095 (9th Cir. 2016) ............................... 11, 13, 18

*Greater Yellowstone Coal. v. Larson*,
  641 F. Supp. 2d 1120 (D. Idaho 2009) ................................ 43

*Greater Yellowstone Coal. v. Lewis*,
  628 F.3d 1143 (9th Cir. 2010) ................................................. 32

*Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*,
  857 F.2d 505 (9th Cir. 1988) .................................................... 1

*Headwaters, Inc. v. BLM*,
  914 F.2d 1174 (9th Cir. 1990) ......................................... 26, 28

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) ................................................. 44

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ................................................................. 23

*Laguna Greenbelt Inc. v. U.S. Dept. of Transp.*,
  42 F.3d 517 (9th Cir. 1994) ..................................................... 26

*Lands Council v. McNair*,
  537 F.3d 981 (9th Cir. 2008) ..................................................... 6

*Lands Council v. Powell*,
  395 F.3d 1019 (9th Cir. 2005) ................................................. 16

*Lane v. Pena*,
  518 U.S. 187 (1996) ...................................................... 6, 32, 35

*League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*,
  615 F.3d 1122 (9th Cir. 2010) ......................................... 17, 24

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ................................................................. 18

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................... 6

*N. Alaska Env't Ctr. v. Haaland*,
  No. 3:20-CV-00187-SLG, 2022 WL 1556028 (D. Alaska May 17, 2022) ............................ 44

*N. Alaska Env't Ctr. v. Kempthorne*,
 457 F.3d 969 (9th Cir. 2006) .................................................................. 25, 28

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*,
 668 F.3d 1067 (9th Cir. 2011) ....................................................................... 36

*Native Ecosystems Council v. Dombeck*,
 304 F.3d 886 (9th Cir. 2002) ..................................................................... 6, 36

*Or. Nat. Res. Council v. Lowe*,
 109 F.3d 521 (9th Cir. 1997) ........................................................................ 18

*Or. Nat. Res. Council v. U.S. Forest Serv.*,
 834 F.2d 842 (9th Cir. 1987) .............................................................. 5, 32, 36

*Or. Wild v. U.S. Forest Serv.*,
 193 F. Supp. 3d 1156 (D. Or. 2016) ............................................................. 35

*Pronsolino v. Nastri*,
 291 F.3d 1123 (9th Cir. 2002) ....................................................................... 42

*Robertson v. Methow Valley Citizens Council*,
 490 U.S. 332 (1989).................................................................................... 7, 8

*S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
 588 F.3d 718 (9th Cir. 2009) ........................................................................ 11

*San Luis & Delta-Mendota Water Auth. v. Locke*,
 776 F.3d 971 (9th Cir. 2014) ........................................................................ 18

*Selkirk Conservation All. v. Forsgren*,
 336 F.3d 944 (9th Cir. 2003) ................................................................... 16, 22

*Steel Co. v. Citizens for a Better Env't*,
 523 U.S. 83 (1998)........................................................................................ 33

*United States v. Sherwood*,
 312 U.S. 584 (1941)........................................................................................ 6

*Upper Snake River Chapter of Trout Unlimited v. Hodel*,
 921 F.2d 232 (9th Cir. 1990) ........................................................................ 10

*W. Watersheds Proj. v. USDA Aphis Wildlife Servs.*,
 No. 1:20-CV-00213-BLW, 2020 WL 7318299 (D. Idaho Dec. 11, 2020)............................... 10

*Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*,
 375 F.3d 913 (9th Cir. 2004) ........................................................................ 36

*Weinberger v. Romero-Barcelo*,
 456 U.S. 305 (1982)...................................................................................... 44

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008)............................................................................................ 6

## Statutes

18 U.S.C. § 930(g)(1) ................................................................................ 33

33 U.S.C. § 1313(d) .................................................................................. 42

33 U.S.C. § 1323 ....................................................................................... 32

33 U.S.C. § 1323(a) ............................................................................. 32, 34

33 U.S.C. § 1362(12) .................................................................................. 5

33 U.S.C. § 1362(14) .................................................................................. 5

33 U.S.C. § 1365 ....................................................................................... 35

33 U.S.C. § 1365(b)(1)(A) ........................................................................ 36

42 U.S.C. § 4332(2)(C) ............................................................................... 7

5 U.S.C. § 706(2) ........................................................................................ 6

5 U.S.C. §§ 701–706 ................................................................................... 6

## Regulations

40 C.F.R. § 1500.1(b) ............................................................................... 24

40 C.F.R. § 1500.4(b) .......................................................................... 12, 17

40 C.F.R. § 1501.3 ...................................................................................... 7

40 C.F.R. § 1502.1 .................................................................................... 19

40 C.F.R. § 1502.14(a) .............................................................................. 25

40 C.F.R. § 1502.21 ............................................................................. 12, 18

40 C.F.R. § 1502.22 .................................................................................. 16

40 C.F.R. § 1502.7 .................................................................................... 12

40 C.F.R. § 1502.8 .................................................................................... 11

40 C.F.R. § 1506.13 .................................................................................... 7

40 C.F.R. § 1508.7 ............................................................................... 16, 23

40 C.F.R. § 1508.7-8 (1978) ..................................................................... 11

40 C.F.R. Part 1500 (2019) ......................................................................... 7

43 C.F.R. § 2920.7(b)(3) ........................................................................... 43

43 C.F.R. § 3510.11 .................................................................................. 27

43 C.F.R. § 3510.21 .................................................................................. 27

43 C.F.R. § 3590 ....................................................................................... 28

Idaho Admin. Code r. 58.01.02.010.09.................................................................... 40

Idaho Admin. Code r. 58.01.02.051.......................................................................... 39

Idaho Admin. Code r. 58.01.02.350.01...................................................................... 40

Idaho Admin. Code r. 58.01.02.800.......................................................................... 41

Idaho Admin. Code r. 58.01.25.100.02...................................................................... 41

**Other Authorities**

123 Cong. Rec. 39,212.............................................................................................. 33

1972 U.S.C.C.A.N. 3668 ........................................................................................... 34

1977 U.S.C.C.A.N. 4326 ........................................................................................... 35

85 Fed. Reg. 43,304 (July 16, 2020)........................................................................... 7

<u>**INTRODUCTION**</u>

A set of three environmental organizations (collectively "Plaintiffs") challenge the United States Bureau of Land Management ("BLM") approval of the Caldwell Canyon phosphate mine ("Caldwell Canyon Project" or "Project") for alleged violations of the National Environmental Policy Act ("NEPA"), Federal Land Policy and Management Act ("FLPMA"), and Clean Water Act ("CWA"). In analyzing the environmental impacts of the Project pursuant to NEPA, BLM adequately assessed baseline conditions, analyzed the Project's impacts to wildlife and water, among other resources, and considered a reasonable range of alternatives. BLM also made the Project and its decision documents available through public notice and comment. BLM received comments from two of the Plaintiffs.[1]

Plaintiffs' main contention is that BLM failed to take a "hard look" at the Project's impacts on environmental resources, especially water quality and sage-grouse. Although Plaintiffs attack BLM's NEPA analysis from many angles, none of the attempts rest on firm legal bases. Each iteration of the claims merely invites the Court to improperly "flyspeck" the agency's scientific analysis, in contravention of the deference owed to an agency's expertise. *See Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988). Plaintiffs also argue that BLM violated FLPMA by not imposing certain limitations found in the Pocatello Resource Management Plan ("RMP") and subsequent Amendments related to sage-grouse. But, the relevant RMP provisions by their own terms do not apply to the actions at issue. Finally, Plaintiffs contend that BLM's authorizations fail to comply with Idaho water quality standards in violation of FLPMA and the CWA. Not only does the relevant section of the CWA not apply to BLM's actions in this case, but BLM reasonably determined, and the Idaho

---

[1] One of the Plaintiffs, WildEarth Guardians, did not provide comments.

Department of Environmental Quality ("IDEQ") confirmed, that the Project will comply with Idaho water quality standards.

Because BLM's approval of the Project complied with applicable law and regulations, and Plaintiffs have not carried their burden of demonstrating otherwise, the Court should deny their motion for summary judgment and grant Federal Defendants' cross-motion.

## **BACKGROUND**

The federal phosphate program in southeast Idaho involving BLM and U.S. Forest Service lands is one of the largest and most complex non-energy, leasable minerals programs operated by these agencies. AR000984. The program includes 83 phosphate leases encompassing 43,000 acres, with about 17,000 disturbed acres associated with five active mines and 15 inactive or closed mines. *Id*.; *see also* AR000986 (summarizing mine sites). In 2013, the southeast Idaho phosphate program supported direct employment of about 1,800 people, more than 1,000 jobs in rural southeast Idaho, and contributed over $10 million in production royalties, rents, and bid fees (of which half is returned to and distributed within the State of Idaho), and over $500 million in value-added products to the United States. AR001001. Phosphate's use is varied, ranging from agricultural products like herbicides and fertilizers, to flame retardants, leavening agents, and toothpaste. AR000983. The southeast Idaho program supplies about 17 percent of the nation's and three percent of the world's phosphate, and these contributions are expected to increase as other sources are depleted. AR001001.

On February 2, 2017, BLM received a proposal for a Mine and Reclamation Plan ("MRP") for the Caldwell Canyon Project. *See* AR000279; AR016113-287. On March 22, 2017, BLM published in the Federal Register a notice of intent to prepare an Environmental Impact Statement for the Project. AR004224-6. The Caldwell Canyon Project proposes mining along Schmid Ridge, about 13 miles northeast of Soda Springs, Idaho. AR004225. The proponent, P4

Production, LLC, seeks to conduct "open pit mining on the [existing] Federal Phosphate Leases IDI-02, IDI-014080, and IDI-13738" and the existing State of Idaho Mineral Lease E07959. *Id*. In addition to certain modifications to these leases, the Project would include two new open mine pits, construction of haul and access roads, installation of a power line, water management features, monitoring wells, shop and office facilities, environmental protection measures, and reclamation. AR004224-5; *see also* AR016128-30 ("revised MRP"). These actions would newly disturb approximately 1,559 acres, with surface ownership by BLM of 153 acres (10 percent), the U.S. Forest Service of 7 acres (<1 percent), and the State of Idaho of 230 acres (15 percent), and the remaining 1,169 acres (75 percent) privately owned. *See* AR071250. The United States owns the mineral rights that would be leased for the Project.

BLM received and considered scoping comments, and on November 30, 2018, published the Project's Draft Environmental Impact Statement ("DEIS"). *See* AR004227-28; AR003538-880 (DEIS). The DEIS identified and analyzed in detail three alternatives: (a) the Proposed Action, AR003564-75; (b) Alternative 1, the Geosynthetic Membrane Enhanced Backfill Cover Alternative that "was developed to address long-term groundwater quality issues," AR003576-78; and (c) the No Action Alternative, AR003578. Also, the DEIS identified at least thirteen additional alternatives relating to maximizing ore recovery, cover systems, ore transport/haulage, power supply, and water treatment. *See* AR003578-83. BLM identified these alternatives based on public comments and potential project impacts and considered but did not included them in the detailed alternatives analysis for the various reasons identified in Section 2.4 of the DEIS. *Id*.

