UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, WESTERN WATERSHEDS PROJECT, and WILDEARTH GUARDIANS, | Case No. 4:21-cv-00182-BLW<br><br>MEMORANDUM DECISION AND ORDER |
| Plaintiffs, | |
| v. | |
| UNITED STATES BUREAU OF LAND MANAGEMENT, MARY D'AVERSA in her official capacity as District Manager for the Bureau of Land Management Idaho Falls District, and UNITED STATES DEPARTMENT OF INTERIOR, | |
| Defendants, | |
| and | |
| P4 PRODUCTION, LLC, | |
| Intervenor-Defendant. | |

## INTRODUCTION

This case involves a challenge to the United States Bureau of Land

Management's approval of a new open-pit phosphate mine in southeast Idaho—the

Caldwell Canyon Mine—which is to be operated by intervenor P4 Production. Plaintiffs allege that BLM's decision and analysis in approving the mine is arbitrary and capricious in violation of the National Environmental Protection Act, the Federal Land Policy Management Act, the Clean Water Act, and the Administrative Procedures Act. Before the Court are the parties' cross-motions for summary judgment. (Dkts. 58, 61, 64.) Also before the Court are Plaintiffs' motion for leave to file a surreply and motion to strike (Dkts. 72, 73.) For the reasons set forth below, the Court grants in part and denies in part the cross motions for summary judgment, denies the motion to strike, and grants the motions to file a surreply.

## BACKGROUND

Southeastern Idaho is the site of a federal phosphate program operated by the BLM and the U.S. Forest Service. The program includes 83 phosphate leases encompassing 43,000 acres. About 17,000 acres, or 23 square miles, are "disturbed" and there are 5 active mines and 15 inactive or closed mines. These mines are operated by several entities, including intervenor P4 Production, a subsidiary of Monsanto. Monsanto is, in turn, a wholly-owned subsidiary of Bayer AG.

Phosphate is used in many applications and products, including as an herbicide (Roundup), fertilizer, animal feed, metal finishing, flame retardants,

water-based paints and coatings, aviation fluids, potable water treatment, leavening

agents, carbonated beverages, and toothpaste. The mines in the southeast Idaho

phosphate program supply about 17 percent of the United States' and 3 percent of

the world's phosphate. The mining program also generates approximately $10

million in royalties, rents, and bonus bids, 50% of which is distributed to Idaho.

On February 17, 2017, BLM received a proposal from P4 for a Mine and

Reclamation Plan (MRP) in southeast Idaho. The proposal is for a new open-pit

phosphate mining project—the Caldwell Canyon Mine—along Schmid Ridge,

which is located about 13 miles northeast of the town of Soda Springs, Idaho. The

open pit mining would be conducted on existing federal phosphate leases (IDI-02,

IDI-014080, and IDI-13738) and an existing State of Idaho mineral lease

(E07959). The federal leases grant P4 exclusive development rights to the

phosphate deposits under the federal and private lands.

The Project would include two new open mine pits (the North Pit and the

South Pit) from which P4 would extract phosphate ore. (AR 4021-22.) It would

also require construction of haul and access roads, installation of a power line,

water management features, monitoring wells, shop and office facilities,

environmental protection measures, and reclamation. (*See* AR 4224-45, 16128-30).

The Project would result in new disturbance of approximately 1,559 acres of

previously undeveloped land. (AR 71250.) Surface ownership of this land is mixed—the BLM has surface ownership of 153 acres; the Forest Service has surface ownership of 7 acres; the State of Idaho has surface ownership of 230 acres; and the remaining 1,169 acres of the surface is in private ownership. (AR 71250, 71251.)

The Project would involve mining for about 40 years, with operations continuing year-round, 4 to 5 days per week in 2 10-hour shifts. (AR 71253, 4021-22.) The ore from the mine would be transported via truck and rail to the Soda Springs Plant, which is owned by parent company Bayer AG and operated by P4. The ore would be processed at the Soda Springs Plant to produce the herbicide glyphosate for use in Roundup products.

The Soda Springs Plant has been processing phosphate ore for many decades and currently processes phosphate ore from the Blackfoot Bridge Mine. The Blackfoot Bridge Mine was anticipated to be depleted and cease operations in 2022.

The Soda Springs Plant is an active federal Superfund Site. It was added to the National Priorities List due to concern that groundwater contaminated with selenium, cadmium, sulfates, and fluoride was flowing south from the property towards the town of Soda Springs. (AR 28495, 28427-34.) Subsequent

investigation revealed that there is also potential exposure of community members and employees to metals (arsenic and beryllium) and to radionuclides through groundwater contamination. (AR 28427.) In a 2018 five-year review report of the Soda Springs Plant Superfund Site,[1] the U.S. Environmental Protection Agency stated that the groundwater remedy for contamination at the site was not performing as intended:

> Groundwater monitoring data reveal that after initially decreasing, some COC [contaminants of concern] concentrations have been increasing over the last several years in some of the monitoring locations, and at some locations appear relatively stable above the RGs [remedial goals]. In addition, the COC selenium has been detected at the southern property boundary in monitoring well TW-65 at concentrations that exceeded its RG. Monitoring wells upgradient from the southern property line are interpreted to be increasing in the short-term . . . . These trends indicate the selenium is not attenuating at the previously-estimated rate.
>
> . . . .
>
> Attenuation rates have proved to be slower than originally predicted, for selenium in particular. These issues raise the uncertainty of the ability of the implemented remedy of MNA to achieve the goal of groundwater restoration within the 5- to 30-year timeframe. Groundwater cleanup performance standards have not been achieved as of 2017, and data suggest that those standards will not be achieved in the foreseeable future, particularly now that leaching from remaining COC sources has been positively identified.

---

[1] This 2018 report was the fifth five-year review report for the Soda Springs Plant Superfund Site.

(AR 28444.)

The COC source piles onsite at the Soda Springs Plant thus continue to contaminate groundwater, creating a plume that extends beyond the property boundary of the Plant. (AR 29432, 28440-41, 28444, 28446.) Not only will groundwater standards not be achieved in the foreseeable future, but EPA also found groundwater contamination from the Soda Springs Plant was contributing to surface water contamination in several streams and creeks that already exceed Idaho water quality standards. (*Ibid.*)

The Caldwell Canyon Mine Project, which will process ore at the Soda Springs Plant, was approved by BLM in a 2019 Record of Decision (ROD). After issuing the 2019 ROD, BLM issued rights of way (ROWs) associated with the Project, including for the East Caldwell Haul Road and for a water pipeline, fiber optic line, and powerline along the same corridor as the East Caldwell Haul Road. On September 19, 2019, BLM issued a Notice to Proceed, authorizing P4 to proceed with surface disturbance and initial mining activities for the Project.

Plaintiffs, Center for Biological Diversity, Western Watersheds Project, and WildEarth Guardians (collectively CBD) initiated this action in April 2021. They allege that the ROD and the final environmental impact statement (FEIS) upon which the ROD is based, violate the National Environmental Protection Act

(NEPA), the Federal Land Policy and Management Act (FLPMA), and the Clean

Water Act (CWA). Currently before the Court are the parties' cross motions for

summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law. *Karuk Tribe of

Cal. v. U.S. Forest Serv*., 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc). Because

this is an administrative record review case, the Court may grant summary

judgment to either party based upon a review of the administrative record. *Id.*

A federal agency's compliance with environmental laws is reviewed under

the Administrative Procedure Act (APA). 5 U.S.C. § 706; *see Ctr. for Biological

Diversity v. U.S. Dep't of Interior*, 581 F.3d 1063, 1070 (9th Cir. 2009); *Earth

Island Inst. v. U.S. Forest Serv*., 351 F.3d 1291, 1300 (9th Cir. 2003). Under the

APA, the reviewing court must set aside the agency's decision if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A). A decision is arbitrary and capricious if the agency has relied

on factors which Congress had not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its decision

that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise.

*O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th Cir.1996). An agency action is also arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Id.*

Thus, the agency must set forth clearly in the administrative record the grounds on which it acted. *See Atchison T. & S.F. Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 807 (1973). A court may not accept an agency's post hoc rationalizations for its action. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (citation omitted). "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* (citations omitted).

The reviewing court's inquiry must be "thorough," but "the standard of review is highly deferential; the agency's decision is entitled to a presumption of regularity, and [the court] may not substitute [its] judgment for that of the agency." *Id.*; *see Nat'l Wildlife Fed. v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927 (9th Cir. 2008) (Although a court's review is deferential, the court "must engage in a careful, searching review to ensure that the agency has made a rational analysis and decision on the record before it."). To withstand review under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for

its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

## NEPA CLAIMS

### A.    NEPA Statutory Framework

"NEPA imposes procedural requirements, but not substantive outcomes, on agency action." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989). Under NEPA, federal agencies must "assess the environmental impact of proposed actions that 'significantly affect[ ] the quality of the human environment.' " *WildEarth Guardians v. Provencio*, 923 F.3d 655, 668 (9th Cir. 2019) (quoting 42 U.S.C. § 4332(C)).

NEPA "serves two fundamental objectives. First, it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Id.* (citation and internal quotation marks omitted). "[S]econd, it requires that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Id.* (citation and internal quotation marks omitted). "In short, NEPA's purpose is to ensure that the agency will not act on incomplete information, only to regret its

decision after it is too late to correct." *Id.* (citations and internal quotation marks omitted).

"[T]o accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Powell*, 395 F.3d at 1027 (citation omitted). Further, courts are to "strictly interpret the procedural requirements in NEPA to the fullest extent possible consistent with the policies embodied in NEPA. [G]rudging, pro forma compliance will not do." *WildEarth Guardians*, 923 F.3d at 668 (citations, ellipses, and quotation marks omitted). Finally, "agencies must ensure 'that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.' " *Id.* (quoting 40 C.F.R. § 1500.1(b)).

With this statutory framework in mind, the Court turns to its analysis of CBD's NEPA claims.

### B.    BLM failed to adequately consider the indirect effects of processing ore at the Soda Springs Plant.

CBD argues that BLM failed to adequately consider the indirect effects of processing ore at the Soda Springs Plant and provided inconsistent rationale in response to comments that BLM was required to do so. The Court agrees.