BLM analyzed comments on the DEIS, and on May 17, 2019, published notice of the availability of the Project's Final Environmental Impact Statement ("FEIS"). *See* AR004230-31;

AR071213-757 (FEIS).[2] On August 14, 2019, BLM signed the Project's Record of Decision ("ROD"). *See* AR003990-4076. The ROD selects Alternative 1, approves mining of federal phosphate leases IDI-000002, IDI-014080, and IDI13738 as described in the FEIS, approves a "modification of the existing Dry Valley Mine South Extension MRP," approves a haul road right-of-way, recommends approval of a lease modifications to lease area boundaries, and recommends approval of a phosphate use permit. AR004008-10.

 BLM conducted a thorough review of the Project that met all applicable legal requirements. This included a detailed review of and response to Plaintiffs' comments. *See, e.g.*, AR004069-76; AR071676, -79, -706.

 Impacts to wildlife were considered, and particularly to Greater sage-grouse, whose "[c]onservation . . . is of specific concern." AR004019. BLM considered baseline habitat areas, activity, and populations, AR071353-54, and it considered the alternatives' direct and indirect effects, AR071362, and cumulative impacts to the sage-grouse, AR071364-65. These analyses summarize and were informed by the Greater Sage-Grouse Habitat Assessment Technical Report appended to the FEIS. *See* AR071453-651. Plaintiffs particularly emphasize BLM's allegedly inadequate consideration of the Dry Valley lek. *See* Pls.' Mem. in Supp. of Mot. for Summ. J. 5-6, ECF No. 58-1 ("Pls.' Mem."). But what they call the "Dry Valley Lek" is not a lek but a "pending lek." AR071362. And BLM properly determined that the relevant lek in the area is located on private land, AR071362; AR074248, and thus not subject to the management activity buffers in BLM's Approved Resource Management Plan.

---

[2] The administrative record also includes an April 2019 version of the FEIS, *see* AR003040-537, but the final May 2019 version of the FEIS is located at AR071213-757.

Finally, the agency thoroughly considered the Project's water-related impacts and IDEQ compliance conclusions when determining that the Project would conform to applicable water quality standards. BLM coordinated with IDEQ in evaluating the Project's impacts and CWA compliance. In addition to considering the Project's potential impacts to surface waters from point sources,[3] runoff, and groundwater, BLM considered potential impacts from airborne transport of selenium-contaminated dust. *See* AR071312, AR020534-50. BLM reasoned that even under an unrealistic worst-case scenario, where *all* selenium from the dust would be deposited in the Blackfoot River, AR020542-45, the selenium concentration in the River due to dust from the Project would be "less than the most conservative state and federal criteria by two orders of magnitude." AR020543. BLM conditioned its decisions on IDEQ's determination that the Project conforms to the CWA, AR004035, and IDEQ ultimately determined that "the Caldwell Canyon Mine will be compliant with Idaho's Water Quality Standards and the Ground Water Quality Rule if operated in agreement with the FEIS," AR077098. BLM also conditioned its decisions on P4's compliance with "all necessary local, state, and federal permits and authorizations;" "conditions defined by authorized agencies in their respective decisions" related to the Project; *id.* at AR004031; and compliance with multiple requirements related to impacts

---

[3] The CWA defines a "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). In relevant part, the CWA defines "discharge of a pollutant" and "discharge of pollutants" as "any addition of any pollutant to navigable waters from any point source." *Id.* at § 1362(12) . "Point sources are subject to direct federal regulation and enforcement under the [CWA]." *Or. Nat. Res. Council v. U.S. Forest Serv.*, 834 F.2d 842, 849 (9th Cir. 1987). Nonpoint sources are not defined in the CWA but are addressed "in a separate portion of the Act which encourages states to develop areawide waste treatment management plans." *Id.*

on surface waters specified in the FEIS, ROD, MRP, and an environmental monitoring plan, *see infra* Note **Error! Bookmark not defined.**.

## STANDARD OF REVIEW

Plaintiffs bear the burden of showing that their claims fall within an applicable and unequivocal waiver of sovereign immunity. *United States v. Sherwood*, 312 U.S. 584, 586 (1941); *see Lane v. Pena*, 518 U.S. 187, 192 (1996). To the extent that the government has waived sovereign immunity, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, governs review of Plaintiffs' claims. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205–06 (9th Cir. 2004). Final agency action is reviewed under 5 U.S.C. § 706(2). Such review is highly deferential. *The Lands Council v. McNair*, 537 F.3d 981, 992–94 (9th Cir. 2008), *overruled in part on other grounds*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Agency decisions may be overturned only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (citation omitted). An agency action will be upheld if the agency has considered the relevant factors and articulated a rational connection between the facts found and choice made. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105 (1983). The court may not substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Moreover, courts are at their "most deferential" when reviewing an agency's predictive scientific judgments within its area of special expertise. *Balt. Gas & Elec. Co.*, 462 U.S. at 103.

## ARGUMENT

## I.    BLM'S ENVIRONMENTAL ANALYSIS COMPLIED WITH NEPA

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is

made available to the public so that they "may also play a role in both the decisionmaking

process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*,

490 U.S. 332, 349 (1989). To meet these dual purposes, NEPA requires that an agency prepare a

comprehensive EIS for "major Federal actions significantly affecting the quality of the human

environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.[4] NEPA imposes purely procedural

requirements. *See Robertson*, 490 U.S. at 351. In reviewing the sufficiency of an EIS, a court

should evaluate whether the agency has presented a "reasonably thorough discussion of the

significant aspects of the probable environmental consequences." *California v. Block*, 690 F.2d

753, 761 (9th Cir. 1982) (citation omitted). A court should not "substitute its judgment for that of

the agency," *id.*, or "'fly speck' an EIS and hold it insufficient on the basis of inconsequential,

technical deficiencies," *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126

F.3d 1158, 1183–84 (9th Cir. 1997) (citation omitted). Once the Court is satisfied that the agency

"has taken a 'hard look' at a decision's environmental consequences, the review is at an end."

*Block*, 690 F.2d at 761 (citation omitted).

The record here amply demonstrates that BLM took a "hard look" at environmental

impacts, including the environmental values and categories of impacts most important to

Plaintiffs. The FEIS, spanning over 500 pages (along with dozens of referenced studies and

reports), analyzed the affected environment and the Project's potential impacts on geology and

minerals; water; air; noise; soil; vegetation, wetlands, and riparian areas; wildlife; visual quality;

transportation; cultural resources; tribal treaty rights and interests; and social and economic

---

[4] The Council on Environmental Quality issued new implementing regulations in 2020. *See* 85 Fed. Reg. 43,304 (July 16, 2020). Because the challenged administrative actions were subject to previous regulations, *see* 40 C.F.R. § 1506.13, all citations herein are to the version of the regulations in effect at the time of the relevant decisions, 40 C.F.R. Part 1500 (2019).

conditions. *See* AR071283-385. The FEIS also addressed consultation with relevant agencies and

tribal entities, AR071387-88, and documented BLM's consideration of and responses to public

comments on the DEIS, AR071665-071757. Therefore, BLM satisfied NEPA's goal of

informing agency decision-makers and the public of the Project's significant environmental

effects. *Robertson*, 490 U.S. at 349. Plaintiffs' attempt to undermine BLM's reasoned decision

by "fly speck[ing]" alleged inconsistencies or deficiencies in the FEIS cannot defeat BLM's

robust analysis under NEPA. *Ass'n of Pub. Agency Customers*, 126 F.3d at 1183–84.

### A. BLM Adequately Considered Effects Related to the Soda Springs Processing Plant.

BLM properly considered the impacts associated with continuing operations of the Soda

Springs Plant. Plaintiffs argue that BLM's discussion was inadequate. *See* Pls.' Mem. 11-17.

However, BLM meaningfully considered the effects of transporting phosphate ore to the Plant,

and subsequent processing of that ore. BLM's discussion was particularly appropriate because

these effects have occurred throughout the Plant's long operation, and because BLM reasonably

concluded that they will continue to occur regardless of operation of the Caldwell Canyon Mine.

BLM disclosed and considered indirect and cumulative effects to air quality from

emissions at the Soda Springs plant, stating that such emissions reflect continuation of past and

ongoing activity that is limited by existing permit requirements, and that changes to any

emissions "would not be detectible" given the current and anticipated sources of phosphorous

ore likely to maintain these operations at the Soda Springs plant. AR071324-25 (FEIS); *see also*

AR003633 (DEIS). BLM also analyzed direct and indirect noise effects related to rail transport

of mined ore to the Soda Springs processing plant. *See* AR071328-29; *see also* AR003636-37.

Finally, BLM analyzed the direct and indirect effects to social and economic conditions related

to continuing operations of the Soda Springs processing plant. *See* AR071382-84.

BLM's analysis relies in part on the assumption that "P4 Production's Soda Springs plant would continue to operate albeit using a different ore source if Caldwell Canyon was not approved." AR071704; *see also* AR071286-87 (identifying multiple reasonably foreseeable sources of such ore other than the Project). The assumption was reasonable and the record contains evidence that P4 is pursuing other options for obtaining phosphate ore from its leases. *See* AR071286-87 (noting exploration drilling to gather information about phosphate reserves on Trail Creek will resume into 2019 and phosphate mining on Ballard Lease expected in 2019).

Plaintiffs go to great lengths to dispute this reasoning or to point out purported inconsistencies in BLM's rationale, Pls.' Mem. 12-14, but these discussions reflect the robust and healthy NEPA dialogue, not an illegal one. BLM considered the impacts associated with transport of mined ore and its processing at the Soda Springs plant. Ultimately, BLM explained:

> Ore processing at the P4 Production Soda Springs plant is an indirect effect of the Caldwell Canyon Mine. The indirect effects were noted in the Final EIS. The Soda Springs processing plant was identified as a past, present and reasonably foreseeable action and considered in the cumulative effects on resources where impacts (air and socioeconomic) would occur. The processing plants would not have cumulative effects on other resources such as wildlife and water.

AR004076 (ROD).

Dissatisfied with the depth of BLM's analysis, Plaintiffs draw comparisons between the FEIS at issue here and the one prepared for the Blackfoot Bridge Mine, which Plaintiffs characterize as being "more consistent with NEPA." Pls.' Mem. 14. Contrary to Plaintiffs' characterization, that 2011 FEIS adopted a similar approach leading to the same conclusion that "[u]nder the No Action Alternative, indirect impacts to air quality are not expected to change." *See* AR034403 (also noting that "P4 holds a number of other mining leases and other interests in phosphate ore reserves that could and would be expected to be developed to provide raw material to the processing plant in Soda Springs for continued operations"); AR034177-78 (noting that if

the Blackfoot Bridge Mine was not approved, "ore for P4's processing plant would be obtained from other sources (e.g., other new and existing mines) elsewhere in the phosphate district"); *id.* (explaining that even if the No Action Alternative were selected, another Mine Plan for the leases could be submitted in the future because phosphate leases grant the lessee the exclusive right and privilege to explore for and mine the phosphate deposit on the leased land and such leases are not cancellable by the United States); AR034400 ("Where required, all emissions that represent indirect impacts are fully permitted by the State of Idaho. Under the Proposed Action, such emissions would not be expected to change from current conditions and, therefore, would not have a significant impact.").