"NEPA requires agencies to evaluate the direct and indirect effects of the proposed action." *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 737 (9th Cir. 2020) (citing 40 C.F.R. § 1502.16). "Indirect and direct effects are both 'caused by the action,' but direct effects occur 'at the same time and place' as the proposed project, while indirect effects occur 'later in time or [are] farther removed in distance.' " *Id.* (citing 40 C.F.R. § 1508.8(a), (b)). Agencies need to consider any indirect effects that are "reasonably foreseeable," or that " 'a person of ordinary prudence would take [ ] into account in reaching a decision.' " *Id.* (citing 40 C.F.R. § 1508.8(b); *EarthReports, Inc. v. F.E.R.C.*, 828 F.3d 949, 955 (D.C. Cir. 2016); 40 C.F.R. § 1502.22(b)).

Here, it is undisputed that processing of ore at the Soda Springs Plant is a reasonably foreseeable indirect effect of the Project and must be considered in the FEIS. BLM takes the position that it did so. Specifically, BLM contends that the Soda Springs Plant will continue to operate regardless of whether the Project is approved because ore would be acquired from another source if approval of the Project is withheld. (Dkt. 61-1 at 17-18.) Thus, BLM asserts that the Project does not have any indirect effect on the Soda Springs Plant. In support, BLM cites to AR 71704, 71286-87, which BLM contends demonstrate that P4 is pursuing other options for obtaining phosphate ore from its leases. P4 similarly contends that its

operation of the Soda Springs Plant will continue regardless of whether the Caldwell Canyon Mining Project is approved because it will simply obtain ore from other sources within the district. (Dkt. 64-1 at 14-15 (citing AR 24341, 35867-026, 71263, 71286-87, 71384, 71721, 74643-78).)

The cited portions of the record do not, however, support BLM's determination that the Project will not have any indirect effect on the Soda Springs Plant. This is because the record does not demonstrate that the Soda Springs Plant will continue operations in the same manner and for the same length of time whether or not the Project is approved. There is no information demonstrating that the alternative sources of ore would produce the same volume of ore and over the same amount of time as that anticipated from the Project. Moreover, there is no analysis or discussion of whether approval of the Project would result in extending the operation of the Soda Spring Plant for a longer time than the Plant would operate if the Project was not approved, and if so, the impacts of such extended operation.

Turning to the cited portions of the record, AR 71704 is a citation to a page in the FEIS at which BLM responds to the City of Soda Springs' comment regarding the impact if the Project is not approved, including estimated job losses. This comment disagrees with BLM's conclusion that the Soda Springs Plant would

continue to operate even if the Project was not approved, stating:

> The BLM suggests 185 job losses from the shutdown of the Blackfoot Bridge mine. This assumes that there would be an alternate source of phosphate ore and the manufacturing plant would not be affected because P4 could obtain phosphate ore from some other source and its plant could continue to produce elemental phosphorous. No one on behalf of the City of Soda Springs is aware of an alternative source of ore and the City does not believe that such an assumption is reasonable.

> If there is no alternate reliable source of ore and the Caldwell Canyon Mine is not approved, 795 people in the Soda Springs area would become unemployed as well as significant indirect economic consequences from job losses. These losses can only be described as catastrophic for a city which counts 25% of its households as employees of the P4 facility or other direct contractors. Needless to say, this would have a devastating effect on the city's property tax revenues and would make it impossible for the city to function anywhere near its current level.

> With respect to the economic consequences of the No Action Alternative, the DEIS does not [emphasize] enough the consequences of mine closure on property tax values, loss of funding for county and school services along with the general economic decline that would result in the loss of nearly 800 jobs. Further, the complications of relocating and re-training that size of work force is beyond anything that Caribou County could do . . . .

(AR 71704-05.) In response to this comment, BLM stated:

> The analysis in [the relevant section of the EIS] does assume that the no action would mean the leases would not be mined and the loss of mineral royalty and jobs is disclosed. The EIS recognizes that mine and support employees may leave the area, which could adversely affect property tax revenue. The cost of job retraining is beyond the scope of the analysis as it is highly speculative, however, the EIS does recognize that employees may need to relocate.

It is not expected that the property taxes paid to the county by P4
Production would be lost if P4 Production did not mine Caldwell
Canyon. It is assumed in the EIS that P4 Production's Soda Springs
plant would continue to operate albeit using a different ore source if
Caldwell Canyon was not approved. Utilizing phosphate ore from
different mines to feed a plant is not an uncommon occurrence in the
southeastern Idaho phosphate district.

(*Id.*)

BLM's response to the City of Soda Springs' comment merely reiterates the
position BLM is taking here on summary judgment—that if the Project is not
approved, the Soda Springs Plant will continue to operate using an alternative
source of ore. That response does not address whether the Soda Springs Plant will
continue to operate in the same manner and for the same length of time regardless
of whether the Project is approved.

AR 24341, 71721, and 71286-87 are citations to tables in the April 2019
Final Biological Assessment for Federally Listed Endangered, Threatened,
Proposed and Candidate Species for the Proposed Caldwell Canyon Activity (AR
24341) and the FEIS for the Project (AR 71721, 71286-87). The tables are in
relevant part the same in both documents. They provide a list of past projects in the
area of the Project and reasonably foreseeable future projects. The only active or
reasonably foreseeable projects involving Monsanto/P4 in those tables—outside of
the Caldwell Canyon Project—is the Trail Creek Exploration and the Ballard

Lease.

The Trail Creek Exploration is designated in the tables as "In Progress" and the tables indicate that this future project involves "Exploration drilling to gather information about phosphate reserves on portions of [the] federal phosphate leases and three off lease areas" that will resume in 2019.[2] As to the Ballard Lease, the tables indicate that implementation of the Ballard Lease project was expected in 2019, and that the Ballard Lease project will involve phosphate mining on the previously disturbed Ballard Mine to recover ore and facilitate reclamation. No additional disturbed areas will be involved. There is nothing in the tables addressing how much ore is anticipated to be recovered during the Ballard Lease recovery and reclamation project or how long it will last. In sum, there is nothing in the tables indicating that the projects in Trail Creek and/or Ballard Mine would provide the same or a similar volume of ore as is expected from the Caldwell Canyon Project. Nor is there anything in the tables indicating that the Trail Creek and/or Ballard Mine projects would otherwise keep the Plant operating for an additional 40 years, as is anticipated if the Caldwell Canyon Project is approved.

---

[2] The Court attempted to follow the link provided in the table to find more details regarding the Trail Creek Exploration, but the link led to a page on the BLM website stating: "The URL was not found on this server."

Additionally, AR 35867-026 is a citation to a 161-page document—the June 2013 Caldwell Canyon Prospecting and Exploration and Trail Creek Exploration Drilling Programs Environmental Assessment. Providing this general citation to a 161-page document, without providing specific citations to the portions upon which the party relies, is insufficient. "Judges are not like pigs, hunting for truffles buried in the [administrative] record." *Albrechtsen v. Bd. of Regents of Univ. of Wisconsin Sys.*, 309 F.3d 433, 436 (7th Cir. 2002) (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Nonetheless, the Court conducted a high-level review and acknowledges that the document demonstrates that P4 intended to conduct exploration drilling on the leases held by P4/Monsanto in the Trail Creek area. This information does not, however, demonstrate that the Trail Creek project would provide the same quantity of ore for processing at the Soda Springs Plant, and for the same period of time, as the Caldwell Canyon Project. Nor does this information address whether approval of the Caldwell Canyon Project would extend operations of the Soda Springs Plant for a longer period of time than it would operate if the Project was not approved.

Finally, AR 74643-78 is a citation to a 36-page letter dated July 3, 2013, from P4 production to BLM making a formal request to conduct proposed exploration activities on federal leases located in Caldwell Canyon and the Trail

Creek area. Again, P4 provides no citation to any specific page in this document. There is no citation to information regarding the phosphate ore potential in the Trail Creek area or that otherwise demonstrates that Trail Creek could replace and act as an equivalent substitute source of ore for the Soda Springs Plant if the Caldwell Canyon Project does not proceed.[3]

In sum, the citations to the record provided by BLM and P4 do not support BLM's assumption that the Soda Springs Plant would continue to operate at the same level and for the same length of time regardless of whether the Caldwell Canyon Project is approved. BLM has failed to address whether the potential alternative sources of ore for the Plant would be developed whether or not the Caldwell Canyon Project is not approved. BLM has also failed to address whether those potential alternatives would provide the same amount of ore for the same length of time as the Caldwell Canyon Project. BLM's assumption that there was an equivalent alternative source of ore should the Caldwell Canyon Project not proceed was therefore arbitrary and capricious and not in compliance with NEPA

---

[3] P4's argument that it was not required to have concrete plans or approved permits for alternative ore sources at the time of the Caldwell Canyon FEIS misses the point. At issue here is not whether P4 did or did not have concrete plans or approved permits. Rather, at issue is BLM's assumption that there is a perfect substitute for the Caldwell Canyon Project and failure to provide citations to information in the record that supports that assumption.

or the APA. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 647, 650 (9th Cir. 2010) (BLM's assumption that the mining would occur in the same manner and to the same extent regardless of whether the project proceeded was unreasonable where "[t]here is nothing in the record supporting" that assumption); *WildEarth Guardians v. United States Bureau of Land Mgmt.*, 870 F.3d 1222, 1235 (10th Cir. 2017) (BLM's assumption that there was a perfect substitute for coal should it decline to approve a project was arbitrary and capricious where assumption was not supported by citations to information (other than the BLM's own unsupported statements) in the administrative record). Finally, BLM' failure to address whether approval of the Project would result in extending the operations at the Soda Springs Plant for longer—potentially for 40 years longer—than it would operate under the no action alternative, and the impacts of that extended operation, was also arbitrary and capricious and not in accordance with NEPA and the APA. *See S. Fork Band Council Of W. Shoshone Of Nevada v. U.S. Dep't of Interior*, 588 F.3d 718 (9th Cir. 2009) (BLM's failure to consider impacts from transport and processing of ore from proposed gold mine over a 10-year period violated NEPA where mine expansion would create 10 years of environmental impacts that would not have been present in no-action scenario).