BLM's analysis is even more appropriate in light of the principle that "[a]n EIS need not discuss the environmental effects of mere continued operation of a facility." *Burbank Anti-Noise Grp. v. Goldschmidt*, 623 F.2d 115, 116 (9th Cir. 1980); *see also Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 234-35 (9th Cir. 1990); *W. Watersheds Proj. v. USDA Aphis Wildlife Servs.*, No. 1:20-CV-00213-BLW, 2020 WL 7318299, at *5 (D. Idaho Dec. 11, 2020). BLM explained that impacts involving constituents of potential concern ("COPC") from the Soda Springs processing plant are attributable to historic operations, and thus reflect baseline conditions rather than project-related impacts that might vary by alternative. *See* AR071679 (explaining that "issues identified in the EPA 2018 Five-Year Review result from historic COPC sources at P4 Production's Soda Springs elemental phosphorus plant"). Again, BLM concluded that effects associated with continuing operations at the Soda Springs would not meaningfully vary between alternatives. *See* AR071704 ("P4 Production's Soda Springs plant would continue to operate albeit using a different ore source if Caldwell Canyon was not approved").

Plaintiffs' significant reliance on *South Fork Band Council of West Shoshone of Nevada v. U.S. Department of the Interior*, 588 F.3d 718 (9th Cir. 2009), is misplaced. That decision mentions processing impacts to air quality in a section entitled "ore transportation" where the transportation at issue involved 70 mile shipments by truck "in two shipments per day, every day, for ten years." *Id*. at 725. There, BLM defended its complete absence of any consideration of effects by arguing that "no change in the rate of shipping and processing is forecast." *Id*. at 725-26. The panel rejected that explanation because "mine expansion" would create "ten years of environmental impacts that *would not be present in the no-action scenario*." *Id*. (emphasis added). While that reasoning may be valid for the start-and-stop life cycle of gold mining and processing in remote Nevada, it does not translate to phosphate production in southeast Idaho.

Plaintiffs' mistakenly argue that there will be environmental effects from the Soda Springs Processing Plant solely attributable to development of the Caldwell Canyon Project. But BLM reasonably considered any such effects and determined, given the nature and extent of the southeast Idaho phosphate patch, that they will not vary by alternative. BLM's discussion of these effects was reasonable and satisfies the APA's standard of review.

**B. BLM Adequately Considered Impacts to Sage-Grouse.**

When drafting an FEIS, an agency takes a "hard look" at the direct, indirect, and cumulative ecological impacts of a proposed action to include changes in growth, pattern of land use, and population density or growth rate. 40 C.F.R. § 1508.7-8 (1978); *Great Basin Res. Watch v. BLM*, 844 F.3d 1095, 1101 (9th Cir. 2016). These statements should be "based upon the analysis and supporting data" from scientific and environmental studies. *Id.* at 1502.8. But an EIS is not intended or expected to recite all of the data within the considered material or studies. Rather, the agency may incorporate supplemental material and analysis by reference, *id.*

§ 1502.21, and should adhere to reasonable page limits, *id.* § 1502.7, with the goal of preparing "analytic rather than encyclopedic environmental impact statements," *id.* § 1500.4(b) .

BLM meaningfully analyzed and disclosed impacts to sage-grouse and supported the FEIS with quantified information from supplemental studies. All studies referenced by incorporation were "cited in the statement," "briefly described," and "reasonably available for inspection by potentially interested persons." *id.* § 1502.21; *see also* AR004058. This assessment satisfies NEPA standards. Plaintiffs' claim that BLM insufficiently examined Project impacts on sage-grouse should be rejected.

      1.    <u>BLM considered and disclosed direct and indirect effects on sage-grouse habitat and populations.</u>

BLM began its hard look at sage-grouse impacts by examining baseline habitat areas, activity, and population. AR071344; *see also* AR071453–573 (Greater Sage-Grouse Habitat Assessment Technical Report); AR24378-412 (Habitat Equivalency Assessment); AR006481–96 (Noise Baseline Technical Report); AR007533-786 (Vegetation Baseline Technical Report). The findings from these baseline studies were examined along with disturbance projections and incorporated into BLM's direct and indirect effects analysis, which discussed project impacts on functional habitat, population connectivity, and species viability. AR071353-365; *see also* AR071593-651 (Environmental Noise Assessment); AR007533-786.

Plaintiffs first claim that BLM ignored functional habitat loss by "arbitrarily limiting its habitat analysis to the project footprint." Pls.' Mem. 18-19. This is based on an erroneously narrow interpretation of a single graphic in the habitat assessment that highlights the overlap of suitable sage-grouse habitat and BLM General Habitat Management Area boundaries. *See id.* at 18; AR071497. The record shows that BLM's analysis was neither arbitrary nor limited. Rather, the Greater sage-grouse analysis area covered approximately 100,000 acres surrounding the

1,559-acre Project area. AR071342 ("These analysis areas encompass the locations where direct and indirect effects on habitat and individual wildlife could occur from mining and ore transportation."); AR071353.[5] And because of the limited observational data of sage-grouse activity, *see* AR054791-792; AR071476-77, vegetation type and distribution were used to estimate total suitable habitat throughout the assessment area, even where there was no evidence of bird presence or activity, AR071478; AR071489; *see also Great Basin Res. Watch*, 844 F.3d at 1101 (finding that an agency may estimate baseline conditions as long as the data and methodology used is accurate and reasonable). This ensured that any subsequent estimate of habitat degradation would also be over- rather than under-inclusive. *See* AR071480.

The FEIS thoroughly analyzes functional habitat loss. The baseline assessments determined that the Project area "is not within the current [Greater Sage-Grouse] distribution area[,] [n]o seasonal habitats have been identified for the project area, and no winter habitat is identified anywhere within the East Central Idaho Population Area." AR071476. Less than 50 percent of the 100,000-acre study area contained vegetation and habitat suitable for the species, and the suitable acreage was further reduced when accounting for patch size and connectivity. AR071479-80. These findings considered together resulted in a "marginal" habitat suitability rating within the assessment area.[6] AR071483. The FEIS's description of habitat loss or modification as "long-term and moderate" is supported by the acreage of disruption, the

---

[5] BLM reviewed habitat interruption and suitability at four incrementally smaller scales from range-wide to site-specific, AR071488-89. At each scale, the assessment identified the percentage of analysis area made up of key habitat, breeding habitat, summer habitat, winter habitat, and non-habitat, and determined overall habitat suitability. *Id.*

[6] "Marginal" habitat is defined as: "Landscapes have patchy, fragmented sagebrush shrublands that are not well connected for dispersal and migration in portions of the population or subpopulation area. Anthropogenic disturbances that disrupt dispersal or cause mortality are present throughout all or portions of the landscape. Some lek groups or subpopulations are isolated or nearly isolated." AR071512.

acknowledgement that "habitat is already patchily distributed," and the data from supplemental studies. AR071362.[7]

Indirect effects from noise avoidance were also studied and documented. AR071325; AR006481-496; AR071593-651. The noise analysis area "extend[ed] in a two-mile radius" from the Project "to account for potential noise disturbance to Greater Sage-Grouse leks . . . and encompasse[d] the mine pits, haul roads, and railway loop." AR071325. BLM described baseline sage-grouse activity at each lek in the study area and quantified projected levels of noise increase at the pending lek near the Project site. AR071362; AR071610-631. BLM acknowledged that "greater than 10 dBA increase above ambient [levels] . . .  could reduce lek attendance or dissuade use of [leks]," AR071362, and that predicted noise levels "could negatively affect the success of the lek or cause it to be abandoned," AR071329. BLM explained that "[n]oise disturbances could result in dispersal movements away from mining activities," "[d]isplacement may result in unnecessary energy expenditure and potential disruptions in behavior that could ultimately impact reproductive success and survival," and "[d]ispersal into adjacent habitats may result in increased competition for resources with other individuals." AR071275.

Plaintiffs' assertion that BLM failed to evaluate whether the Project would increase risk of extirpation or impair species connectivity is similarly unfounded. These topics are critically interrelated to the loss of functional habitat and are addressed throughout the FEIS. The habitat assessment identified the total area and average, minimum, and maximum size of habitat and

---

[7] This data predicts that "species richness, diversity, and plant community structure would be permanently altered," particularly in the mixed shrub and big sagebrush/native grass vegetation types key to sage-grouse habitat. AR071339–40. Detailed projections of vegetation disturbance throughout the life of the mine reinforce BLM's anticipation of fragmentation and habitat loss beyond the project boundary based on connectivity and size of habitat patches identified in baseline studies. AR024411; *See* AR024389; AR024391; AR024395–403.

non-habitat patches within the study area and discussed the impact of patch size on connectivity and habitat quality. AR071478-480 ("[S]maller patches are often located adjacent to . . . non-habitat, reducing the connectivity of seasonal habitat patches and eliminating movement corridors between seasonal habitats."). Although not quantified in the FEIS, risk of extirpation is directly correlated to potential habitat loss. "[L]oss or modification of habitat types would . . . contribute to habitat fragmentation into smaller, isolated patches," AR071355, and "populations at the margins of suitable habitat . . . are less likely to be robust," AR071471. The FEIS also explained that removal of vegetation types suited to the species can result in "individual mortality" and "loss of . . . breeding site[s]." AR071355.

     BLM also considered and disclosed impacts to sage-grouse population connectivity. *See* AR071474-74, -82-83 (analyzing habitat connectivity). As the FEIS explained, "in Eastern Idaho, Greater Sage-Grouse populations are isolated and the distances among occupied habitat patches is high because sagebrush habitat is fragmented by wooded mountain ranges, and higher levels of anthropogenic disturbances e.g. agricultural land uses and transportation infrastructure land uses." AR071353. Plaintiffs also insist that the scope of analysis should have encompassed additional sage-grouse populations contained entirely within separate management zones. The FEIS noted that the 100,000 acre analysis area surrounding the proposed action is contained within Greater Sage-Grouse Management Zone IV, and the East Idaho Uplands Greater Sage-Grouse population within that area is not within a Priority Area for Conservation identified by the U.S. Fish & Wildlife Service. AR071353. Moreover, the small, isolated population in this area is separated from adjacent populations by 18 to 31 miles. AR071353. The analysis area considered for sage-grouse is three times the scope considered for any other species. AR071342. Considering the relative size of the Project area and the proximity to other management zones

and population areas, BLM's scope of assessment (encompassing an expansive study area) was entirely reasonable and adequate. *See Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 959 (9th Cir. 2003) (holding that where an agency's decision to limit the geographic scope of wildlife impact assessment is supported by reasoning in the EIS, that decision should be upheld).