### C.   BLM failed to take a hard look at the impacts on greater sage-grouse

The Greater Sage-Grouse analysis area consists of 100,000 acres around the proposed Project and represents the seasonal habitat needs of the local sage-grouse population—the East Idaho Uplands[4] Greater Sage-Grouse Population—a population that is already classified as being at "high risk." (AR 65171-72, 71353.) CBD argues that BLM violated NEPA by failing to take a hard look at the Project's (1) direct and indirect impacts on this sage-grouse habitat, (2) the local sage-grouse population, and (3) the cumulative impacts on the sage-grouse.

### 1.   Direct and indirect impacts on sage-grouse habitat and populations

CBD argues that BLM failed to take a hard look at the impacts on sage-grouse habitat and populations by overlooking three key impacts of the Project: (a) functional habitat loss, (b) risk of extirpation, and (c) connectivity between sage-grouse populations.

#### a.   *Functional Habitat Loss*

As to functional habitat loss, CBD argues that BLM's analysis reflects only the areas that would be impacted by direct disturbance, i.e., by the mine footprint,

---

[4] There are references in the administrative record to both the East Idaho Uplands population and the East Central Idaho population. These populations appear to be one and the same.

and ignores the indirect habitat loss that will occur beyond the mine footprint such as through powerline, road, and railroad avoidance, and habitat fragmentation. CBD contends that this omission is significant because functional habitat loss can be orders of magnitude larger than a project's physical footprint.

BLM does not deny that functional habitat loss is an important consideration but instead contends that the FEIS discussed the topic of functional habitat loss "thoroughly." However, the citations to the record provided by BLM and P4 are insufficient to demonstrate such a thorough analysis. Indeed, as CBD points out, only a few of the provided citations discuss behavioral avoidance or the impact of habitat fragmentation.

The FEIS determined that the sage-grouse analysis area contains one occupied lek (3C028); three undetermined leks (3C014, 3C035, and 3C038); and one pending lek (3C040). (AR 71353-54.) The FEIS concludes that the occupied lek (3C028) is unlikely be directly impacted by mining activities due to the distance from those activities. (AR 71362.) As to the undetermined leks (3C014, 3C035, and 3C038), the FEIS found the use of those leks to be unknown. The FEIS further found that there would be negligible impacts on birds attending those leks due to the distance away from mining activities but that undetermined lek 3C038 "may experience some level of visual and audible disturbance from use of the

railroad." (*Id.*)

As to the pending lek (3C040), the FEIS noted that the lek is located on private property, is only 1.0 miles from the mine and 0.38 miles from the railroad, and would be subjected to increased noise levels. (AR 71362; *see* AR 71325.) The FEIS concluded that the "noise from mining operations could reduce lek attendance or dissuade future use" of the lek, and could cause the lek to be abandoned. (AR 71362, 71325; *see* AR 71329 (finding that the Project will result in noise impacts at lek 3C040, including from construction, reclamation, and operations, and "could negatively affect the success of the lek or cause it to be abandoned.").)

Thus, the FEIS does discuss leks, and potential impact of the Project on the leks. However, the FEIS does not discuss or analyze the impacts of the Project of functional habitat in areas outside of the leks.[5] It also appears that when BLM was describing the amount of sage-grouse habitat that would be lost or modified, BLM accounted only for the footprint of the Project area and did not take into account the impacts outside of the Project's footprints, such as in the buffer zones. (*See,*

---

[5] BLM does cite to a generic discussion in the FEIS regarding the impacts of the Project on wildlife and birds in general (*see* AR 71275). However, this generic discussion is insufficient to demonstrate that BLM thoroughly analyzed the impact of the Project on sage-grouse functional habitat.

*e.g.,* AR 71362 ("The action alternatives would result in a loss or modification to

113 acres of GHMA[General Habitat Management Area].").)

Finally, the Court rejects BLM's and P4's attempts to minimize and

downplay the value of the Project Area for sage-grouse habitat. First, although the

habitat is classified as "marginal," all habitat for the East Idaho Uplands population

is similarly classified as "marginal" and, further, most of the Project Area is

designated sage-grouse habitat. (*See* AR 16527, 16533, 71472.) Moreover, the

record makes clear that seasonal habitat had not yet been identified in the analysis

area only because the needed mapping in the vicinity of the Project Area had not

yet occurred. (*See* AR 71476 (explaining that seasonal habitats have not been

identified and that previous "attempts at seasonal habitat mapping in proximity to

the Project Area hadn't occurred"). Finally, as noted, there are multiple leks in the

vicinity of the Project, as well as numerous sage-grouse sightings.

In sum, BLM failed to adequately consider the impact of the Project on

sage-grouse functional habitat.

### b.  Risk of Extirpation

CBD argues that BLM failed to adequately consider and analyze whether the

Project would put the local sage-grouse population at greater risk of extirpation.[6] BLM does not dispute that extirpation was not explicitly discussed in the FEIS. However, BLM contends that the issue of extirpation is critically interrelated to the loss of functional habitat, that habitat loss is addressed throughout the FEIS, and that BLM has thus complied with NEPA. The Court disagrees.

The local population—the East Idaho Uplands population—is classified as being at "high risk," and is isolated with a low probability of persistence. (AR 16508, 65117, 65171-72.) Leks in the Project Area have also exhibited declining counts since the mid-1970s. (AR 71354.) Habitat loss and fragmentation contribute to the isolation of a population and the risk of extirpation. (AR 65104.) And here, the Project would eliminate a large amount of the local sage-grouse population's habitat, negatively impacting connectivity. According to the FEIS, the Project will result in the loss or modification of 113 acres of the GHMA and 868 acres of key habitat outside of the GHMA, for a total loss or modification of 981 acres of largely intact/mature habitat "within a region where Greater Sage-Grouse habitat is already patchily distributed." (AR 71362.) The FEIS concluded that the overall effects of the habitat loss "would be expected to be long-term and moderate." (AR

_____

[6] The term extirpation means that a species no longer exists in a particular area, but still exists elsewhere.

71362.) However, there is no discussion or evaluation in the FEIS of the impact on the viability of the local population.

BLM and P4 have provided citations to particular pages in the record in support of their arguments that the risk of extirpation was adequately considered. For example, they provide a citation to portions of the FEIS that discuss the current status of the local sage-grouse population; how the "loss or modification of habitat types would . . . contribute to habitat fragmentation into smaller, isolated patches"; how "populations at the margins of suitable habitat . . . are less likely to be robust"; and how removal of vegetation types suited to species can result in "individual mortality" and loss of breeding sites. (AR 71354-55, 71362, 71455-573, 71471, 71593-651.) While these aspects of BLM's analyses are important and necessary, they are simply insufficient to demonstrate that BLM adequately considered the impact of the Project on the viability of the local population.

In sum, the analysis and discussion in the FEIS regarding habitat loss is simply insufficient to meet BLM's obligation to adequately consider the impact of the Project on the viability of the local sage-grouse population.

### c. Connectivity between populations

CBD contends that BLM violated NEPA by entirely failing to consider how the mine would impact connectivity between sage-grouse populations, despite the importance of connectivity to species viability and despite comments requesting

that BLM consider whether the mine would impair connectivity between the local population and other populations.

Connectivity between sage-grouse populations, or "population connectivity," refers to the ability of sage-grouse to intermingle with neighboring populations. Population connectivity is critical for maintaining the viability of the species because it allows for genetic interchange and movements between breeding populations. (AR 36914, 62255, 47826, 65129, 62178.) Loss of population connectivity can increase population isolation and result in the loss of genetic diversity and extirpation from stochastic events, such as drought or wildfire. *W. Watersheds Project v. Bernhardt*, 519 F. Supp. 3d 763, 799 (D. Idaho 2021).

BLM does not dispute the importance of population connectivity, nor does BLM dispute that it was required to give adequate consideration to population connectivity.[7] BLM instead takes the position that it adequately considered and

---

[7] At the same time, BLM and P4 appear to take the position that BLM was not required to consider population connectivity. They point out that the local population is not within a Priority Area for Conservation identified by FWS, the local population was the only population in the assessment area, and the local population is separated from adjacent populations by 18 to 31 miles. However, they do not provide a citation to the record that support their position that population connectivity was not relevant and did not need to be analyzed. Indeed, the record indicates that seasonal migrations of sage grouse of up to 100 miles have been noted, and average migration is around 21 miles. (AR 62178.) The Court rejects BLM's and P4's attempts to minimize the importance of, and justify the lack of assessment of, the impact of the Project on population connectivity.

disclosed the expected impacts the Project would have on population connectivity. However, the citations provided by BLM and P4 do not demonstrate adequate consideration of this critical factor in maintaining the viability of the local sage-grouse population.

For example, BLM cites to AR 71474, 71482, and 71483. These portions of the record discuss *habitat* connectivity, e.g., connectivity between habitat patches and seasonal use areas by the same population. There is no discussion of *population* connectivity or the impact of the Project on population connectivity.

BLM also cites AR 71342, at which the FEIS discusses that the analysis area is intended to encompass locations where direct and indirect effects from the Project could occur; that the analysis area for wildlife other than sage-grouse was 29,346 acres; and that the analysis area for the sage-grouse was approximately 100,000 acres. However, again, there is no discussion of population connectivity or the impact of the Project on population connectivity.

Finally, BLM cites AR 71353, at which the FEIS discusses sensitive wildlife in the analysis area, including sage-grouse. The FEIS references the project-specific sage-grouse habitat assessment report contained in Appendix C of the FEIS and summarizes some of the findings from that assessment, including that the assessment area contains 17,602 acres of key habitat; that the habitat was rated as

marginal; and that the Eastern Idaho sage-grouse populations "are isolated." (AR 71353.) Once again, there is no discussion of population connectivity or the impact of the Project on population connectivity.