The disclosure of total baseline habitat, lek activity, and quantifiable data about patch size, noise levels, and vegetation disturbance provided the agency and public with the best data available to anticipate Project impacts. Beyond these descriptions, exact calculations of disruption and viability outside the Project area would be highly speculative, particularly considering the limited evidence of sage-grouse in the area. *See* AR071482; AR054791-792; AR071476-77; *see also* 40 C.F.R. § 1502.22.

2.   BLM adequately analyzed the Project's cumulative impacts to sage-grouse.

NEPA requires an agency to consider impacts resulting from incremental additive effects of a proposed action when combined with "past, present, and reasonably foreseeable future actions" that may be "individually minor but collectively significant." 40 C.F.R. § 1508.7.

BLM's expansive cumulative impacts assessment "encompasses approximately 452,000 acres" and includes past, present, and reasonably foreseeable actions and disturbances within that area. AR071289, AR071341. The FEIS contains a table of these projects spanning three pages and over 100 years including a detailed description of project acreage, period of activity, and characteristics of the project site and ancillary facilities and infrastructure. AR071286-88. Where available, cites and links to planning and analysis documents for each project are included. *Id.*

Relying on *Lands Council v. Powell*, Plaintiffs criticize the cumulative impacts assessment for not containing individualized discussion of past projects and their impact on sage-grouse. Pls.' Mem. 20 (citing *Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005)). However, in *League of Wilderness Defenders Blue Mountains Biodiversity Project v. U.S. Forest*

*Service*, and *League of Wilderness Defenders Blue Mountains Biodiversity Project v. Allen*, the Ninth Circuit more recently upheld Council on Environmental Quality guidance explaining that aggregation of past actions is permissible and cumulative effect analysis does not require agencies "to list or analyze the effects of individual past actions unless such information is necessary to describe the cumulative effect of all past actions combined." 615 F.3d 1122, 1135-36 (9th Cir. 2010).

Here, BLM adequately assessed and summarized the cumulative impacts of regional actions on the sage-grouse. Section 3.9 (Wildlife) of the FEIS aggregates cumulative impact to all species, AR071364. BLM explained that "[n]egative effects on wildlife . . . include mortality of individual wildlife, loss of habitat, reduction of habitat functionality, displacement of wildlife from suitable habitat due to human activity, and habitat fragmentation resulting from these effects." AR071364-65. In doing so, the agency appropriately synthesized hundreds of pages of supporting data into a succinct and transparent impact analysis. *See* 40 C.F.R. § 1500.4(b); *Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781, 789-790 (9th Cir. 2001) (finding an EIS "adequately examine[d] the cumulative impacts" on wildlife where the agency summarized that "cumulative habitat losses could affect the nesting distribution or density of some species for more than one generation"). The Habitat Assessment also lists and maps sources of anthropogenic disturbances. AR071475-76; AR071483; AR071501.

Cumulative impacts to sage-grouse are further assessed in detail within FEIS sections 3.6 (Noise) and 3.8 (Vegetation). AR071330; AR071341-42. The noise analysis showed that "there are no active mines or other projects that would generate noise within the cumulative effects analysis area." AR071330. The vegetation analysis considered habitat loss impact to sage-grouse, noting that "historical and present mining activities would result in approximately 13,700

acres of disturbance," AR071341, and "reasonably foreseeable mining activities . . . would add approximately 6,900 acres of disturbance, increasing the amount of disturbance within the cumulative effects analysis area to about 64,600 acres," AR071342. While the Greater sage-grouse is not explicitly named in these sections, the context of the FEIS and supporting habitat assessments allows for identification of habitat degradation that would impact the species.

Despite Plaintiffs' concerns and disagreement with the scope of analysis, the FEIS appropriately and rationally summarizes the results of comprehensive scientific study. BLM based its statements on the data in the record. BLM has met NEPA's mandate to carefully examine and disclose indirect and cumulative project impacts.

### C. BLM Adequately Analyzed the Project's Impacts on Water Resources.

BLM took the requisite "hard look" at the impacts of the proposed Caldwell Canyon Project by preparing a comprehensive FEIS that examined effects on the quality and beneficial uses of groundwater and surface water. AR071294.

NEPA requires that an agency take a "hard look" at a proposed action's effects on the environment prior to decision-making. *Great Basin Res. Watch*, 844 F.3d at 1101 (quoting *Or. Nat. Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir. 1997)). The agency is given "substantial discretion" in its reasoned choice of and reliance on modeling methods. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 997 (9th Cir. 2014). Where the "analysis . . . requires a high degree of technical expertise," courts "must defer to the informed discretion of the responsible agency." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 361 (1989).

BLM assessed the Project's anticipated environmental impacts through extensive examination of highly technical reports and models. These reports are referenced by incorporation and "reasonably available for inspection by potentially interested persons." *id.* § 1502.21; *see also* AR004058; AR071305-06; AR071671; AR071678. BLM analyzed and

disclosed cumulative impacts from past, present, and future actions in the region and supported agency findings with quantified information. BLM's assessment satisfies NEPA standards and is entitled to heightened deference. Plaintiffs' claim that BLM insufficiently analyzed the Project's impact on water resources should be rejected.

       1.      <u>BLM adequately analyzed the effects of selenium-contaminated fugitive dust.</u>

       **a.   BLM disclosed methods and uncertainties of modeling impacts from selenium-contaminated fugitive dust.**

Contrary to Plaintiffs' claim that BLM failed to describe the types and limitations of modeling processes used for analysis of selenium impact on surface waters, Pls.' Mem. 22, the administrative record makes clear that BLM adequately disclosed its analysis methodologies.

BLM fully disclosed all studies conducted and reviewed during its analysis of potential selenium impacts. These studies assessed baseline surface and groundwater quality and flow, *see* AR012579-AR015926; AR010152-AR012578; AR016605-AR019463, selenium content within the affected area, *see* AR019545-AR020520; AR006267-AR006444, potential impact to groundwater flow and quality, *see* AR023684-AR024017, and potential transmission of selenium-contaminated fugitive dust within the study area, *see* AR020534-AR020550. The summary of these studies in the FEIS and their incorporation by reference fulfills NEPA's mandate that agencies "reduce paperwork and the accumulation of extraneous background data." 40 C.F.R. § 1502.1; *see generally* AR071294-322; AR071403-411.

Baseline water studies were conducted between 2014 and 2016, and "the baseline reports and addenda provide detailed discussions of the data collected and interpretations of the data." AR071296. BLM highlights that the types of geochemical testing conducted (rock analysis, static leaching testing, and column leach testing) *focused* on selenium because past regional studies identified it as a primary COPC. AR071304-05; *see also* AR006267-444.

Results from these tests were included in modeling of the Project's effect on both groundwater and surface water, and BLM prepared a detailed report of "input parameters, calibration and operation, and model sensitivity and uncertainty." AR071305; *see* AR023684-AR024017. BLM noted the degree of uncertainty inherent in modeling natural systems because of aquifer properties, hydrologic processes, and the lack of information about those variables within the modeled area. AR071305-06.

Transmission of selenium-contaminated dust to surface waters was assessed through modeling fugitive dust. *See* AR071312; AR020534-50. Variables within the fugitive dust modeling were also disclosed. For example, the study used flow data from the United States Geological Survey gaging station closest to the proposed mine site and described how the distance between the gaging station and site might bias concentration estimates. AR020542.

Plaintiffs refer to EPA comments suggesting the benefits of seasonal wind modeling as evidence that BLM's annual modeling techniques were inadequate. *See* Pls.' Mem. 23. These EPA comments suggest that dust emissions may be significantly lower or significantly higher based on seasonal changes. AR071682-83. However, BLM noted that the projected dispersion of dust would actually be *reduced* if precipitation or winter time conditions had been incorporated into the modeling. AR071683. Additionally, the modeling conservatively assumed that all dust emissions from the project would be emitted from a single point (rather than the wider area of emissions expected), with dispersion occurring uniformly in all directions. AR020534, 38-40.

In sum, BLM used "[a] conservative model of the selenium in dust from the mine [that] found negligible effects on selenium concentrations in surface water." AR071271. BLM's reliance on this model is reasonable, as it uses the best data available while acknowledging methodological limitations.

**b.  BLM disclosed existing impacts to surface waters and rationally concluded that the Project's fugitive dust is unlikely to impact surface waters.**

Contrary to Plaintiffs' contention, *see* Pls.' Mem. 25, BLM did disclose and consider that surface waters near the Project contain elevated levels of selenium, as well as other pollutants. *See, e.g.*, AR071300-01; AR020543-45. BLM disclosed and considered the results of multiple models to assess how emissions would impact surface waters. The agency reasonably concluded that the overall impact of fugitive selenium-contaminated dust would be negligible, through baseline water quality analysis, fugitive dust modeling, and the consideration of a dust control plan. AR071223.

Modeling of selenium-contaminated dust projected that "airborne dust would be generated that carries an estimated annual average of [approximately] 5.5 kilograms of selenium each year," little of which would be deposited into surface waters. AR071312; *see also* AR020534-50. BLM considered an extremely unrealistic "worst case scenario" where all emitted dust would be deposited directly into the Blackfoot River. AR020542. Under that scenario, the average selenium concentration in the River resulting from dust emissions would be less than one percent of the lowest water quality standard. *See* AR020544 (projecting selenium water concentration as 0.0000452 mg/L; showing lowest standard as 0.005 mg/L). For the dust alone to cause selenium concentrations in the Blackfoot River to exceed the lowest standard of 0.005 mg/L, *all* dust projected for an entire year would need to be "deposited directly into the Blackfoot River over about nine days" with stream flow at its lowest recorded daily average— another incredibly unrealistic scenario that demonstrates the minimal impact of the dust on water quality. AR071312. Accordingly, BLM rationally concluded that only a small portion of the estimated annual average of 5.43 kilograms of selenium in the dust would be deposited on surface waters. AR071312; *see* AR020538-40. To the extent that Plaintiffs now argue that BLM

should have specifically analyzed fugitive dust impacts from the Project's tipple and processing area on selenium levels in Dry Valley Creek, Pls.' Mem. 25, that argument was not presented during the administrative proceedings and is waived. *See infra* Section III.C.

BLM's finding of negligible increased selenium in surface waters is further supported by the fugitive dust control plan for the Project. That plan would additionally serve to mitigate potential dust impacts to surface waters by "using vegetated cover materials and water spray or surfactant on roads and other mine dust sources during operations." AR071224. Accordingly, BLM provided the "requisite rational connection" between best available science and its decision that the control plan would mitigate potential threats to surface waters and result in negligible impacts, *cf. Selkirk Conservation All.*, 336 F.3d at 957 (deferring to agency conclusion that a private conservation agreement containing mitigation measures would minimize species displacement, holding that the agency provided the requisite rational connection between best available science and its decision that the agreement mitigated threats).