P4 provides additional citations in support of BLM, including to the project-specific sage-grouse habitat assessment report (AR 71471-72, 16541); to a map that shows the different sage-grouse conservation areas (AR 36257); and to a table that sets out the sage-grouse populations in Idaho and Montana (AR 65118). There is not, however, any discussion of population connectivity or the impact of the Project on population connectivity.

In sum, BLM failed to adequately consider the impact of the Project on the connectivity of the local sage-grouse population with other sage-grouse populations.

### 2. Cumulative impact on sage-grouse

CBD argues that BLM failed to take a hard look at the impacts of the Project by failing to adequately consider the cumulative impacts of the past, present, and reasonably foreseeable future projects on sage-grouse. The Court agrees.

NEPA requires that an EIS consider the cumulative impact of the proposed action. 40 C.F.R. § 1508.7. "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency

(Federal or non-Federal) or person undertakes such other actions." *Id.* "A proper consideration of the cumulative impacts of a project requires some quantified or detailed information; *general statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.*" *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971 (9th Cir. 2006) (emphasis in original) (quoting *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Management*, 387 F.3d 989, 993 (9th Cir. 2004)). "The analysis must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects in the area." *Id.* (citation omitted). Further, the "cumulative impacts analysis must do more than merely catalogue relevant projects in the area." *Indigenous Env. Network v. U.S. Dept. of State*, 347 F. Supp. 3d 561, 578 (D. Mont. 2018). Instead, the agency must discuss and analyze the impacts of the projects "in sufficient detail to assist 'the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts.' " *Id.* (citing *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971 (9th Cir. 2006)).

Here, BLM contends that it adequately analyzed the Project's cumulative impacts on sage-grouse by engaging in an expansive cumulative impacts assessment that encompassed approximately 452,000 acres and included past,

present, and reasonably foreseeable future actions and disturbances within the area. (Dkt. 61-1 at 24-26 (citing AR 71286-88, 71289, 71330, 71341-42, 71364-65, 71475-76, 71483, 71501); Dkt. 70 at 9-10). P4 similarly contends that the FEIS adequately discussed the cumulative impacts of the Project, including all past, present, and reasonably foreseeable future projects. (Dkt. 71 at 13-14 (citing AR 71364); Dkt. 64-1 at 19-21 citing 71321, 71325, 71326, 71334, 71342-43, 71364).) The cited portions of the record do not, however, provide an adequate discussion of the cumulative impacts on sage-grouse of the past, present, and future projects.

For example, at AR 71286-89, the FEIS contains a table that provides a catalogue of the past, present, and anticipated future projects, including the timeframe for each project, the number of acres involved, and a short description of the project for present and future projects. There is no discussion regarding the cumulative impacts of the past, present, and future projects on sage-grouse.

At AR 71325 and 71326, the FEIS discusses the noise analysis area specific to sage-grouse. There is not, however, any discussion regarding the cumulative impacts the past, present, and future projects would have on sage-grouse.

At AR 71330, the FEIS discusses cumulative effects for noise. This generic discuss does not address the cumulative impacts of past, present, and future projects on sage-grouse.

At AR 71341-43, the FEIS discusses the cumulative effects for vegetation. The FEIS concludes that past projects have resulted in about 44,045 acres of disturbance, or about 10 percent of the 452,000 acres of cumulative effects analysis area; and that anticipated future projects, including the Caldwell Canyon Project, would add about 6,900 acres of disturbance, with a cumulative disturbance of about 64,600 acres. (AR 71341-42.) Lacking, again, is any discussion of the cumulative impacts of this loss or disturbance of vegetation on sage-grouse.

At AR 71364-65, the FEIS discusses the cumulative impacts for wildlife. This portion of the FEIS includes the following general discussion regarding wildlife impacts:

> Negative effects on wildlife from actions in the cumulative effects analysis include mortality of individual wildlife, loss of habitat, reduction of habitat functionality, displacement of wildlife from suitable habitat due to human activity, and habitat fragmentation resulting from these effects. The Caldwell Canyon Project would add to the cumulative negative effects on wildlife that use sagebrush, conifer, aspen, grassland, other shrub, and wetland/riparian habitat types.

(AR 71364.) There is no discussion of the cumulative impacts on sage-grouse or any other species. Instead, the FEIS merely lumps all wildlife into a single, generalized discussion. This is insufficient. *See Klamath-Siskiuyou Wildlands Ctr.*, 387 F.3d at 995; *Bark*, 958 F.3d at 872 ("[G]eneral statements about possible effects and some risk do not constitute a hard look absent a justification why more

definitive information could not be provided.")

At AR 71475-76, 71483, and 71501, the FEIS supplement 01 (the Final Greater Sage-Grouse Habitat Assessment Technical Report) discusses habitat availability for sage-grouse and anthropogenic disturbances to the habitat. This report discusses generally how past development and disturbances have impacted the habitat. It does not, however, include a discussion of the cumulative impact on sage-grouse of the past, present, *and anticipated future* projects. For example, the Dairy Syncline Mine is a future project located approximately 2 miles south of the Caldwell Canyon Project. (AR 71287, 71465.) Yet, there is no discussion regarding the close proximity of this anticipated future project to the Caldwell Canyon Project, nor is there any discussion of the cumulative impact this future project would have on sage-grouse in light of that proximity.

In sum, the cited portions of the FEIS lack any analysis or discussion of the cumulative impact on sage-grouse of the past, present, and future projects. Further, to the extent the cited portions of the FEIS discuss cumulative impacts on wildlife, all wildlife species are lumped into a single, generalized discussion, and there is no discussion of the cumulative impacts on sage-grouse. Indeed, BLM appears to have taken the position that it was not required to engage in such an analysis. (*See* AR 71693 (BLM stating in response to comment: "The analysis of the effects of past

mining, roads, grazing is outside the scope of the Caldwell Canyon EIS.")

BLM does not deny that sage-grouse are not explicitly named in the sections of the FEIS discussing cumulative impacts. BLM contends, however, that the "context of the FEIS and supporting habitat assessments allows for identification of habitat degradation that would impact the species." This is insufficient to comply with NEPA as it does not demonstrate that BLM adequately considered and analyzed the cumulative impact of past, present, *and future* projects on sage-grouse, a species that is sensitive to cumulative impacts and will eventually abandon an area when habitat disturbance reaches a certain threshold. (*See* AR 36909 ("The cumulative effects of management . . . can greatly influence regional extirpation of sage-grouse."); AR 62265 ("Sage-grouse eventually avoid areas with high density of anthropogenic features even if site-scale conditions are suitable. . . . [T]here is mounting evidence that sage-grouse are sensitive to human disturbances and will avoid areas they once used if those areas have been altered by anthropogenic features that exceed some threshold.").)

### D.    BLM failed to take a hard look at impacts to water resources

#### 1.  Selenium-contaminated dust

The FEIS explains that the Project will produce fugitive dust containing selenium that will enter into the Blackfoot River, and its tributaries, including Dry Valley Creek, which are already classified as "impaired" for selenium under the

Clean Water Act.[8] (AR 71323-24, 71300.) The FEIS concludes, however, that "it is very unlikely that the dust would increase the selenium concentration in the river water to the acute or chronic aquatic life standards." (AR 71312).[9]

CBD argues that BLM failed to take a hard look at the effects on water quality of the selenium-contaminated fugitive dust that the Project will produce. Specifically, CBD argues that BLM did not adequately disclose how it analyzed selenium-contaminated dust, how it accounted for the already elevated selenium levels in the waters, or how the dust emissions will impact the Blackfoot River or its tributaries.

### a. *Disclosure of BLM's methodology*

CBD argues that BLM failed to adequately disclose how it analyzed selenium-contaminated fugitive dust and how those dust emissions will impact the

---

[8] Being classified as "impaired" for selenium under the Clean Water Act means that the selenium concentrations in the waters already exceed state water quality standards

[9] BLM admits, in its response brief, that this statement is inaccurate because some selenium from dust would be added as a result of the Project. (Dkt. 61-1 at 46 n.18.) BLM insists, however, that this inaccuracy in the FEIS is not fatal because BLM "reasonably predicted that the impact from deposition of dust would be nominal." *Id.* In support, BLM cites AR 71312. However, AR 71312 merely states, as noted, that "it is very unlikely that the dust would increase the selenium concentration in the river water to the acute or chronic aquatic life standards" and, further, that "Designated beneficial uses for the Blackfoot River . . . would not be affected because selenium, other COPCs, and sediment would not be added . . . ." (AR 71312.) The Court finds this error to be harmless in light of the acknowledgement in the FEIS and the studies the FEIS relies upon that the Project will add selenium to the surface waters.

Blackfoot River or its tributaries, and that BLM reached its conclusions regarding the impact of the dust based on "undisclosed modeling calculations."

In formulating an EIS, an agency must "ensure the professional integrity, including scientific integrity, of the discussions and analyses." 40 C.F.R § 1502.23. This requires the agency to "make use of reliable existing data and resources," "identify any methodologies used," and "make explicit reference to the scientific and other sources relied upon for conclusions" in the EIS. *Id.*

Here, the FEIS explains that "selenium carried on airborne dust from the mine could be deposited on surface water," but that a "conservative model of the selenium in dust from the mine found negligible effects on selenium concentrations in surface water." (AR 71271.) The FEIS relies on baseline water studies conducted between 2014 and 2016 to obtain flow rates and baseline water quality, including for selenium, in the Blackfoot River and its tributaries, noting that these studies provided detailed discussion of the baseline data collected and interpretations of that data. (AR 71295-96, 71300 (citing AR12579-15296 (Water Resources Baseline Technical Report); AR 10152-10178 (Addendum to Water Resources Baseline Technical Report); AR 16605-19463 (Addendum No. 2 to Water Resources Baseline Technical Report)).