Considered together, the modeling and mitigation plan, as well as a multitude of other measures that the Project would implement to protect surface waters,[8] supported BLM's conclusion that designated beneficial uses for the Blackfoot River and presumed beneficial uses

---

[8] Notably, BLM conditioned its decision on requirements that P4 comply with environmental protection measures ("EPMs"), best management practices ("BMPs"), and other requirements specified in the FEIS, ROD, and MRP; comply with a detailed environmental monitoring plan consistent with the draft plan (*see* AR071430-39); and monitor water quality to ensure EPMs are met. AR004031-33; AR071423-28 (describing how water will be managed, including discussion of the water management system, water management ponds, stormwater management, and systems to divert and/or manage rainwater and snowmelt); AR071432-34 (describing surface water monitoring plan); AR071438 (describing dust monitoring "in accordance with the Fugitive Dust Control Plan"); AR071439-41 (listing BMPs that may be employed for minimizing impacts to waters, including controlling run-on and runoff); AR071441 (listing dust-control BMPs); AR071444 (describing sediment control structures). *See* AR004057 ("Fugitive dust and surface water quality monitoring will be required as per the Environmental Monitoring Plan to be approved before implementation of activities requiring monitoring.").

for other waters in the area would not be affected. AR071312. Further discussion about the

impact to surface waters is therefore not required, and its omission is reasonable. *Cf. Edwardsen*,

268 F.3d at 787 ("[I]n light of the EIS' conclusion that [water] withdrawals would have a

minimal effect on water levels, the absence of any further discussion [about water withdrawal

impact on wildlife] is reasonable.").

Plaintiffs' allegations that BLM failed to describe the modeling process, its limitations, or

the impacts to surface water are unfounded. The agency is entitled to heightened deference on

matters of scientific expertise, and its assessment of impacts based on modeling and mitigation

plans is reasonable and satisfies NEPA's "hard look" requirement.

2.    BLM adequately analyzed the Project's cumulative effects to water resources.

BLM's analysis of cumulative Project impacts on water resources complied with NEPA

by considering the "incremental impact of the action when added to other past, present, and

reasonably foreseeable future actions." 40 C.F.R. § 1508.7. The FEIS established an appropriate

scope of analysis by accounting for past and reasonably foreseeable future projects within the

Upper Blackfoot Watershed, where "reasonably foreseeable" was defined to encompass projects

that had been approved or proposed as of the time of analysis. *Kleppe v. Sierra Club*, 427 U.S.

390 (1976) (only regional actions and proposals which are pending concurrently or pre-existing

must be considered with regard to cumulative effect); *see* AR071286-88 (detailing 100 years of

past, present, and reasonably foreseeable future actions including a description of project

acreage, period of activity, characteristics of the project site, and ancillary facilities and

infrastructure.). BLM supported its analysis with quantified information where available, thus

allowing for "[a]ccurate scientific analysis, expert agency comments, and public scrutiny," 40

C.F.R. § 1500.1(b). BLM also aggregated impacts from past actions where appropriate. *League*

*of Wilderness Defs.*, 615 F.3d at 1136 (agency not required to list or analyze effects of individual past actions unless information is needed to describe cumulative effect of all past actions).

The FEIS's cumulative effects section for water does not consist merely of "three vague paragraphs," Pls.' Mem. 26, but rather consists of eight paragraphs that reference and incorporate the study area map and two scientific studies containing quantifiable data about selenium contamination levels and characteristics of groundwater and surface water flows within the study area. AR071321-22; *see generally* AR053848-AR053891; AR058213-AR058567. Discussion of cumulative impacts was also incorporated into Chapter 3.4.2 of the FEIS (Affected Environment), where BLM described how the baseline water quality has been affected by past actions. AR071300-302. This section articulated impairment levels for specific surface water features and elevated background levels of selenium in groundwater samples. *Id.*

BLM adequately summarized and conveyed the cumulative impact of regional phosphate mining operations on selenium contamination. BLM acknowledged that past actions have degraded water quality, but that "recent analysis methods have resulted in the design of the active projects showing little potential for future impact." AR071321. The FEIS specified the elements of past phosphate mining operations that contribute to contamination (open pits and overburden piles), surface water features that have been impacted (Blackfoot River, Slug Creek, Dry Valley Creek, and other tributaries), and levels at which surface water and groundwater contamination are present (at or above chronic aquatic life standard in surface water). *Id.* The FEIS also analyzed the potential interaction between projected groundwater plumes created by the Proposed Action in the Wells Formation aquifer and concluded that "[t]he plumes would not overlap spatially with the cumulative effects related to other past actions and active projects, except the Conda Mine (Figure 9)." *Id.* As for the interaction with the past Conda Mine project,

the FEIS found that "commingling of plumes from the Proposed Action and the Conda Mine is very unlikely due to the shallow depth of the Conda Mine plume and the much greater depth predicted for the Proposed Action plume." AR071322.

In sum, BLM analyzed and disclosed all reports and models of environmental impacts to surface water, used its discretion in weighing and relying on technical data, and provided a detailed assessment of the cumulative regional impacts of past, present, and future actions. Plaintiffs' claims are contradicted by clear evidence in the administrative record and do not provide sufficient reason to ignore the heightened deference owed to the agency in its analysis of technical information.

### D. BLM Considered the Required Range of Alternatives.

NEPA's implementing regulations require agencies to "evaluate [all] reasonable alternatives." 40 C.F.R. § 1502.14(a). The range of alternatives an agency must consider is "dictated by the nature and scope of the proposed action." *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723, 729 (9th Cir. 1995) (quotations and citations omitted). As a result, "[p]roject alternatives derive from an Environmental Impact Statement's 'Purpose and Need' section." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). "An agency need not . . . discuss alternatives similar to alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (quotation and citation omitted). "Judicial review of the range of alternatives considered by an agency is governed by a rule of reason that requires an agency to set forth only those alternatives necessary to permit a reasoned choice." *Cal. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (quotations and citation omitted). "Thus, an agency's consideration of alternatives is

sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative." *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1181 (9th Cir. 1990).

First, contrary to Plaintiffs' claim, the alternatives BLM analyzed were not virtually identical. Rather, Alternative 1 was developed specifically to address concerns about the impact to water quality from predicted groundwater plumes under the Proposed Action. *See* AR071261-63) (explaining development and features of Alternative 1). Alternative 1 requires P4 to place a geosynthetic membrane on backfill areas in the mine pits to reduce the rate that COPCs reach groundwater. *Id*. Thus, not only are the action alternatives distinct, but their anticipated effects on groundwater are different. *See* AR071222 ("[The] mass loading of COPCs from the mine pit backfill into the groundwater system [under Alternative 1] would be reduced compared to the Proposed Action . . . result[ing] in much smaller COPC groundwater plumes."). Indeed, this is why BLM selected Alternative 1 over the Proposed Action Alternative. AR004005 ("Alternative 1 is the environmentally preferred alternative and best promotes the national environmental policy found in Section 101 of the NEPA."). Therefore, the Proposed Action Alternative and Alternative 1 are clearly distinct, and any similarities between the two do not violate NEPA. *See Laguna Greenbelt Inc. v. U.S. Dept. of Transp.*, 42 F.3d 517, 524 (9th Cir. 1994) (finding analysis of two action alternatives with only slight differences did not violate NEPA).

Second, BLM did not ignore or reject other reasonable alternatives without an adequate justification as Plaintiffs contend. "For alternatives which were eliminated from detailed study," the EIS must only "*briefly discuss* the reasons for their having been eliminated." *City of Sausalito*, 386 F.3d at 1207 (internal citation and quotations omitted). As outlined in the FEIS, at least thirteen additional alternatives relating to maximizing ore recovery, cover systems, ore transport/haulage, power supply, and water treatment were considered but eliminated from

detailed study. AR071264-27. Justifications for not including alternatives in detailed study can be found in each of the respective, considered alternatives. *Id*.

Plaintiffs claim that a fringe lease should have been analyzed because it would have allowed BLM "to impose more stringent lease stipulations for protection of Greater sage-grouse and other resources." Pls.' Mem. 30. But BLM reasonably declined to analyze a "fringe lease" alternative because it was outside the scope of the purpose and need of the project and did not need to be considered. *Carmel-By-The-Sea*, 123 F.3d at 1155; *see* AR071243 ("The purpose of the Caldwell Canyon Project is for the BLM to evaluate and respond to the MRP submitted for the recovery of phosphate ore and to *modify* leases, in accordance with the Mineral Leasing Act of 1920." (emphasis added)). A lease modification and fringe lease have the common goal of placing new federal lands under lease to accommodate off-lease ore outside of the competitive bidding process. *See* 43 C.F.R. § 3510.11. A lease modification is typically issued when the proposed lease modification area is adjacent to an existing federal lease and the acreage of the modified lease, including additional lands, is not in excess of the maximum size allowed for a lease. *Id*. A fringe lease, on the other hand, may be issued when the proposed lease is not adjacent to an existing federal lease (but is, for example, adjacent to a State phosphate lease or private lands) or when the proposed lease is adjacent to an existing federal phosphate lease but the acreage of the existing lease, including additional lands, would exceed the maximum size allowed for a lease. *Id*. This distinction explains why a lease modification adopts the terms and conditions of the existing lease, whereas a fringe lease requires the creation of a new federal lease. 43 C.F.R. § 3510.21. Because the proposed additional lands are adjacent to P4's existing federal lease, a lease modification, and not a fringe lease, was the appropriate vehicle to lease the

additional lands. Therefore, it would be outside the scope of the purpose and need of the FEIS to analyze a fringe lease alternative.[9]

BLM also reasonably considered but chose not to analyze in detail the alternative of maintaining the existing lease boundaries. As explained in the FEIS, while not modifying the lease boundaries would prevent disturbance of 113 acres of General Habitat Management Area ("GHMA") land, there is 7.25 million acres of primary and important habitat (which is of higher quality than GHMA land) protected in Idaho, and therefore the loss of 113 acres of lower quality habitat would have a negligible impact on the species. AR071269; *see also* AR071362 (analyzing the impacts of disturbing 113 acres of GHMA under the action alternatives). Therefore, BLM, in considering its obligation to ensure ultimate maximum recovery and use of all known mineral resources in accordance with 43 C.F.R. § 3590, in balance with its obligation to protect and preserve the environment, reasonably found that any potential minor benefits to sage-grouse from not modifying the lease boundaries would not justify the loss of 11.2 million tons of available phosphate ore. *See Headwaters, Inc.*, 914 F.2d at 1180 (an agency need not consider alternatives that are "inconsistent with the basic policy objectives for the management of the area").

In short, BLM analyzed a reasonable range of alternatives, and adequately explained why it considered but did not analyze in detail other alternatives.

---

[9] Even if BLM's regulations do not preclude issuing a fringe lease here, analyzing that alternative would be redundant because the environmental impacts are the same for a lease modification and a fringe lease. *N. Alaska Env't Ctr.*, 457 F.3d at 978 (An agency need not discuss alternatives similar to alternatives actually considered). In both cases, the approved MRP would be the same and the environmental impacts of the project would be the same since the analysis of either would include the same number of acres under lease, the same number of acres disturbed, and the same resulting mitigation measures. Moreover, mitigation measures are addressed in the ROD, not in the phosphate lease stipulations.