The FEIS acknowledges that selenium-contaminated dust would be

generated during mining, but concludes that, "[b]ased on modeling, only a small portion of that dust would be deposited into the Blackfoot River, it is very unlikely that the dust would increase the selenium concentration in the river water to the acute or chronic aquatic life standards." (AR 71312.) The FEIS further concludes that "Designated beneficial uses for the Blackfoot River . . . would not be affected because selenium . . . would not be added. . . ."[10] (*Id.*) To reach these conclusions, the FEIS relies on an April 2018 technical evaluation that explains that a Gaussian plume model was used to determine the fugitive dust transport distance, and further explains how that model works and the inputs used for the model. (AR 20534-50.) The Court finds this explanation of the methodology used, in combination with other explanations throughout the record, and references to the various reports BLM relied upon, to be more than adequate to meet the requirement that the agency "identify the methodologies used" and "make explicit reference to the scientific and other sources relied upon for conclusions." 40 C.F.R § 1502.23.

### b. *Consideration of the impact of fugitive selenium-contaminated dust*

CBD contends that BLM violated NEPA by mischaracterizing both the

---

[10] Again, BLM acknowledges that this statement is inaccurate and that some dust would be added.

baseline water quality of the Blackfoot River and its tributaries, and the Project's additive impact on the selenium levels in these already selenium impaired waters.

As previously noted, the Blackfoot River and tributary Dry Valley Creek are already selenium impaired under the Clean Water Act meaning they have selenium concentrations above state water quality standards. (AR 71300.) The April 2018 technical report, upon which the FEIS relies, specifically acknowledges the selenium contamination in these waters. (AR 20543-44.) This report identifies the average selenium concentrations from the two locations of the Blackfoot River closest to the Project for the period 2001 to 2012. (AR 20543-44.) These average selenium concentrations were obtained from a U.S. Geological Survey study that collected samples from 21 locations on the Blackfoot River. (AR 20543.)

The report estimates that the impact the Project would have on the average selenium concentrations in the Blackfoot River is "a small portion of these average concentrations (0.5% to 0.7%)." (AR 20544.) The report also examines the average daily load of selenium in the river, again using USGS data, and compares it with the expected annual and average daily load from the Project. (*Id.*) The report analyzes a worst-case scenario in which all fugitive dust from the Project for an entire year would be deposited into the Blackfoot River and finds the impacts on the waters would be minimal when compared with background levels. (AR 20542.)

The calculations in the technical report were also reviewed by TetraTech, the third-party EIS contractor for BLM. (AR 26247-63.) A TetraTech senior quality engineer stated that she had reviewed the report and agreed with the calculations. (AR 26263.) Similarly, the Idaho Department of Environmental Quality (IDEQ) also reviewed the report and indicated agreement with "these hypothetical calcs," and that "showing the extreme case here better illustrates that airborne dust is not an issue." (AR 77325.)

Finally, the Record of Decision (ROD) approved the Project subject to P4 obtaining "documentation from the IDEQ that the Caldwell Canyon Mine conforms to the Clean Water Act." (AR 4051.) IDEQ provided that documentation, stating that IDEQ has determined that the Project "will be compliant with Idaho's Water Quality Standards. . . if operated in agreement with the FEIS." (AR 77098.)

The Court finds that BLM adequately analyzed and disclosed the baseline water quality of the Blackfoot River and its tributaries, and the Project's additive impact on the selenium levels in these waters.

### 2.  Cumulative impacts on water resources

CBD argues that BLM violated NEPA by failing to take a hard look at the cumulative impacts to water resources from the Project. Specifically, CBD contends that BLM did not provide quantified and detailed information about the cumulative impacts of past, present, and future projects on the water resources. The

Court disagrees.

The FEIS provides a list of the past, present, and anticipated future projects, including the status of the projects, the period of activity, and a description of the projects, including the number of acres. (AR 71286-88.) The FEIS also considers the impacts that past and present projects have had on the water resources, including by referencing and incorporating the study area map and scientific studies containing quantifiable data on selenium contamination in groundwater and surface water within the study area. (AR 71321-22; *see* 53848-91 (2015 report on "Selenium in the Upper Blackfoot River Watershed, Southeastern Idaho, 2001-12"); AR 58213-58567 (1983 report on "Thermal Ground Water Flow Systems in the Thrust Zone in Southeastern Idaho").) The FEIS describes how the baseline water quality has been impacted by past actions, including impairment levels for specific surface waters and elevated baseline levels of selenium in groundwater. (AR 71300-02.) The FEIS thus summarizes the cumulative impact of past and present projects on selenium contamination in the surface and ground waters, including acknowledgement that past and present actions have degraded water quality.

The FEIS also notes that recent "analysis methods and regulatory requirements have resulted in the design of the active projects showing little

potential for future impacts to beneficial uses." (AR 71321.) The FEIS further

notes the aspects of past projects that have contributed to the contamination (open

pits and overburden piles from mining projects), the surface waters that have been

impacted, and the levels of contamination for both surface water and groundwater.

(AR 71321.) Finally, the FEIS analyzes the interaction between potential

groundwater plumes from the Project and past projects, such as the Conda Mine.

(AR 71321-22.)

These discussion of cumulative impacts on water resources of past, present,

and future projects are adequate to comply with NEPA.

### E.    BLM considered the required range of alternatives.

NEPA's implementing regulations require agencies to "evaluate reasonable

alternatives to the proposed action, and, for alternatives that the agency eliminated

from detailed study, briefly discuss the reasons for their elimination." 40 C.F.R.

§ 1502.14(a). The range of reasonable alternatives is "dictated by the nature and

scope of the proposed action," and must be "sufficient to permit a reasoned

choice." *Alaska Wilderness Rec. & Tourism v. Morrison*, 67 F.3d 723, 729 (9th

Cir. 1995) (citations and quotation marked omitted).

Here, CBD claims that BLM violated NEPA by failing to consider

reasonable alternatives, and specifically by (1) evaluating virtually identical

alternatives that were not varied enough to allow for a real, informed choice, and

(2) by improperly ignoring or rejecting other reasonable alternatives proposed in public comments.

### 1. Virtually Identical Alternatives

BLM considered only two alternatives (in addition to the no action alternative)—the proposal alternative and Alternative 1. CBD contends that these two alternatives were nearly identical and were thus inadequate. The Court disagrees.

As BLM points out, Alternative 1 was developed to address concerns about the impact the proposed action was expected to have on groundwater plumes. Alternative 1 requires P4 to place a geosynthetic membrane on backfill areas in the mine pits to reduce the rate that COPCs reach groundwater. (AR 71261-63.) Thus, the alternatives are different in what they require, and have differing anticipated effects on groundwater. Indeed, it was this differing effect on groundwater that led BLM to ultimately choose Alternative 1 over the proposed action. The difference between the proposal alternative and Alternative 1 is sufficient to distinguish the alternatives and fulfill the requirement that BLM evaluate reasonable alternatives to the proposed action.

### 2. Rejection or failure to consider alternatives proposed in public comments

CBD also contends that BLM unreasonably rejected without reasonable

explanation at least two other alternatives proposed in public comments—the

fringe lease alternative and an alternative of keeping the existing boundaries in

place.

a.  *Fringe lease alternative*

CBD notes that a fringe lease alternative was raised as an alternative in

public comments and was available to BLM. (AR 28504 (comment that the EIS

"should explain why BLM proposes to increase the size of the existing phosphate

lease (lease modification) by 670 acres rather than issue a new lease (fringe

acreage lease).) CBD explains that a fringe lease would allow BLM to impose

more stringent lease stipulations for protection of the sage-grouse and other

resources. CBD argues that BLM violated NEPA by failing to consider or provide

an explanation for rejecting this fringe lease alternative.

BLM explains that it did not consider or analyze a fringe lease alternative

because it was outside the scope of the purpose and needs of the Project and thus

did not need to be considered. However, BLM does not provide any citation to the

record at which it provided this or any other explanation for rejecting or otherwise

failing to consider the proposed fringe lease alternative. And the Court cannot

consider BLM's post-hoc rationalizations for failing to consider this alternative.

*See High Country Conservation Advocates v. U.S. Forest Service*, 951 F.3d 1127,

1125 (10th Cir. 2020) ("We cannot consider a 'post-hoc rationalization' for

eliminating an alternative from consideration in an EIS."). BLM thus violated

NEPA by failing to comply with the requirement that, "for alternatives that the

agency eliminated from detailed study, [the agency] briefly discuss the reasons for

their elimination." 40 C.F.R. § 1502.14(a).

### b. *Keeping lease boundaries alternative*

Plaintiffs argue that BLM unreasonably rejected the proposed alternative of

keeping the existing lease boundaries in place, which Plaintiffs argue would better

preserve surface resources such as sage-grouse.

The FEIS explains why BLM rejected this proposed alternative:

> An alternative that would approve a mine plan but without the lease
> modifications was suggested in public comments to address impacts
> to Greater Sage-Grouse habitat that could result from the lease
> modification. This alternative would eliminate disturbance of
> approximately 113 acres in General Habitat Management Area. Not
> modifying the lease would result in a need to redesign the pit walls.
>
> . . . .
>
> . . . . This alternative was not analyzed in detail because the
> disturbance of 113 acres of GHMA when there is 7.25 million acres of
> primary and important habitat protected in Idaho is a negligible
> impact and not modifying the lease boundary would result in the
> approximately 11.2 million tons of ore not being mined in the leases
> and the lease modifications, which would not allow ultimate
> maximum recovery and use of all known mineral resources in
> accordance with 43 CFR 35900.

(AR 71269.)

Plaintiff argues that in rejecting this alternative, BLM failed to acknowledge or discuss several important factors, including that ultimate maximum recovery is not a reasonable ground for rejecting the alternative of leaving the lease boundaries in place. However, BLM was not required to engage in extensive discussion of this rejected alternative and instead was only required to provide a brief discussion of the reasons it eliminated the alternative. BLM's discussion complied with that requirement.

## FLPMA CLAIMS

CBD contends that BLM violated the Federal Land Policy and Management Act (FLPMA) because the Project violates various Range Management Plan requirements for the protection of greater sage-grouse. Specifically, CBD contends that BLM failed to ensure that the Project complies with the 2012 Pocatello Range Management Plan (AR 34939-5338), the 2015 Idaho and Southwestern Montana Greater Sage Grouse Approved Resource Management Amendment (2015 ARMPA) (AR 36152-557), and the 2019 Idaho Greater Sage Grouse Record of Decision and Approved Resource Management Plan Amendment (2019 ARMPA) (AR 36575-645).