II.     **BLM'S APPROVAL OF THE MINE PLAN AND SUBSEQUENT RIGHTS OF WAY COMPLIED WITH RELEVANT SAGE-GROUSE REQUIREMENTS**

Plaintiffs allege that BLM's approval of the Caldwell Canyon Mine and subsequent rights of way violate certain RMP and Approved Resource Management Plan Amendment ("ARMPA") requirements, generally related to the application of lek "buffers" as defined in the 2012 Pocatello RMP, the 2015 ARMPA, and the 2019 ARMPA. First, the leks that Plaintiffs refer do not have the designated status of either "occupied" or "active" that would trigger the relevant buffer requirements. Second, even if the southernmost lek referenced in Plaintiffs' exhibit map could be considered "occupied" or "active," that lek is on private land, and therefore the RMP and ARMPAs do not apply to it.

Plaintiffs' contention that the "Dry Valley lek" is "occupied" is a misrepresentation of the record.[10] First, their characterizations of field observations in 2016, 2017, and 2018 at the "Dry Valley lek" misconstrue the record as they encompass observations at three different sites. "In 2016, very low numbers of displaying male Greater Sage-Grouse were observed and documented approximately 5,100 feet north of current pending lek 3C040. In 2017, very low numbers of displaying males were observed at the 3C040 pending lek location. In 2018, very low numbers of displaying males were observed 1,600 feet south of the pending lek 3C040. It is expected that the three display locations constitute one set of birds." AR071362; *see also* AR016510; AR074236 (explaining that the northern site documented in 2016 is referred to as 3C089); AR074205 (map).

---

[10] Plaintiffs refer to two alleged lek locations denoted as stars on their demonstrative exhibit, ECF No. 56, either as the "Dry Creek lek" or the "Dry Valley lek," although it is unclear which of the alleged leks the terms apply to. In any case, the northernmost star on Plaintiffs' map shows the location of a non-lek ("3C089") and the southern star shows the location of a "pending" lek ("3C040"). AR074248. Only the 3C040 lek is possibly relevant to the analysis. AR074248 ("The Northern lek [3C089] will be deemed inactive/not a lek. The southern one [3C040] will be listed as 'pending' as [IDFG] does not have enough info at this time.").

Second, Plaintiffs' statement that a BLM wildlife biologist "concluded" that the Dry Valley

pending lek constitutes an "occupied lek" under applicable agency guidance is also taken out of

context and does not accurately reflect the agency's final determination of the lek's location or

status.[11] Rather, as required under the 2015 ARMPA, "[i]n determining lek locations, the BLM

will use the most recent active or occupied lek data available from the state wildlife agency."

AR036260. In this case, the relevant state agency, IDFG, determined that neither of the pending

lek locations constituted an "occupied" or an "active" lek. AR074248.

Therefore, the various buffer requirements do not apply to the Caldwell Canyon Mine.

First, the Pocatello RMP's requirement of a 2.0 mile buffer between "occupied leks" and "new

infrastructure facilities/structures" (e.g., power lines), AR034972, does not apply to the Slug

Creek Powerline because the northernmost "lek" on Plaintiffs' demonstrative map is not a lek

and the southernmost lek is neither "occupied" nor within 2 miles of the Slug Creek Powerline.[12]

Second, the 2015 ARMPA's 3.1 mile "linear features" and "surface disturbance" buffer

requirements do not apply to the rights of way because those buffer requirements only apply to

"occupied" or "active" leks. AR036260.

---

[11] Plaintiffs' citations, AR074604 and AR074225, fall within a series of emails beginning on May 17, 2018, between BLM specialists, BLM managers, BLM's contractor and Idaho Department of Fish & Game ("IDFG") personnel. *See* AR074184-217; AR074604-16. The culmination of these discussions and deliberations is reflected in an August 30, 2018, email from the Idaho Falls BLM District Manager explaining "[o]f the 2 leks to the NE of the project area. The Northern lek [3C089] will be deemed inactive/not a lek. The southern one [3C040] will be listed as 'pending' as [IDFG] does not have enough info at this time. I am not sure if we have policy/precedent for pending. If not, I suspect we will need to defer to there not being a[n IDFG] 'approved' lek in that location." AR074248.

[12] BLM's authorization of the Slug Creek powerline also did not violate the 2019 ARMPA because the FEIS explained why burying the powerline would be impracticable. *See* AR071267 (explaining that "the expense is prohibitive, underground placement poses risks for inadvertent contact through digging, difficulty in maintaining the power line, and the fact that risks to wildlife from overhead power lines are mitigated").

Furthermore, even if the Dry Valley lek could be considered "active" or "occupied," it is on private land and thus falls outside the authority of the RMP and ARMPAs. As Plaintiffs concede, the 2012 Pocatello RMP applies only to BLM-managed lands, and the ARMPAs apply only to BLM-managed lands that have been designated as a sage-grouse habitat management area. *See* AR034930; AR036165 ("Any decisions in the ARMPA apply only to BLM-administered lands, including split-estate lands within [sage-grouse] habitat management areas (the decision area).").[13] And the goal of the ARMPAs is to protect sage-grouse habitat on federal lands in habitat management areas where sage-grouse are known or most likely to be found (because of the favorable landscape and vegetation). *See* AR036092 ("The ARMPAs strive to conserve [sage-grouse] and their habitat *on BLM-administered lands* across the remaining range of the species." (emphasis added)). Therefore, the ARMPAs, when discussing leks, refer to leks in habitat management areas on federal land, and the buffer requirements in the RMP and ARMPAs do not apply to leks on private lands.

In sum, BLM complied with FLPMA in approving the Project and subsequent rights-of-way because those authorizations did not run afoul of the relevant RMP and ARMPAs.[14]

---

[13] The ARMPA identifies three management area categories of sage-grouse habitat: (a) Priority Habitat Management Areas ("PHMA") "having the highest value to maintaining sustainable [sage-grouse] populations"; (b) Important Habitat Management Areas ("IHMA") having "moderate-to-high conservation value"; and (c) General Habitat Management Areas ("GHMA") which include "areas of occupied seasonal or year-round habitat" outside of the first two categories. AR071461-62. The ARMPA provisions apply only to BLM-managed lands and existing mineral leases are not included within any of the above-described Management Areas. AR071462; AR004069-70. As a result, approximately 69 acres of BLM-administered lands within the Project Area are within GHMA and subject to ARMPA Management Area prescriptions. AR071462; AR071497 (map).

[14] BLM's subsequent authorizations of rights-of-way also did not violate the 2015 ARMPA's requirement that compensatory mitigation achieve a "net conservation gain" to greater sage-grouse. *See* AR071574-91.

### III.    PLAINTIFFS CANNOT PREVAIL ON THEIR CLEAN WATER ACT CLAIM

### A. Plaintiffs' Clean Water Act Claim Is Not Cognizable.

Plaintiffs' claim that BLM's final actions violate CWA section 313, 33 U.S.C. § 1323, is not viable. Although the Ninth Circuit has evaluated similar claims under the APA, that court has not analyzed whether a federal agency's authorizations of third-party activities were properly within section 313's scope.[15] Because section 313 is a waiver of sovereign immunity, it must be construed narrowly. *Lane v. Pena*, 518 U.S. 187, 192 (1996) (stating that a waiver of sovereign immunity "must be unequivocally expressed in statutory text," it "will not be implied," and it "will be strictly construed, in terms of its scope, in favor of the sovereign"). Section 313 should not be applied to a federal agency's authorization of third-party activities.

Section 313 requires that federal entities "(1) having jurisdiction over any property or facility; or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity" regardless of any immunity of such entities. 33 U.S.C. § 1323(a). Nothing in section 313's plain language suggests that Congress intended it to apply to entities other than (1) federal entities that exercise control over a potentially-polluting property or

---

[15] *See, e.g.*, *Cent. Sierra Env't Res. Ctr. v. Stanislaus Nat'l Forest*, 30 F.4th 929, 932 (9th Cir. 2022) (stating, without analysis, that "federal agencies managing federal lands generally must comply with the water pollution laws and regulations of the relevant state"); *Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143, 1149 (9th Cir. 2010), as amended (Jan. 25, 2011) (citing section 313 in stating, without analysis, that the CWA "requires federal agencies to determine that approved actions do not result in pollution in violation of state water quality standards"); *Or. Nat. Res. Council*, 834 F.2d at 852 (concluding, without analysis of section 313, that plaintiffs' claim concerning nonpoint sources was reviewable under the APA).

facility, or (2) federal entities that are acting in a manner that may potentially pollute. Indeed, section 313's title—"Federal facilities pollution control"—demonstrates Congress' intent to address violations from federal dischargers.[16] Section 313 is not implicated here because BLM does not have jurisdiction over the property or facility at issue (i.e., the mine and related equipment), nor is BLM currently "engaged in" an activity that may release pollutants.

Plaintiffs suggest that BLM has "jurisdiction" over the federal mineral interests at issue. *See* Pls.' Mem. 39-40; *see also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) (stating that "jurisdiction" "is a word of many, too many, meanings" (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998)). But the "jurisdiction" in the first clause of section 313 refers to a federal agency's exercise of control over a "property or facility." *See Jurisdiction*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/jurisdiction (last visited July 25, 2022) (defining "jurisdiction" as "the power or right to exercise authority: control"). The mineral interests are not a "facility," nor are they the type of "property" that Congress had in mind.[17] Indeed, the Ninth Circuit has never premised application of section 313 on federal "jurisdiction" over mineral interests. The text of section 313, as well as legislative history, shows that the "property or facility" must be one that has the potential to contribute to water pollution, otherwise directing federal agencies to comply with requirements "respecting the control and

---

[16] Legislative history also demonstrates this intent. Prior to section 313's amendment in 1977, federal facilities were "the prime violator of environmental laws." 123 Cong. Rec. 39,212 (Dec. 15, 1977). The Supreme Court had ruled that federal facilities did not need to comply with state permit requirements. *EPA v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 227-28 (1976). Congress amended section 313 to clarify that federal discharges are subject to such requirements and to correct the de facto double standard for private and federal discharges. 123 Cong. Rec. 39,212; *see also id.* at 39,213 ("There is nothing sacrosanct about federal wastes.").

[17] Although the Clean Water Act does not define a "federal facility," various other statutes do. *See, e.g.*, 18 U.S.C. § 930(g)(1) (defining "Federal facility" as "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties.").

abatement of water pollution" would make no sense. *See* 33 U.S.C. § 1323(a). In sum, BLM

lacks jurisdiction within the meaning of section 313 over the relevant potentially-polluting

"property or facility" here—the mine and related equipment—which will be controlled by the

mine operator.