The 2019 ARMPA, adopted in March 2019, was in effect at the time the ROD was issued but was subsequently preliminarily enjoined by this Court. *See*

*WWP v. Schneider*, 417 F. Supp. 3d 1319 (D. Idaho 2019).[11] The ROWs at issue in this case were authorized after the injunction was issued and thus when the 2015 ARMPA was in effect. Accordingly, although the ROD was issued under the 2019 ARMPA, the ROWs were issued after the 2019 ARMPA was enjoined and are thus subject to the 2015 ARMPA.[12]

Turning first to the general applicability of the various provisions of the ARMPA[13] and the Pocatello Resource Management Plan (RMP), the parties appear to agree that applicability depends primarily on land ownership and habitat classification. Thus, the Pocatello RMP applies to all BLM-administered lands in the Project Area, including non-federal surface with federal mineral rights (split estate). The ARMPAs applying only to the subset of these lands that have been designated as General Habitat Management Area (GHMA) (AR 3540, 35013,

---

[11] "The BLM is enjoined from implementing the 2019 BLM Sage-Grouse Plan Amendments for Idaho, Wyoming, Colorado, Utah, Nevada/Northeastern California, and Oregon, until such time as the Court can adjudicate the claims on the merits. The 2015 Plans remain in effect during this time." *WWP v. Schneider*, 417 F. Supp. 3d 1319, 1335 (D. Idaho 2019).

[12] BLM appears to argue that the ROWs should be subject to the 2019 ARMPA rather than the 2015 ARMPA. BLM also appears to argue that the Court should defer to BLM;s interpretation that the issuance of the ROD did not trigger ARMPA requirements related to the pending Dry Valley lek.

[13] Because the ROWs are subject to the 2015 ARMPA, any reference to the ARMPA in the remainder of this decision is to the 2015 ARMPA.

36165, 36162, 42421). Further, if there are inconsistencies between the RMP and the ARMPA, the more restrictive provision applies (AR 36178, 36176).

The Pocatello RMP provides that new infrastructure facilities/structures requiring permanent surface occupancy are to be "sited in a manner that avoids sage-grouse habitat to the extent possible and will be placed at least 2.0 miles from occupied leks or other important sage-grouse seasonal habitats as identified locally." (AR 34972.) An "occupied lek" is, in turn, defined as a "lek where at least two or more male sage-grouse have attended in two or more of the previous five years." (AR 35081.)

The 2015 ARMPA provides that linear features (such as roads) and "surface disturbance (continuing human activities that alter or remove the natural vegetation)" are to be at least 3.1 miles from leks. (AR 36260.) Tall structures, such as communication or transmission towers and transmission lines are to be at least 2.0 miles from leks. (*Id.*) Further, BLM may approve a project within these lek buffers only if it is not possible to relocate the project outside of the buffer and (1) "[b]ased on best available science, landscape features, and other existing protections . . ., the BLM determines that a lek buffer-distance other than the applicable distance identified above offers the same or a greater level of protection to [sage-grouse], and its habitat, including conservation of seasonal habitat outside

of the analyzed buffer area"; (2) "BLM determines that impacts to GRSG and its habitat are minimized such that the project will cause minor or no new disturbance . . . ; or (3) "[a]ny residual impacts within the lek buffer-distances are addressed through compensatory mitigation measures sufficient to ensure a net conservation gain . . . ." (AR 36261.) Use of exemption criteria must be analyzed and disclosed and, further, third parties must provide compensatory mitigation sufficient to ensure "net conservation gain" for the species. (AR 36260, 36376.)

With these provisions in mind, the Court turns to CBD's FLPMA claims.

### A.    Slug Creek power line claim is moot

CBD contends that BLM unlawfully approved the Slug Creek power line, which was to be constructed above ground and within 2 miles of the Dry Creek Lek. However, as P4 points out, P4's proposed modification to the Project, which has been approved, provides that P4 will no longer require a separate power line along Slug Creek Road as originally contemplated and that power to the site will instead be supplied via a buried power line in the haul road from a substation in Dry Valley. CBD's challenge to the overhead power line along Slug Creek Road is therefore moot. (See Dkt. 66 at 24 (based on P4's representation that it will not be constructing the Slug Creek power line, Plaintiffs are no longer pursuing this issue).

**B.      BLM unlawfully approved ROW for the East Caldwell haul road and utilities within the Dry Valley lek[14] buffers**

CBD contends that the ROW corridor for the East Caldwell Haul Road, Water Pipeline, and Fiber Optic Line is located within 2 miles of the Dry Valley lek 3C040 and that approval of this ROW thus violates the ARMPA.

BLM does not deny that this ROW corridor is located within 2.0 miles of the Dry Valley lek but contends that the ARMPA lek buffer does not apply because (1) the Dry Valley lek is not "occupied" and is instead "pending"; and (2) the Dry Valley lek is located on private land.

### 1.  Whether the Dry Valley lek was "pending" or "occupied"

BLM and P4 argue that the ARMPA lek buffers are inapplicable to the Dry Valley lek because that lek is designated by the Idaho Department of Fish and Game (IDFG) as "pending" status (AR 74248) and the ARMPA does not designate or manage leks that are designated as "pending" status, let alone regulate activity in proximity to a "pending" lek. The Court rejects this reasoning and finds that BLM violated FLPMA when it approved the haul road and utility corridor.

First, the record demonstrates that the Dry Valley lek has shown three

---

[14] The lek is sometimes referred to as the Dry Creek lek and other times the Dry Valley lek. The Court will refer to it as the Dry Valley lek.

consecutive years of spring breeding activity and that the lek thus falls squarely within the "lek, occupied" definition of the ARMPA. (AR 36225 ("Lek, occupied. Idaho—A lek that has been active during at least one breeding season within the prior five years.").) BLM and P4 take the position that these lek observations occurred at three slightly different locations and that the Dry Valley lek is not, therefore, an occupied lek. However, BLM itself ultimately determined that these sightings constitute a single lek. (AR 71694 (FEIS noting that a study found that pending lek 3C089 "is considered to be the same birds that displayed at pending lek 3C040"); AR 71362 (FEIS calling Dry Valley lek an "occupied" lek and noting that "the three display locations" in the area in 2016, 2017, and 2018 "constitute one set of birds").

Second, the Court finds BLM's reliance on IDFG's designation of the lek as "pending" status to be improper. The ARMPA does not include a "pending" lek status and instead contains only four possible lek status designations—active, inactive, occupied, and unoccupied. (AR 36225.) "Pending" is thus not an appropriate status designation under the ARMPA. As BLM points out, the ARMPA directs that, "In determining lek locations, the BLM will use the most recent active or occupied lek *data* available from the state wildlife agency." (AR 36260 (emphasis added).) This language does not, however, indicate that BLM is

to adopt a state's status designation of a lek when that status designation is not an appropriate designation under the ARMPA. Instead, where, as here, the state has applied a status designation that is not appropriate under the ARMPA, BLM may not merely rely upon that status designation but must instead look to the underlying *data* available from the state to determine into which ARMPA status designation the lek falls.

In sum, BLM acted unreasonably when it blindly adopted the IDFG "pending" lek designation even though that designation is not covered by the ARMPA and then failed to use the most recent data available from the IDFG to determine into which of the ARMPA lek status designations the Dry Valley lek falls.[15]

### 2. The lek buffer applies despite the location of the Dry Valley lek on private land

BLM contends that, even if the Dry Valley lek could be considered "active" or "occupied," because the lek is located on private land, BLM did not have

---

[15] The Court questions whether BLM would be allowed to blindly adopt an IDFG lek status designation that is covered by the ARMPA where the underlying data available to BLM demonstrates that the IDFG's lek status designation is inconsistent with the ARMPA definitions. However, the Court need not reach that issue here because the IDFG designation of the lek as "pending" is simply not appropriate under the ARMPA. Thus, BLM was required to look at the *data* (not the designation) available from the state and determine the status of the lek based on the ARMPA definitions.

authority to and was not required to apply, the ARMPA lek buffer. The Court disagrees.

The ARMPA decision area is defined as "BLM-administered lands in GRSG habitat management areas . . . including surface and split-estate lands with BLM subsurface mineral rights." (AR 36165.) Here, there is no dispute that the Project Area is on BLM-administered lands in GRSG habitat management area and is thus subject to the ARMPA. There is also no dispute that the ARMPA prohibits BLM from approving certain habitat-destructing activities in GHMA and PHMA within specified distances from leks. (AR 36261 (BLM may not "approve actions in [PHMA, GHMA, and IHMA] that are within the applicable lek buffer distance identified" unless a specific exemption applies); AR 36192 ("In undertaking BLM management activities. . . BLM will apply the lek buffer-distances").) Thus, the question comes down to whether activities within the Project Area can be prohibited under the ARMPA based on the destructive impact that those activities will have on habitat and wildlife located outside of the Project area on private land. The Court answers that question in the affirmative.

To put it in more concrete terms, here the challenged action is the location of the ROW for the haul road and utilities within the buffer for the Dry Valley lek. This *action*—the ROW—is within the Project Area and is thus on BLM-

administered surface or split estate in GHMA. Thus, the challenged *action* falls within the purview of the AMPRA. The destructive impact of that action will extend to the lek. Thus, the *protections* provided by the ARMPA from the habitat-destructing activities occurring in the Project Area (the location of the ROW for the road and utilities) extend to that lek, even though the lek is located on private property.

BLM argues, nonetheless, that enforcement of buffers for leks located on private lands would create confusion and inconsistency in the field, and perhaps create a disincentive for nonfederal landowners to cooperate in sage-grouse conservation efforts. This argument is unconvincing because it ignores, again, that the *action* at issue—the location of the haul road and utility ROW corridor—is not on private land but is, instead, within the Project Area on a BLM-administered estate. It is merely the *protections* from habitat-destructing activities that are being extended to private lands. Thus, the enforcement of the buffer for a lek located on private land is not imposing a burden on private land but is, instead, providing protection to private land (and wildlife located thereon) from harms caused by federally authorized activities occurring on a BLM-administered estate. *See Cominco American Inc., GFS* (1976) (agency has authority to impose conditions on phosphate mining company's operations on federal lands to protect from the

offsite private property impacts of those operations).