Although Plaintiffs do not argue that section 313's second clause applies to BLM's

challenged actions, that clause likewise indicates that Congress was focused on situations where

the federal entity is the discharger of pollutants. Congress could have extended section 313 to

apply to situations where the federal agency is simply authorizing an activity or granting a

permit, but it did not. Instead, it specified that the United States waives immunity where the

federal entity is "engaged in" the activity that might result in a discharge. In this context,

"engaged in" means "to begin and carry on an enterprise or activity" or "to do or take part in

something." *Engage*, Merriam-Webster.com, https://www.merriam-

webster.com/dictionary/engage (last visited July 25, 2022). When an agency, such as BLM,

simply issues an authorization for a project, it does not participate in or carry out the project.

Rather, it is acting in a regulatory oversight role of a third-party project. Congress could not have

meant to sweep such agency action into the section 313 immunity waiver. Indeed, section 313

expressly does not impose obligations on the federal government beyond those that apply to

nonfederal entities—entities that could not undertake the types of final agency action at issue

here, and that would only be subject to state requirements as potential dischargers. *See* 33 U.S.C.

§ 1323(a) (requiring compliance with state requirements "in the same manner, and to the same

extent as any nongovernmental entity"); *see also* S. Rep. No. 92-414, 92d Cong., 2d Sess. 77,

*reprinted in* 1972 U.S.C.C.A.N. 3668, 3734 ("This section requires that Federal facilities meet

all control requirements as if they were private citizens."); S. Rep. No. 95-370, 95th Cong., 1st

Sess. 77, *reprinted in* 1977 U.S.C.C.A.N. 4326, 4392 (1977) (describing section 313 as

subjecting federal facilities "to the same extent as any person is subject to these requirements").

Any ambiguity in section 313's scope must be construed in favor of immunity. *FAA v. Cooper*,

566 U.S. 284, 290 (2012); *Lane*, 518 U.S. at 192.

Courts that have considered this issue generally agree. *See*, *e.g.*, *City of Olmstead Falls v.

EPA*, 233 F. Supp. 2d 890, 897 (N.D. Ohio 2002) ("On its face, Section 313 acts to waive

sovereign immunity only where an arm of the federal government is an alleged polluter."); *Colo.

Wild, Inc. v. U.S. Forest Serv.*, 122 F. Supp. 2d 1190, 1194-95 (D. Colo. 2000) (concluding that

an agency's approval of a master development plan on federal land did not implicate section

313). *But see Cent. Sierra*, 304 F. Supp. 3d at 936-37 (finding that section 313 does not require

"that the government itself be the discharger" while also acknowledging that the Ninth Circuit

"has not squarely addressed" section 313's scope); *cf. Or. Wild v. U.S. Forest Serv.*, 193 F. Supp.

3d 1156, 1170 (D. Or. 2016) (declining to decide the issue and ruling for the government on the

merits); *Ctr. For Biological Diversity v. Wagner*, No. 08-302-CL, 2009 WL 2176049, at *14-16

(D. Or. June 29, 2009), *report and recommendation adopted*, No. 08-302-CL, 2009 WL 2208023

(D. Or. July 22, 2009) (same). Here, BLM is not a potential discharger and does not meet either

of section 313's criteria. Accordingly, BLM's final actions authorizing the Project fall outside

the scope of section 313, so cannot violate it.

## B.  Plaintiffs' Claim Concerning Point-Source Discharges Must Be Dismissed.

Even assuming that section 313 could be construed to apply to BLM's final actions here,

Plaintiffs cannot bring their claim alleging point-source violations under the APA, and they have

failed to provide the requisite notice of their claim. The CWA's citizen-suit provision authorizes

suit for alleged point-source violations. 33 U.S.C. § 1365. "Where plaintiffs may otherwise

proceed under the citizen suit provision, they should not be allowed to bypass the explicit

requirements of the Act," nor may they "circumvent the notice requirement . . . by resorting to the APA." *Or. Nat. Res. Council*, 834 F.2d at 851. Accordingly, Plaintiffs' claim that point sources will violate state water quality standards, *see* Pls.' Mem. 41-43, must be brought under the CWA's citizen-suit provision (or as a direct challenge to a CWA permit). But Plaintiffs have failed to allege such a claim. *See* Am. Compl., ECF. No. 49. Because Plaintiffs failed to provide the requisite notice, *see* 33 U.S.C. § 1365(b)(1)(A), the claim must be dismissed for lack of subject matter jurisdiction. *Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 916 (9th Cir. 2004) (stating that compliance with notice requirement "is required for jurisdiction.").

### C.  Plaintiffs Waived Their CWA Claim by Failing to Raise the Issue in Comments.

During an administrative process, such as the development of the FEIS and ROD here, "[p]arties must alert an agency to their position and contentions"—arguments that are not raised during the administrative process are waived. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1081 (9th Cir. 2011). A party fails to exhaust its administrative remedies "if an issue was not 'raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised.'" *Bahr v. Regan*, 6 F.4th 1059, 1082 (9th Cir. 2021) (quoting *Glacier Fish Co.*, 832 F.3d 1113, 1120 n.6 (9th Cir. 2016) (further citation omitted)). The exhaustion requirement "ensur[es] that the agency be given a chance to bring its expertise to bear to resolve a claim." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 900 (9th Cir. 2002). Here, Plaintiffs waived their arguments concerning compliance with state water quality standards.

Plaintiffs waived their arguments concerning fugitive dust. Plaintiffs argue here that selenium added to the Blackfoot River and Dry Valley Creek from fugitive dust will violate Idaho's antidegradation policy. Pls.' Mem. 40. And Plaintiffs contend that the Project's fugitive dust controls fail to comply "with Idaho's water pollution control requirements for nonpoint source pollution." Pls.' Mem. 41. But Plaintiffs did not raise these issues in their comments.

Indeed, their comments nowhere express the position that dust should be evaluated for compliance with state water quality standards. Plaintiffs' comments do not mention Dry Valley Creek, nor do they describe fugitive dust as subject to the CWA or state standards, including Idaho's antidegradation policy and best management practices ("BMPs") for nonpoint sources.

Likewise, Plaintiffs failed to comment on wind erosion of stockpiles, *see* Pls.' Mem. 41, or their three alleged categories of point sources, *see* Pls.' Mem. 41-43. Indeed, Plaintiffs' comments are devoid of any mention of point-sources or any argument that their three categories would violate water quality standards. In sum, during the administrative review process, Plaintiffs failed to alert BLM to its positions and contentions concerning compliance with the CWA and state standards. Therefore, Plaintiffs' arguments are waived and should be dismissed.

### D. Even if Plaintiffs' CWA Claim Is Justiciable, BLM Complied with CWA Section 313.

1.  <u>BLM's consideration of the Project's compliance was reasonable.</u>

BLM reasonably determined that the Caldwell Canyon Mine Project will comply with Idaho law for the control and abatement of water pollution. BLM considered the impacts of the Project on surface water and specifically conditioned its approval on "receipt of documentation from the IDEQ that [the Project] conforms to the Clean Water Act," AR004035, which BLM received, AR077097-99. BLM's approval was also conditioned on P4 obtaining and complying with "all necessary local, state, and federal permits and authorizations" and complying with "conditions defined by authorized agencies in their respective decisions" related to the Project. AR004031; *see also* supra Note 8 (describing additional requirements). Indeed, IDEQ helped to prepare the FEIS and evaluated the Project to ensure its compliance with Idaho water quality standards. AR077097; AR071213, 243, 389 (listing IDEQ as a cooperating agency). The FEIS analyzed projected impacts to surface waters and concluded that discharges to waters would be

in accordance with the MRP and regulatory permits. AR071311.[18] That is all that is required by the CWA and state requirements concerning the control and abatement of water pollution.

2.   <u>BLM's authorizations did not violate state laws.</u>

Plaintiffs' arguments that the Project will violate state laws respecting the control and abatement of water pollution misunderstand Idaho's laws. Plaintiffs allege violations of certain provisions of Idaho's rules entitled "Water Quality Standards." As noted above, IDEQ was a participating agency in the FEIS, and BLM's approvals in the ROD were conditioned on IDEQ's determination that the Project would comply with the State's water quality standards. Indeed, IDEQ expressly determined "that the Caldwell Canyon Mine will be compliant with Idaho's Water Quality Standards . . . if operated in agreement with the FEIS." AR077098. Importantly, IDEQ is the agency best-positioned to interpret Idaho's rules and evaluate the Project's compliance with them. Moreover, as explained below, the provisions of Idaho's rules that Plaintiffs allege were violated generally "do not directly apply, of their own force, to individual dischargers but instead reflect standards that regulators must take into account in fashioning the requirements that *do* apply to dischargers." *Cent. Sierra*, 30 F.4th at 941. And, as evidenced by the text and context of Idaho's rules, BLM's authorizations did not violate the standards. Accordingly, BLM has complied with any obligation it may have under CWA Section 313.

---

[18] Plaintiffs point out that BLM's statement in the FEIS that "[d]esignated beneficial uses for the Blackfoot River . . . would not be affected because selenium, other COPCs, and sediment would not be added" is inaccurate because BLM projected that selenium from dust *would* be added. Pls.' Mem. 44 (quoting FEIS). But that inaccuracy does not render BLM's authorizations arbitrary and capricious. As explained above, BLM reasonably predicted that the impact from deposition of dust would be nominal. *See* supra, Section I.C.1.b. And BLM explained that presumed beneficial uses for other waters would not be affected because implementation of BMPs would limit the addition of pollutants. AR071312.

**a. Selenium from fugitive dust will not violate Idaho's antidegradation policy.**

At the outset, Plaintiffs' argument concerning fugitive dust seems to erroneously interpret Idaho's antidegradation policy to be violated whenever any amount of pollution would be added to a water. *See* Pls.' Mem. 40. But the antidegradation policy does not automatically render any additional pollution a violation of state law. *See* Idaho Admin. Code r. 58.01.02.051 (antidegradation policy); *id.* at 58.01.02.052 (antidegradation implementation). The antidegradation implementation provision specifies that IDEQ conducts an antidegradation review when it receives an application for a permit or license, and IDEQ is tasked with evaluating the effect of an activity or discharge on water quality. *Id.* at 58.01.02.052.04, .06. Indeed, a different provision of Idaho's rules specifies that for waterbodies that do not meet water quality standards, "*the Department* [IDEQ] shall take those actions required by the antidegradation policy" and its implementation procedures. *Id.* at 58.01.02.055 (emphasis added). Further, for high-quality waters that have an additional level of protection under the antidegradation policy, the addition of pollutants may be allowed from point sources when "the highest statutory and regulatory requirements" are achieved, and from nonpoint sources when "cost-effective and reasonable [BMPs]" are applied. Idaho Admin. Code r. 58.01.02.051.02.