In sum, BLM's failure to apply the mandated protections for the Dry Valley lek renders BLM's approval of the haul road and utility corridor ROW arbitrary and capricious, and contrary to FLPMA.

### 3. CBD's FLPMA lek-buffer compliance claim is not moot.

P4 argues that any buffer for the Dry Valley lek only applied during the initial mine development, that the initial mine development has now ended, and that any relief that Plaintiffs may have sought regarding buffers is now moot because P4 has finished constructing the challenged portions of the Project.[16] The Court disagrees.

The declaration submitted by P4 in support of its mootness argument states that there is still work to be done on completion of the haul roads and installation of buried utilities in the ROW, and further that there are still multiple years of work to bring Caldwell Canyon mine online. (See Dkt. 65-1.) Further, completion of the activity—here the completion of the haul roads and installation of the utilities—does not moot the issue as long as the Court can still order at least some effective relief. And, as CBD points out, there is still effective relief available here

---

[16] P4 raised its mootness argument for the first time in its reply brief. CBD has moved to file a surreply to address the argument. (Dkt. 72.) The Court grants that motion.

as the use and maintenance of the haul road and utility corridor will have ongoing

impacts on the sage-grouse, such as habitat disturbance, noise impacts, and bird-

vehicle collisions. These impacts could be remedied in various ways, such as

through vacating BLM's ROW approvals, imposing use restrictions, requiring

mitigation actions, or ordering the road and utility removed. Thus, P4's decision to

complete the haul road and utility corridor while this lawsuit is pending does not

render CBD's FLPMA claim moot.

### C.     BLM adequately ensured compensatory mitigation that provides a net conservation gain to sage-grouse

The ARMPA requires that,

> in authorizing third party actions that result in habitat loss and
> degradation, the BLM/USFS will require and ensure mitigation that
> provides a net conservation gain to the species including accounting
> for any uncertainty associated with the effectiveness of such
> mitigation. . . . Any compensatory mitigation will be durable, timely,
> and in addition to that which would have resulted without the
> compensatory mitigation.

(AR 36376.)

Here, P4's mitigation plan proposes: (1) reclamation of mine pits; (2) a

research project on P4 parent company Bayer AG's Fox Hills Ranch private

property, located near the Caldwell Canyon Project Area; and (3) an "in-lieu fee"

contribution of $62,273 to the State of Idaho's sage-grouse mitigation fund. (AR

71574-91.) CBD contends that this mitigation plan is insufficient because it does

not meet the ARMPA's timeliness, durability, or additionality requirements, and the in-lieu fee is far too small.[17]

P4 concedes that the reclamation of the mine pits and the research and associated habitat restoration elements of the mitigation plan do not meet either the timeliness or durability requirement. (AR 3418 (P4 stating in mitigation plan that the reclamation of the mine and the research project and associated habitat restoration do not meet the timeliness criteria for compensatory mitigation because of a time lag between the impacts and the replacement habitat, and, further, do not meet the durability requirement because there is no legal assurance that the areas will be maintained as habitat).) The additionality criteria is also not met as to these first two elements of the mitigation plan because (1) reclamation of the mine pit is already legally required, *see* 43 C.F.R. § 3591.1 (requiring that the surface of leased lands "be reclaimed"); and (2) the research and habitat restoration project was already under way before the mine was approved (*see* AR 3417 (stating in mitigation plan that Monsanto "has initiated a habit restoration research project at

---

[17] BLM does not provide any substantive argument in response to CBD's claim, responding only that "BLM's subsequent authorizations of rights-of-way also did not violate the 2015 ARMPA's requirement that compensatory mitigation achieve a 'net conservation gain' to greater sage-grouse." (Dkt. 61-1.)

its Fox Hills Ranch property," with the focus of the research "to test several treatments to restore sagebrush, native bunchgrasses, and native forbs"). Thus, the mine reclamation and the research and associated habitat restoration would have occurred even without the compensatory mitigation.

This leaves only the in-lieu fee contribution of $62, 273—an amount that P4 estimated was sufficient to reclaim 32.1 acres of sage-grouse habitat at P4's estimated cost of reclamation of $1,500 per acre. CBD admits that the footprint of the road and utility corridor are less than 32.1 acres (P4), and P4 represents that the actual footprint 6.9 acres. CBD contends, however, that BLM's decision to accept the in-lieu fee as sufficient to satisfy the "net conservation gain" standard is arbitrary and capricious because the contribution does not account for all the harms cause by the haul road and utility corridor. However, as P4 points out, the in-lieu payment was actually used to restore 414 acres of priority restoration areas at the Idaho National Laboratory. The Court finds, based on the information before it, that BLM acted reasonably in accepting the in-lieu contribution from P4 as sufficient to satisfy the "net conservation gain" standard.

## CLEAN WATER ACT CLAIMS

CBD contends that BLM violated the Clean Water Act (CWA) by authorizing pollution in violation of state standards.

### A.    BLM's procedural challenges to CWA claims

BLM contends that Plaintiffs' claims under § 313 of the CWA, 33 U.S.C. § 1323, are not cognizable because § 313 does not apply to a federal agency's authorization of third-party activities. The Court disagrees.

Section 313 of the CWA, entitled "Federal facilities pollution control," provides, in relevant part that each federal agency:

> (1) having jurisdiction over any property of facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity.

33 U.S.C. § 1323(a). This language has been interpreted as providing a limited waiver of sovereign immunity. *See U.S. Dep't of Energy v. Ohio*, 503 U.S. 607, 615 (1992) (section 313 includes a clear waiver of sovereign immunity as to coercive fines but did not unambiguously waive sovereign immunity for punitive fines). Indeed, "Congress intended this section to ensure that federal agencies were required to 'meet all [water pollution] control requirements as if they were private citizens." *Ctr. For Native Ecosystems v. Cables*, 509 F.3d 1310, 1332 (10th Cir. 2007) (quoting S. Rep. No. 92-414 (1971), *as reprinted in* 1972 U.S.C.C.A.N. 3668, 3734).

Consistent with this intent, the Ninth Circuit has exercised jurisdiction over claims that an agency violated § 313 by authorizing a third party's action that would violate state water quality standards. *See Greater Yellowstone Coalition v. Lewis*, 628 F.3d 1143, 1146 (9th Cir. 2010) ("The CWA requires federal agencies to determine that approved actions do not result in pollution in violation of state water quality standards. 33 U.S.C. § 1323(a).").

"Although the Ninth Circuit has not squarely addressed the scope of CWA § 313 under the particular circumstances here . . . it has repeatedly entertained challenges to agency actions under CWA § 313 that involve authorization of third-party action." *Central Sierra Env't Res. Ctr. V. Stanislaus Nat'l Forest*, 304 F. Supp. 3d 916, 934-36 (E.D. Cal. 2018). Further, "[t] here is no requirement in § 313 that the government itself be the discharger, only that it undertake an activity that 'may result' in the discharge or runoff of pollutants." *Id.* at 937. Here, BLM's authorization of a mining project is an activity that will or may result in discharges or runoff of pollutants. Thus, the Court has jurisdiction under § 313.

BLM also contends that CBD's point source discharge claims must be dismissed because CBD failed to provide the requisite notice required by CWA's citizen suit provision, 33 U.S.C. § 1365. Again, the Court disagrees.

Section 1365 provides, in relevant part, that a citizen may commence an

action against an agency for alleged violations of an effluent standard or limitation. 33 U.S.C. § 1365(a)(1). In order to maintain such an action, a plaintiff must first give notice of the violation to the administrator, the state in which the alleged violation occurred, and any alleged violator of the standard or limitation. *Id.* at § 1365(b)(1)(a). Here, CBD is seeking to enforce state water quality standards, which do not fall within the definition of effluent standards or limitations and are not actionable under the citizen suit provision. *See id.* at 1365(f) (setting out definition of "effluent standard or limitation"); *see also Oregon Nat. Res. Council v. U.S. Forest Svs*, 834 F.2d 842, 850 (9th Cir. 1987) (because the plaintiffs' claims did not fall under the citizen suit provision, the plaintiffs were not subject to the 60-day notice requirement).  The CWA's citizen suit notice provision is accordingly not applicable.

### B.    Merits of the CWA claims

Turning to the merits of CBD's claims, CBD argues first that BLM violated FLPMA and § 313 of the Clean Water Act (CWA) by authorizing pollution in violation of state water quality standards. CBD points out that FLPMA and the CWA require federal agencies to comply with applicable state water quality standards. CBD contends that BLM's authorizations of the Project fail to require compliance with Idaho water quality standards and, further, that the Project will not comply with Idaho law for the control and abatement of water pollution,

including controls on the discharge or runoff of pollutants. The Court disagrees.

BLM determined that the Project will comply with Idaho law for the control and abatement of water pollution, considered the impacts of the Project on surface water, and conditioned its approval of the Project on receipt from IDEQ of documentation confirming that the Project conforms to the Clean Water Act. (AR 4035.) BLM received that IDEQ confirmation. (AR 77097-99.)

BLM also conditioned its approval on P4 obtaining and complying with all the necessary local, state, and federal permits and authorizations, and complying with the conditions defined by the authorized agencies. (AR 4031.) BLM required P4 to monitor water quality and included a surface water monitoring plan (AR 71432-34); fugitive dust control management plan (AR 4057, 71438); best management practices for minimizing impacts to waters including controlling run-on and run-off (AR 71439-41); and best management practices for sediment control (AR 71444). The FEIS also analyzed the expected impacts of the Project on surface waters and determined that if, the Project is operated in accordance with the mine reclamation plan and regulatory permits, any discharges would comply with regulatory limits. (AR 71311 ("Construction and operations conducted in accordance with the MRP and regulatory permits, would reduce impacts on surface water levels below regulatory limits.").)