Moreover, where water quality criteria are not met or a beneficial use is not fully protected for a water, Idaho's rules governing nonpoint source activities generally consider nonpoint sources to *not* be in violation of water quality standards. *Id.* at 58.01.02.350.01.b. Those rules specify that if IDEQ determines that water quality criteria are not met or beneficial uses are impaired as a result of nonpoint activity, then IDEQ may impose a compliance schedule, operational controls, or modification of BMPs. *Id.* at 58.01.02.350.02. IDEQ may also review project plans for proposed nonpoint-source activities to determine whether the activity will fully

maintain or protect beneficial uses. *Id.* at 58.01.02.350.02.c. Indeed, IDEQ reviewed the Project and determined it would comply with Idaho's Water Quality Standards. AR077098. Thus, the dust cannot reasonably be considered to violate Idaho's antidegradation provision.

### b. Idaho's nonpoint-source rules lack Plaintiffs' alleged "requirement."

Plaintiffs next take issue with the Project's fugitive dust controls, arguing that they do not meet Idaho's "requirement" for BMPs. Pls.' Mem. 41. But the relevant regulatory provision does not specify a requirement for BMPs, which are defined as designed by relevant state agencies.[19] Instead, it simply states that BMPs "*should* be designed, implemented and maintained to provide full protection or maintenance of beneficial uses." Idaho Admin. Code r. 58.01.02.350.01.a (emphasis added). Indeed, the provision anticipates that BMPs may be insufficient to meet water quality criteria or fully protect a beneficial use and it provides a process for IDEQ to evaluate and modify BMPs, *id.* at 58.01.02.350.01.a, or take other action to limit pollution from nonpoint sources, *id.* at 58.01.02.350.02. In other words, the identification and implementation of appropriate BMPs is a matter left to IDEQ. The rules impose no direct requirement on nonpoint sources. Thus, because the provision of Idaho's rules governing non-point source activity does not contain the "requirement" Plaintiffs allege, BLM cannot have violated it.

### c. Fugitive dust from ore stockpiles does not violate state law.

Plaintiffs' argument that dust from ore stockpiles will violate another provision of state law, Pls.' Mem. 41, likewise lacks merit. The relevant provision states that "[h]azardous and deleterious materials must not be stored" near "state waters unless adequate measures and

---

[19] Idaho's Water Quality Standards define "Best management practice" as practices, techniques, or measures "developed, or identified *by, the designated agency* and identified in the state water quality management plan which are determined to be the cost-effective and practicable means of preventing or reducing the amount of pollution generated by nonpoint sources to a level compatible with water quality goals." Idaho Admin. Code r. 58.01.02.010.09 (emphasis added).

controls are provided to insure that those materials will not enter state waters." Idaho Admin. Code r. 58.01.02.800. Even assuming that the ore stockpiles might present a risk to state waters,[20] the provision is not self-implementing because such "[m]easures and controls will be judged by the Department" based on specified criteria. *Id.* at 58.01.02.800.01. Notably, IDEQ determined that the Project "will be compliant with Idaho's Water Quality Standards . . . if operated in agreement with the FEIS." AR077098. Accordingly, BLM has not violated this provision of Idaho's Water Quality Standards.

> **d.  The point-source discharges alleged by Plaintiffs do not violate water quality standards.**

As explained above, Plaintiffs' arguments concerning alleged point-source discharges are beyond the scope of CWA Section 313 and to the extent applicable, were waived. But even if the Court is inclined to consider those arguments, Plaintiffs cannot prevail for at least two reasons. First, discharges that are covered by a CWA permit must comply with that permit, which is generally deemed to be compliant with the CWA and state water quality standards. *See* Idaho Admin. Code r. 58.01.25.100.02 (CWA compliance); *id.* at 58.01.25.103.01 (permit's conditions must "provide for compliance with the applicable requirements" of Idaho's Water Quality Standards); *id.* at 58.01.02.400.02 (permitted discharge not subject to additional restrictions or conditions based on Subsection 080.01). Although Plaintiffs may be able to challenge a permit or allege violations of a permit if those facts come to pass, they cannot claim—prior to the grant of any CWA permit—that BLM's authorization of the Project and its point-source discharges resulted in an independent violation of water quality standards.

---

[20] Notably, the ore stockpiles will be managed to mitigate impacts to surface waters. *See, e.g.*, AR071425-26; AR071438-39.

Second, Plaintiffs seem to assume that Idaho's law prohibits *any* discharge of pollutants to waters that are not meeting water quality criteria for those pollutants. Pls.' Mem. 41-42. But the relevant provision specifies that a discharge violates water quality standards only if it "is in concentrations or in a manner that" can be expected to result in a violation of applicable water quality standards, "[w]ill injure designated or existing beneficial uses," or is an unauthorized discharge of a type that requires authorization. *Id.* at 58.01.02.080.01. Plaintiffs present no evidence that the point-source discharges they allege from the Project would meet those criteria.[21] Nor is it clear that such discharges would be disallowed under Idaho law. *See, e.g.*, *id.* at 58.01.02.051.02 (allowing for point-source discharges to protected waters if those discharges achieve "the highest statutory and regulatory requirements"). Further, although Idaho's law requires discharges to waters with a total maximum daily load ("TMDL")[22] to "be consistent with the allocations" in the TMDL, *id.* at 58.01.02.055.05, that provision is not self-implementing. TMDL allocations for point sources would be imposed through permits. *See* Blackfoot River Subbasin TMDL Addendum, AR049801 (considering that although the TMDL does not have an allocation for point sources, future permits for some point-source discharges may be permissible).

---

[21] As explained above, stormwater discharges would be covered by a permit, *see* AR071246; AR071426, so Rule 58.01.02.080 would not directly apply. And *even if* the Project's ditches, equipment, and railcars were point sources, BLM reasonably considered when it issued the authorizations here that *all* point sources would require a permit. *See* AR004031 (conditioning BLM's approval on P4 obtaining and complying with "all necessary local, state, and federal permits and authorizations" and complying with "conditions defined by authorized agencies in their respective decisions" related to the Project).

[22] A TMDL is a pollution budget, required under the CWA, for waters that do not meet applicable water quality standards. *See* 33 U.S.C. § 1313(d). TMDLs function primarily as planning devices. *See Pronsolino v. Nastri*, 291 F.3d 1123, 1129 (9th Cir. 2002).

In sum, similar to the state water quality standards at issue in *Central Sierra*, the provisions of the Idaho rules that Plaintiffs allege BLM violated here are not self-implementing, nor are they directly enforceable against BLM. *See Cent. Sierra*, 30 F.4th at 942-943 (stating that "a discharge that otherwise complies" with applicable provisions of state law does not violate state law "merely because the water quality objectives are not being met," and declining to restrict or prohibit the government's action just "because it assertedly contributes, perhaps with other contributing causes, to a failure to achieve certain of the water quality objectives"). Moreover, IDEQ—the agency tasked with enforcing Idaho's Water Quality Standards—was involved throughout the FEIS process and determined that the Project would comply with Idaho's Water Quality Standards. *See Greater Yellowstone Coal. v. Larson*, 641 F. Supp. 2d 1120, 1135 (D. Idaho 2009) (finding IDEQ's involvement and consideration of compliance with water quality standards "very persuasive"). Accordingly, BLM's determination that the Project will comply with state water quality standards was reasonable and should be upheld.[23]

## CONCLUSION AND REMEDY

For all the reasons discussed above, the Court should reject Plaintiffs' claims and affirm the validity of the challenged agency actions. However, if the Court rules in any respect for Plaintiffs, then it should conduct further proceedings to craft an appropriate remedy. Plaintiffs erroneously contend that the Court should apply the "presumptive" remedy under the APA and should vacate BLM's "authorizations" related to the Project. *See* Pls.' Mem. 44-45. In fact, any remedy here would involve an exercise of the Court's equity jurisdiction and necessitate a

---

[23] And for the same reasons, BLM complied with FLPMA's requirement that land use authorizations "contain terms and conditions which shall . . . [r]equire compliance with air and water quality standards established pursuant to applicable Federal or State law." 43 C.F.R. § 2920.7(b)(3); *see also* AR004048 ("Prior to initiating mining activity at the Caldwell Canyon Mine, BLM must be in receipt of documentation from the IDEQ that any or all of the Caldwell Canyon MRP conforms to the Clean Water Act, and the Idaho Ground Water Quality Rule.").

remedy carefully tailored to the circumstances of the particular case. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982). If the Court finds some aspect of one or more of BLM's decisions to be deficient, it may well find it necessary to remand the decision(s) to BLM for further proceedings. But on remand, "[w]hether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (internal quotation marks omitted)). The Court has broad discretion in fashioning a remedy, and "when equity demands, [agency action] can be left in place while the agency follows the necessary procedures" to revise its action. *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995).

Because the Court's equitable inquiry will necessarily be informed by the nature and scope of its ruling on the merits, this Court should decline Plaintiffs' invitation to vacate all of the challenged authorizations without first hearing from the parties in supplemental briefing. Plaintiffs have challenged the ROD, but also challenge a number of post-ROD actions, and suggest that all such "authorizations" should be vacated. Pls.' Mem. 45; *see id.* at 4-5 (specifying the "authorizations" that Plaintiffs challenge). They do so by inappropriately presuming that the Court will make certain rulings that will prevent BLM from "support[ing] the same authorizations on remand." *Id*. This hardly provides the Court a sufficient basis for balancing the *Allied-Signal* factors. Moreover, the Court's ruling might allow the parties to establish protective measures on remand to address any risk of environmental harm. *See N. Alaska Env't Ctr. v. Haaland*, No. 3:20-CV-00187-SLG, 2022 WL 1556028, at *5–6 (D. Alaska May 17, 2022) (finding vacatur unwarranted when agency suspended rights-of-way pending completion of

remand). Because it is yet unclear what violations, if any, the Court may find, any analysis of the *Allied-Signal* factors would be premature at this time.  Accordingly, the Court should allow an opportunity for remedy briefing in the event it finds for Plaintiffs on one of more of their claims.


Respectfully submitted,

DATED:  July 25, 2022.                    TODD KIM
                                          Assistant Attorney General
                                          United States Department of Justice
                                          Environment and Natural Resources Division

                                           /s/ *Shannon Boylan*
                                          PAUL A. TURCKE (ID Bar No. 4759)
                                          SHANNON BOYLAN (DC Bar No. 1724269)
                                          Trial Attorneys, Natural Resources Section
                                          P.O. Box 7611
                                          Washington, D.C. 20044
                                          (202) 353-1389 (Turcke)
                                          (202) 598-9584 (Boylan)
                                          (202) 305-0275 (facsimile)
                                          Paul.Turcke@usdoj.gov
                                          Shannon.Boylan@usdoj.gov

                                          SONYA SHEA (CA Bar No. 305917)
                                          Trial Attorney, Environmental Defense Section
                                          999 18th Street
                                          South Terrace, Suite 370
                                          Denver, CO 80202
                                          (303) 844-7231
                                          (303) 844-1350 (facsimile)
                                          Sonya.Shea@usdoj.gov

              Of Counsel:

              SCOTT W. HULBERT
              Attorney
              Office of the Solicitor-Boise Field Office
              960 S. Broadway, Suite 400
              Boise, ID 83706
              (208) 334-1911
              Scott.Hulbert@sol.doi.gov