Further, IDEQ helped to prepare the FEIS and evaluated the Project for compliance with Idaho water quality standards. IDEQ determined that the Project, using Alternative 1, will be compliant with the state water quality standards and ground water quality rule if operated in compliance with the FEIS and ROD. (AR 77097-99.) The Court finds the fact that IDEQ, the very agency charged with enforcing the water quality standards at issue here, was involved in the FEIS process and determined that the Project would comply with the Idaho water quality standards, to be very persuasive. *Greater Yellowstone Coal. v. Larson*, 641 F. Supp. 2d 1120, 1135 (D. Idaho 2009), *aff'd*, 403 F. App'x 275 (9th Cir. 2010), and *aff'd sub nom. Greater Yellowstone Coal. v. Lewis*, 628 F.3d 1143 (9th Cir. 2010), as amended (Jan. 25, 2011) ("The Court finds it very persuasive that the very agency charged with enforcing water quality standards in Idaho was involved from the beginning of the project, assisted with sampling and interpreting results, evaluated the cover design, and put its stamp of approval on the project.").

CBD also contends that fugitive dust from the Project will violate Idaho's antidegradation policy and water pollution control requirements for nonpoint source pollution by allowing selenium to enter the already selenium-impaired

Blackfoot River.[18] (Dkt. 58-1 at 46-47 (citing Idaho Admin. Code 58.01.02.051 and 58.01.02.350)).) As to Idaho's antidegradation provisions, as BLM points out, implementation of these provisions require review and evaluation by IDEQ for a determination of, for example, whether a proposed activity will maintain or protect beneficial uses. *See, e.g.,* Idaho Admin. Code 58.01.02.052, 58.01.02.052.04-.06, 58.01.02.055, 58.01.02.051.02, 58.01.02.350.01-.02. Here, IDEQ conducted a review and evaluation of the Project and determined that if the Project is operated in compliance with the FEIS and ROD, it will comply with state water quality standards. Nothing more was required.

As to Idaho's nonpoint source rules, CBD contends that the Project will violate the best management practices requirements imposed by state law. However, Idaho's nonpoint source pollution policy does not set forth specific best management practice standards. Instead, it provides that "[b]est management

---

[18] BLM contends that CBD's fugitive dust claim must be dismissed because CBD failed to exhaust its remedies on the issue. However, BLM has failed to identify any administrative exhaustion requirement specific to Plaintiffs' claims. Nonetheless, assuming there is an exhaustion requirement, water quality concerns related to both the Blackfoot River and Dry Valley Creek were raised multiple times during the administrative process, including the impacts from wind erosion from stockpiles. (*See, e.g.,* AR 27236-43, 28577, 77314, 71683-84, 26257-58.) Further, there is no need for CBD itself to have personally raised the fugitive dust issue. It is sufficient that the issue was raised by someone else, and that BLM thus had the opportunity to address the issue. *See Conservation Cong v. U.S. Forest Serv.*, 555 F. Supp. 2d 1093, 1106 (E.D. Cal. 2008).

practices should be designed, implemented and maintained to provide full protection or maintenance of beneficial uses." Idaho Admin. Code 58.01.02.350.01a. Further, best management practices are defined as: "A practice or combination of practices, techniques or measures developed, or identified, *by the designated agency* and identified in the state water quality management plan which are determined to be the cost-effective and practicable means of preventing or reducing the amount of pollution generated by nonpoint sources to a level compatible with water quality goals." Idaho Admin. Code 58.01.02.010.09 (emphasis added). Thus, there are no pre-determined best management practices. Instead, the identification and implementation of best management practices for nonpoint source activity is left to IDEQ. CBD does not point to any best management practice that IDEQ has imposed that the Project would violate.

CBD further contends that that the Project's stockpiling of high-selenium content ore at the processing area on the bank of Dry Valley Creek will violate Idaho's prohibition on storage and accumulation of hazardous and deleterious materials in the immediate vicinity of state waters. (Dkt, 58-1 at 47.) The regulation upon which CBD relies provides: "Hazardous and deleterious materials must not be stored, disposed of, or accumulated adjacent to or in the immediate vicinity of state waters unless adequate measures and controls are provided to

ensure that those materials will not enter state waters as a result of high water, precipitation runoff, wind, storage facility failure, accidents in operation, or unauthorized third party activities." Idaho Admin. Code 58.01.02.800.01.

Here, the FEIS provides that ore stockpiles will be managed to mitigate the impacts to surface waters. (AR 71425-26 (describing water management ponds to collect run-off from the ore stockpile and Dry Valley triple area); AR 71438 ("Stockpiles will be monitored to ensure that moisture control efforts and stockpile heights are minimizing fugitive dust emissions.").) Further, if these ore stockpiles do present a risk to state waters, state law provides the method for evaluation of that risk. Specifically, "Measures and controls will be judged by [IDEQ] on the basis of . .  potential of a given occurrence; and . . . potential injury to beneficial uses presented . . . ." Idaho Admin. Code 58.01.02.800.01. Here, IDEQ determined that the Project would be compliant with Idaho's water quality standards if operated in compliance with the FEIS. (AR 77098.) That determination is sufficient to meet Idaho's hazardous and deleterious material storage regulation.

Finally, CBD contends that point source discharges from the Project will not comply with Idaho's water quality standards because they will add selenium and sediment into the Blackfoot River and its tributaries, which are already failing state water quality criteria for those pollutants. (Dkt. 58-1 at 47-48.) The regulation

upon which CBD relies provides:

> No pollutant shall be discharged from a single source or in combination with pollutants discharged from other sources in concentrations or in a manner that:
>
> > a. Will or can be expected to result in violation of the water quality standards applicable to the receiving water body or downstream waters; or
> >
> > b. Will injure designated or existing beneficial uses; or
> >
> > c. Is not authorized by the appropriate authorizing agency for those discharges that require authorization.

Idaho Admin. Code 58.01.02.080.

Here, the FEIS acknowledged that there will be point source discharges from the Project that will require appropriate CWA permits (*see, e.g.,* AR 71426, 71427, 71430, 714440). Further, state law requires that any CWA permit for point discharges comply with the requirements of the applicable water quality standards. *See* Idaho Admin. Code 50.01.25.103.01 (requiring that permits provide for compliance with the requirements of applicable water quality standards). There is nothing in the record cited by CBD indicating that the required CWA permits for the Project have been issued. Once those permits are issued, CBD may be able to challenge the permits or alleged violations of the permits. However, there is no basis for challenging yet-to-be-issued permits or potential future violations of such permits. Nor is there any basis for challenging BLM's authorization of the Project

and its point source discharges that will be subject to the yet-to-be-issued permits.

CBD takes the position that the point source discharges will violate Idaho Administrative Code 58.01.02.055. This section requires IDEQ to develop total maximum daily loads (TMDLs) for identified water bodies, such as the Blackfoot River, that have been identified as not fully supporting designated or existing beneficial uses and not meeting applicable water quality standards despite application of required water pollution controls. Idaho Admin. Code 58.01.02.055.02. "Once a TMDL . . . is completed, discharges of causative pollutants shall be consistent with the allocations in the TMDL." *Id.* at 58.01.02.055.05. The development of TMDLs or interim changes may also "include pollutant trading with the goal of restoring water quality limited water bodies to compliance with water quality standards." *Id.* at 58.01.02.055.06.

Here, the record establishes the TMDLs for the Blackfoot River and its relevant tributaries are already fully allocated to pre-existing sources. (AR 16351.) However, TMDL allocations for point sources would, again, be imposed through yet-to-be-issued permits. Further, the record recognizes the availability of pollutant trading for purposes of meeting TMDLs. (AR 49832.) At this point, there is simply no basis for challenging the yet-to-be-issued permits and TMDL allocations.

In sum, BLM's approval of the Project did not violate Idaho's water quality

rules. *See generally Cent. Sierra Env't Res. Ctr. v. Stanislaus Nat'l Forest*, 30 F.4th
929, 942–43 (9th Cir. 2022) ("But a discharge that otherwise complies with
applicable  [state law standards] does not violate [state law] merely because the
water quality objectives are not being met.").

## ORDER

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment (Dkt. 58)
is GRANTED in part and DENIED in part, and Defendants' and Intervenor's cross
motions for summary judgment (Dkts. 61, 64) are GRANTED in part and
DENIED in part as follows:

1. Summary judgment is granted in favor of Plaintiffs on their
NEPA claim that BLM failed to consider the indirect effects of processing
ore at the Soda Springs Plant.

2. Summary judgment is granted in favor of Plaintiffs on their
NEPA claim that BLM failed to take a hard look at the direct, indirect, and
cumulative impacts on greater sage-grouse.

3. Summary judgment is granted in favor of Defendants and
Intervenor on Plaintiffs' NEPA claim that BLM failed to take a hard look at
the impacts on water resources.

4. Summary judgment is granted in favor of Defendants and
Intervenor on Plaintiffs' NEPA claim that BLM failed to consider the

required range of alternatives.

5.      Summary judgment is granted in favor of Plaintiffs on their claim that BLM failed to consider or discuss reasons for eliminating from consideration the proposed fringe lease alternative.

6.      Summary judgment is granted in favor of Defendants and Intervenor on Plaintiffs' NEPA claim that BLM failed to consider or discuss reasons for eliminating from consideration the proposed keeping lease boundaries alternative.

7.      Plaintiffs' FLPMA claim related to the Slug Creek power line is moot.

8.      Summary judgment is granted in favor of Plaintiffs on their FLPMA claim challenging the approval of the East Caldwell haul road and utility corridor right-of-way.

9.      Summary judgment is granted in favor of Defendants and Intervenor on Plaintiffs' FLPMA claim challenging the compensatory mitigation plan.

10.     Summary judgment is granted in favor of Defendants and Intervenor on Plaintiffs' Clean Water Act claims.

**IT IS FURTHER ORDERED** that Plaintiffs' motion to file a surreply

(Dkt. 72) is GRANTED, and that Plaintiff's motion to strike (Dkt. 73) is DENIED.


DATED: January 24, 2023

B. Lynn Winmill
U.S. District Court Judge