UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, WESTERN WATERSHEDS PROJECT, and WILDEARTH GUARDIANS,<br><br>      Plaintiffs,<br><br>      v.<br><br>UNITED STATES BUREAU OF LAND MANAGEMENT, MARY D'AVERSA, in her official capacity as District Manager for the Bureau of Land Management Idaho Falls District, and UNITED STATES DEPARTMENT OF INTERIOR,<br><br>      Defendants,<br><br>      and<br><br>P4 PRODUCTION, LLC,<br><br>      Intervenor-Defendant. | Case No. 4:21-cv-00182-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Center for Biological Diversity, Western Watersheds Project, and WildEarth

Guardians (collectively "CBD") brought this action challenging the United States

Bureau of Land Management's Final Environmental Impact Statement (FEIS) and

**MEMORANDUM DECISION AND ORDER - 1**

2019 Record of Decision (ROD), which approved a new open-pit phosphate mine in southeast Idaho—the Caldwell Canyon Mine Project (the "Project")—set to be operated by intervenor P4 Production (P4). The Court previously granted summary judgment in favor of CBD on some of their claims finding that the BLM violated the National Environmental Protection Act (NEPA) and the Federal Land Policy and Management Act (FLPMA). Currently before the Court is the issue of remedies, and P4's motions for leave to file the Fifth Declaration of Roger W. Gibson (Dkt. 94) and to take judicial notice (Dkt. 100).

## BACKGROUND[1]

On May 13, 2022, CBD filed a motion for summary judgment on all their claims. *See* Dkt. 58. Specifically, CBD alleged that the ROD, which approved the Project, and the FEIS upon which the ROD was based upon, violated NEPA, FLPMA, and the Clean Water Act (CWA). *See CBD Br.*, Dkt. 58-1. In response, both the BLM and P4 filed cross-motions for summary judgment. *See* Dkts. 61 and 64. On November 2, 2022, the Court heard oral argument. *See* Dkt. 78.

On January 24, 2023, the Court issued a Memorandum Decision and Order granting summary judgment in favor of CBD, in part, and in favor of the BLM, in

---

[1] Additional background information can be found in the Court's Memorandum Decision and Order (MDO), entered January 24, 2023 (Dkt. 79).

part. *See Jan. 24, 2023 MDO*, Dkt. 79. Specifically, the Court found that the BLM violated NEPA by (1) failing to consider the indirect effect of processing ore from the Caldwell Canyon Mine at the Soda Springs Plant,[2] (2) failing to take a hard look at the direct, indirect, and cumulative impacts of the Project on the Greater Sage-Grouse population and habitat, and (3) excluding a citizen-proposed alternative without explanation. *See id.* at 19-32 and 41-42.[3] The Court also found that the BLM's approval of the East Caldwell haul road and utility corridor right-of-way (ROW) violated FLPMA for failing to apply the mandated protections for the Dry Valley sage-grouse lek. *Id.* at 52. Although it granted summary judgment on some of CBD's claims, the Court deferred ruling on the appropriate remedy for BLM's violations.

On February 3, 2023, the Court approved the parties' joint recommendation for an expedited briefing schedule to address the issue of remedies. *See* Dkt. 80. In support of its Response, P4 submitted the Fourth Declaration of Roger W. Gibson, P4's President. *See* Dkt. 87-1. After CBD challenged some of the contentions made

---

[2] The Soda Springs Plant, owned by parent company Bayer AG and operated by P4, processes the phosphite ore P4 mines in the surrounding area.

[3] CBD does not raise any argument regarding the BLM's violation for excluding a citizen-proposed alternative, and therefore the Court will limit its discussion to the BLM's remaining violations.

in that declaration, *see CBD Reply* at 9-12; Dkt. 90, P4 filed a motion for leave to file a fifth supplemental declaration from Mr. Gibson. *See* Dkt. 94. P4 claimed that the Court should consider the additional declaration because it addressed issues raised for the first time in CBD's Reply, and because there would be no prejudice to CBD. *See P4's Br.*, Dkt. 94-1. CBD opposed the request for leave on both procedural and substantive grounds. *See CBD Response*, Dkt. 96.

On March 28, 2023, the Court held a hearing on the remedies issue and P4's motion for leave to file. *See* Dkt. 99. With the remedies issue under advisement, P4 filed a motion to take judicial notice of a recently issued Record of Decision for another phosphate mine. The Court now issues its decision and order on P4's motions and the issue of remedies.

## ANALYSIS

### A.    Motion for leave to file the Fifth Declaration of Roger W. Gibson

As a threshold matter, the Court will grant P4 leave to file and consider Mr. Gibson's fifth declaration. *See Fifth Gibson Decl.*, Dkt. 91-2. As mentioned, following the close of the expedited briefing schedule, P4 sought leave to file a supplemental declaration from Mr. Gibson addressing two items which they felt were raised for the first time in CBD's Reply: (1) CBD's "challenge to the foundation and credibility for declarant Gibson's testimony regarding certain

aspects of P4's and Bayer's business, operations, and projected losses in the event"
that the Court orders vacatur; and (2) "the availability to P4 of an alternative ore
source to maintain operations at the Soda Springs facility during the potential
period of delay caused by vacatur." *P4's Br.* at 1, Dkt. 94-1. While CBD argues
that these are not "new" issues warranting a supplemental declaration, their
opposition is predominately comprised of substantiative arguments regarding the
declaration's content. *See CBD Response*, Dkt. 97.

As noted by the parties, the decision of whether to consider Mr. Gibson's
supplemental declaration falls squarely within this Court's discretion. *See S.E.C. v.
Seaboard Corp.*, 677 F.2d 1301, 1314 (9th Cir. 1982) ("acceptance or rejection of
argumentative briefs, memoranda, and other supplementary material is within the
sound discretion of the court"). However, leave should only be granted "where a
valid reason for such additional briefing exists, such as the movant raises new
arguments in its reply brief." *Allen v. Campbell*, No. 4:20-CV-00218-DCN, 2020
WL 6876198, at *7 (D. Idaho Nov. 23, 2020) (citations omitted) (further noting
that the decision to grant leave to file a sur-reply is discretionary).

Although the Court does not disagree with some of CBD's contentions, it
finds that consideration of the additional declaration is justified under the
circumstances. First, the substantive issue in front of the Court—determining the

**MEMORANDUM DECISION AND ORDER - 5**

appropriate remedy for BLM's violations—is a question of equity. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1406 (9th Cir. 1995). Given the nature of this determination, the Court finds equity is best served by having all possible information at its disposal rather than applying a formulaic rule to preclude consideration of potentially relevant information. Additionally, CBD was able to sufficiently address the supplemental declaration, raising both substantive and procedural arguments in their opposition.[4] The Court also finds it significant that the parties carrying the burden on the remedies issue—BLM and P4—took the procedural status of a non-moving party.[5]

Most importantly, as discussed below, even considering Mr. Gibson's fifth declaration, the Court finds that vacatur is the appropriate remedy. Accordingly, CBD suffers no tangible harm from consideration of the declaration, and the Court will grant P4's motion.

## B.     Vacatur is the appropriate remedy for the BLM's violations

Moving to the issue at hand, CBD requests that this Court vacate the ROD,

---

[4] In granting P4 leave and considering Mr. Gibson's additional declaration, the Court is not determining that it should be entitled to any particular weight, nor is it ignoring CBD's substantive arguments. Instead, CBD's substantive arguments regarding the content of Mr. Gibson's fourth and fifth declarations are better addressed under the substantive remedies issue.

[5] While it was parties' joint proposal that set the expedited briefing schedule, *see* Dkt. 95, the Court nonetheless finds this significant under the circumstances.

MEMORANDUM DECISION AND ORDER - 6

including the EIS, and all decisions made in reliance on those documents. *See CBD Br.* at 1-2, Dkt. 81. In other words, CBD seeks to wipe the slate clean and have the BLM restart its approval of the Project.

Conversely, BLM and P4 seek remand without vacatur, claiming that a more tailored remedy is warranted under the current circumstances. *See BLM Response* at 1-2, Dkt. 84; *P4 Response* at 1, Dkt. 87. Generally, the BLM argues that its errors were not so severe as to taint the entire Project, and P4 argues that whatever the errors were, they are outweighed by the disruptive consequences vacatur would cause. *Id.* The Court finds that BLM and P4 have not demonstrated that a deviation from the presumptive remedy is warranted for the reasons discussed below.

### 1.  Legal Standard

In the Ninth Circuit, vacatur is the presumptive remedy for agency action that the Court has found a violation under the Administrative Procedures Act (APA). *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 882 (9th Cir. 2022) (citing *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018)). Remand to the agency without vacatur is only ordered "in [the] limited circumstances" when equity so demands. *Nat'l Fam. Farm Coal. v. U.S. Env't Prot. Agency*, 960 F.3d 1120, 1144 (9th Cir. 2020) (citation omitted); *Pollinator Stewardship Council v. U.S. E.P.A.*, 806 F.3d 520, 532 (9th Cir. 2015)

("We leave an invalid rule in place only when equity demands that we do so") (internal quotations omitted).

To determine whether vacatur is appropriate, a court applies the "two-factor balancing test first outlined in the D.C. Circuit's *Allied-Signal* decision" by "weigh[ing] the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed." *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022); *see also Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). Because vacatur is the presumed remedy, the burden is on the agency to establish equity demands a more tailored remedy. *See Env't Def. Ctr.*, 36 F.4th at 882; *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1083 (D. Idaho 2020) ("The burden is on BLM to show that compelling equities demand anything less than vacatur.").

### 2. The seriousness of the errors

In addressing the first *Allied-Signal* factor—the seriousness of BLM's errors—the Court considers "whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same [decision] on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same [decision] would be adopted on remand."

*Ctr. for Food Safety*, 56 F.4th at 663–64 (quoting *Pollinator Stewardship*, 806 F.3d at 532).

BLM and P4 argue that the identified deficiencies in the Court's summary judgment decision do not involve foundational elements that taint all aspects of the overall Project analysis. *See BLM Response* at 5, Dkt. 84; *P4 Response* at 2-3, Dkt. 87. The parties further claim that the Court should remand without vacatur because "it is possible, if not likely, that BLM might supply the explanation the Court found missing and otherwise reach the same result on remand." *Id.*

Conversely, CBD claims that BLM's multiple violations of FLPMA and NEPA were serious errors that make it unlikely, if not impossible, that the same mine plan will be re-approved on remand. *See CBD Br.* at 4, Dkt. 81. CBD further argues that because the BLM cannot make the exact same decision, the first factor is dispositive, or if not, all but precludes any remedy outside vacatur.

While the Court recognizes that certain violations may be so fundamental as to render it impossible to make the same rule or decision, thereby foreclosing the possibility of remand, that has not been established here. Nonetheless, applying the *Allied-Signal* balancing test, the Court finds the first factor weighs heavily in favor of vacatur. *See, e.g.*, *California Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 993 (9th Cir. 2012) ("That the EPA's final rule is invalid is not the end

of the analysis. In considering whether vacatur is warranted, we must balance these errors against the consequences of such a remedy.").

> *a. The BLM's violations regarding the Greater Sage-Grouse population and its habitat.*

As mentioned, the Court found that the BLM violated (1) NEPA by failing to take a hard look at the direct, indirect, and cumulative impacts of the Project on sage-grouse, and (2) FLPMA by approving the East Caldwell haul road and utility corridor within the Dry Valley lek buffers. *See Jan. 24, 2023 MDO* at 48-53, Dkt. 79. As discussed below, the BLM's violations regarding sage-grouse are serious errors that call into "doubt whether the [BLM] chose correctly[.]" *Allied-Signal*, 988 F.2d at 150-51.

Initially, this case presents a unique—and for the potential of ordering remand, significant—hurdle in that different parts of the Project, although temporally close, were approved under different standards, which now calls into question whether the BLM can reach the same decision on remand. To elaborate, when the BLM issued the ROD, the more lenient 2019 Idaho Greater Sage Grouse Record of Decision and Approved Resource Management Amendment (2019 ARPMA) provided the governing standard regarding the Greater Sage-Grouse and its habitat. However, soon after the ROD was issued, and before the BLM granted the ROW, the 2019 ARPMA was enjoined, leaving its predecessor—the 2015

Idaho and Southwestern Montana Greater Sage Grouse Approved Resource

Management Amendment (2015 ARPMA)—as the controlling standard. *See WWP*

*v. Schneider*, 417 F. Supp. 3d 1319, 1355 (D. Idaho 2019) (enjoining the 2019

ARPMA); *see also Jan. 24, 2023 MDO* at 43-44 (explaining the applicable

standard in more depth). Therefore, the Court applied the 2019 ARPMA to the

ROD (which contained the FEIS and mine plan) and the 2015 ARPMA to the

ROW on summary judgment.

Pertinent to the issue at hand, the parties do not dispute that, regardless of

the remedy the Court orders, the governing standard the BLM will now need to

apply to the ROD is the more restrictive 2015 ARPMA.[6] In other words, if the

Court is to remand without vacatur, the BLM will not only be tasked with

ameliorating their violations but ensuring that the Project as a whole complies with

the 2015 ARMPA. As CBD points out, there is a realistic possibility that the

Project will need alterations to do so. *See CBD Reply* at 4; Dkt. 90 ("The 2015

ARPMA contains different substantive protections for sage-grouse than were in

place when the ROD was approved and will likely require modifications to the

---

[6] In the briefing, there was some argument regarding whether the 2017 or 2015 APRMA should provide the standard on remand; however, during oral argument, the BLM conceded that the 2015 ARPMA is the governing standard regardless of the remedy ordered.

ROD. This includes modifications related to the service road, haul road, and potential portions of the north pit that are within both GHMA and the 3.1-mile buffer of the Dry Valley lek."). Rather than address CBD's concerns regarding the change in standard, the BLM and P4 disregard them under the assertion that CBD cannot raise a new merits claim at this stage. *See BLM Response* at 12 n. 4, Dkt. 84; *P4 Response* at 8, Dkt. 87.

CBD's claims are not simply impermissible merits claims but are relevant to the equitable question at hand—whether the BLM can make the same decision on remand. Further, the BLM and P4's decision to exclusively address the NEPA and FLPMA violations without addressing the now governing standard cuts against the burden they carry. Simply put, because the ROD was not analyzed under the now-applicable standard, and the BLM did not show that the contested aspects of the Project comply with the 2015 ARPMA, it seems clear that, at a minimum, an extensive re-evaluation of the project will be necessary.  This, in turn, suggests that it is unlikely that the BLM will be able to reach the same decision without substantial and material alterations. This, of course, weighs in favor of vacatur.

Beyond the complexity of applying a new standard to the ROD and FEIS, the Court finds that the BLM and P4 have not shown that the specific violations are not serious. First, a significant amount of the BLM's and P4's arguments rely on

the misguided premise that the Dry Valley lek should now, or soon, be classified as unoccupied. *See BLM Response* at 7-8, Dkt. 84. Specifically, the BLM argues that based on the supporting information provided by Idaho Fish and Game, the Dry Valley lek is unoccupied because only one bird was observed in 2018, and no sage-grouse were observed during the surveys conducted in 2019, 2020, and 2021. *See id*. However, the 2015 ARMPA provides that "[t]o be designated unoccupied, a lek must be inactive . . . for five consecutive breeding seasons." AR 36225. A lek is "inactive" where survey data show there "[w]as no strutting activity throughout a breeding season." *Id*.

As the BLM recognized, and the Court already held, the Dry Valley lek was an "active lek" in 2017.[7] *See BLM Response* at 8, Dkt. 84. Since then, the Dry Valley lek can only be considered inactive during the three consecutive breeding seasons of 2019, 2020, and 2021. *See Myers Decl*., ¶ 6, Dkt. 84-1 (contrary to the BLM's assertion, since a grouse was seen twice in 2018, the lek cannot be considered "inactive" that year). Not only is the majority of the BLM and P4's argument an attempt to reargue the merits of the case, but the Dry Valley lek

---

[7] In its motion for judicial notice, P4 appears to be arguing that any data prior to 2019 is irrelevant in determining the status of the Cry Valley lek. *See P4's Reply* at 2, Dkt. 103. However, to do so would improperly ask this Court to ignore its prior holding. *See Jan. 24, 2023 MDO* at 48, Dkt. 79.

cannot be deemed as unoccupied at this time, negating the BLM's claim that the same decision can be made regarding sage-grouse.

Despite the underlying data already discussed, the contested nature of the status of the Dry Valley lek, and the Court's previous ruling that the lek was active, P4 seeks to have the Court take judicial notice of the recently issued Husky 1 North Dry Ridge Record of Decision ("Husky ROD"), in which the BLM determined that the Dry Valley lek is "not a lek due to the lack of male sage-grouse." *See P4 Br.* at 1, Dkt. 100. Although P4 acknowledges that the BLM's determination cannot be accepted as a fact in this case, it asks this Court to find this information relevant at the remedies stage to demonstrate that the BLM may be able to make the same decision. *See P4 Reply* at 1, Dkt. 97; *see also Friends of the Clearwater v. Higgins*, 523 F. Supp. 3d 1213, 1222 (D. Idaho 2021) ("Thus, the Court may take judicial notice of government documents to prove their existence and contents, but not for the truth of the matters asserted therein when the facts are disputed.") (citations omitted).

The Court fails to see how it can mesh P4's claims that the Husky ROD's Dry Valley lek determination is relevant, while simultaneously acknowledging that it cannot take notice of that decision's truth (or accuracy). In other words, P4 is asking this Court to find the Husky ROD relevant simply because it was made.

However, the Court finds that without being able to take notice of the accuracy of the BLM's determination, it amounts to nothing more than a conclusory statement, which is entitled to little, if any, probative value. This is especially true here, where the "decision" which P4 seeks judicial notice of directly conflicts with this Court's prior holding that the lek was occupied in 2017. *See Jan. 24, 2023 MDO* at 48, Dkt. 79. Because the Court does not find the Husky ROD relevant, it will deny P4's motion to take judicial notice. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000 n.5 (9th Cir. 2018) ("An irrelevant fact could hardly be an adjudicative fact" for purposes of Rule 201, providing yet another reason to deny P4's request for judicial notice.") (quoting 21B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5104, at 156 (2d ed. 2005)) (cleaned up).

Moreover, the Court finds the argument that the BLM can make the same decision due to the recent lack of sage-grouse juxtaposes the equitable principles at play here. That is, it appears that the disappearance of sage-grouse from the Dry Valley lek suspiciously coincides with the start of construction on the Project. As mentioned, in 2016 and 2017, four sage-grouse were observed at the lek. The next year, 2018, one bird was observed. Since then, no birds have been observed. It is undisputed that construction on the Project began in 2019.

MEMORANDUM DECISION AND ORDER - 15

While the Court cannot definitively state that the Project is the direct cause of the sage-grouse disappearing, the correlation between the two is too apparent to ignore. Moreover, to allow the BLM to substantiate its prior decision based on facts that have developed since then, which were possibly the result of the invalidly approved Project, would contravene the well-established purpose of NEPA to "look before leaping." *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 282 F. Supp. 3d 91, 106 (D.D.C. 2017); *see also Env't Def. Ctr.*, 36 F.4th at 882 (NEPA review cannot be used "as a subterfuge designed to rationalize a decision already made.").

Finally, the BLM's violations for failing to take a requisite hard look at the direct, indirect, and cumulative impacts of the Project on sage-grouse undermine the two fundamental objectives of NEPA: "ensur[ing] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and "that the relevant information will be available" to the public so that it can participate in the decision-making process. *WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920, 924 (9th Cir. 2015) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)). These errors, therefore, strongly weigh in favor of vacatur. *See Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l*

*Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1245 (N.D. Cal. 2015) ("[A] failure to analyze cumulative impacts will rarely—if ever—be so minor an error as to satisfy this first *Allied–Signal* factor.").

> b. *The BLM's violation for failing to consider the indirect effects of processing ore at the Soda Springs Plant.*

The BLM's NEPA violation for failing to consider the indirect effects of processing ore at the Soda Springs Plant similarly supports vacatur. The BLM tries to avoid the seriousness of its violation by attributing the entirety of the concerns about human health and environmental impacts of proccing ore at the Soda Springs Plant to "historic processing activities and not current operations[;]" however, the BLM has misinterpreted the Court's holding and its requirements under NEPA. *See BLM Response* at 9-10, Dkt. 84. In its summary judgment ruling, this Court found that the BLM violated NEPA by failing to "address whether approval of the Project would result in extending the operations at the Soda Springs Plant for longer—potentially for 40 years longer—than it would operate under the no action alternative, and the impacts of that extended operation." *Jan. 24, 2023 MDO* at 18, Dkt. 79. Again, the BLM's violation runs afoul of NEPA's fundamental objectives, and simply stating that no further analysis is necessary because the harm is from historic practices ignores the problem contained with the FEIS. Given the seriousness of the BLM's violations, the first *Allied-Signal* factor weighs strongly

in favor of vacatur.

### 3.  Disruptive consequences of vacatur

Generally, courts decline to vacate an agency action when doing so would risk environmental harm, not prevent it. *See, e.g.*, *Nat'l Fam. Farm Coal.*, 960 F.3d at 1145; *Pollinator Stewardship*, 806 F.3d at 532 (finding vacatur appropriate when leaving in place an agency action risks more environmental harm than vacating it); *Idaho Farm Bureau Fed'n*, 58 F.3d at 1405. A court's focus, however, is not exclusively limited to environmental harm; other practical concerns may be weighed in considering the disruptive consequences, such as economic and community-level impacts. *See, e.g., California Communities Against Toxics*, 688 F.3d at 993 (finding remand without vacatur appropriate in part because stopping construction would be "economically disastrous" and would delay a much-needed power plant); *Ctr. for Food Safety*, 56 F.4th at 668 ("Under the second prong of the *Allied-Signal* test, we consider whether vacating a faulty rule could result in possible environmental harm, <u>and</u> the disruptive impact of vacatur") (cleaned up) (emphasis added).

P4 argues that regardless of the seriousness of the BLM's errors, remand without vacatur is the appropriate remedy because of vacatur's significant disruptive consequences. P4 relies heavily on the economic impacts it will suffer if

the Court Orders vacatur. Specifically, P4 estimates that it and its parent company Bayer will suffer over $3 billion in lost revenue plus $72 million to $90 million of additional Project expenses. *See Fourth Gibson Decl.*, ¶ 18; Dkt. 87-1. However, as discussed below, P4 has failed to establish that this significant economic harm is the likely result of vacatur.

First, Mr. Gibson's calculations of anticipated economic harm are vague and conclusory and do not establish that vacatur will ultimately lead to such harm. *See Dine Citizens Against Ruining Our Env't v. United States Off. of Surface Mining Reclamation & Enf't*, No. 12-CV-01275-JLK, 2015 WL 1593995, at *3 (D. Colo. Apr. 6, 2015) ("notwithstanding their conclusory statements to the contrary, neither Respondents nor Respondent–Intervenor have demonstrated that vacatur is likely to ultimately lead to the [alleged economic consequences]").

Regarding the additional project expenses, Mr. Gibson provides no substantive explanation of why halting the project would result in such a substantial additional expense, nor does he address the calculation for his valuation. *See Fourth Gibson Decl.*, ¶ 13, Dkt. 87-1 ("The engineering estimate of the cost to halt the project and then restart it once the requirements on remand have been met is in the range of $72 million to $90 million."). Rather, without providing the actual documentation, Mr. Gibson simply relies on a "engineering estimate."

**MEMORANDUM DECISION AND ORDER - 19**

*Id.*

Additionally, it is similarly not clear that the entirety of the remaining cascading economic consequences (*i.e.*, the loss of jobs and revenue), which appear to assume the Soda Springs Plant would not processing any ore from August 2024 until approximately April 2028, are the realistic outcome of vacatur. Most importantly, the Court remains unsure of the actual availability of ore to temporarily replace the anticipated haul from the Caldwell Canyon Mine during any delay caused by vacatur.

While P4's President, Mr. Gibson, states, "P4 does not have sufficient ore readily available from its existing mining properties to last through a presumed shutdown period[,]" *Fifth Gibson Decl.*, ¶ 11, Dkt. 94-2, it is unclear if that means there will be no alternative ore from the day Caldwell Canyon Mine was expected to become functional—approximately August 2024—or at some unspecified future date. The confusion is only further complicated by Mr. Gibson's attempt to clarify the "availability to P4 of an alternative ore source to maintain operations at the Soda Springs facility during the potential period of delay caused by vacatur." *P4 Br.* at 1, Dkt. 94-1. In his fifth declaration, Mr. Gibson testifies:

> As noted previously, P4 had previously planned for the Caldwell Canyon Mine Project to come online in approximately August 2024, which is when P4 assumed that the ore haul from the Caldwell Canyon Mine via Dry Valley to the Soda Springs Plant would commence. That

**MEMORANDUM DECISION AND ORDER - 20**

timing was intended to coincide with the previously anticipated exhaustion of the Blackfoot Bridge ore resources.

*Fifth Gibson Decl.*, ¶ 11, Dkt. 94-2.

While Mr. Gibson's carefully crafted explanation of how he calculated the potential economic harm caused by vacatur may have been accurate at one point, his testimony lacks any definitive statement of the *current* status of the Blackfoot Mine. Instead, Mr. Gibson's testimony is hedged in assumptions and "previously anticipated" dates even though it was proffered to address CBD's claims that sufficient ore is available to maintain Soda Spring's production. As CBD highlights, although P4 had sufficient time to submit two additional expert reports, it elected to omit any definitive information regarding the current anticipated exhaustion date of Blackfoot Bridge ore.

Additionally, Mr. Gibson's own statements cut against his ultimate conclusions. In addressing another potential source of ore—the Ballard Mine—it is clear that P4 is well on its way to obtaining approval to begin mining. *See Fifth Gibson Decl.*, ¶ 11, Dkt. 94-2 ("The Ballard Mine ore recovery has received certain approvals from the BLM, but overall possible implementation of re-mining awaits further agency approvals and is still contingent on EPA approval of the remedial design."); *see also Tonry Decl.*, Ex. 2 at 7-8, Dkt. 90-3 (showing that in 2022 the Ballard Mine was on the fifth and final step). While Mr. Gibson now claims that

even if the Ballard Mine is approved, that ore could not be used as the sole source for the Soda Springs Plant, this statement seems to contradict P4's prior arguments that the Ballard Mine could have provided at least some of the substitute ore for the Caldwell Canyon Mine. *See P4's Reply on MSJ*, at 2, Dkt. 71 (if the Ballard Mine ore could have been a source of substitute ore, it cuts against the statement that it was only "intended to be blended with Caldwell Canyon ore"). Given the information before the Court, and the significant previous arguments that "P4 has other [ore] resources available locally, is actively pursuing them, and could develop those resources with adequate lead time, to operate the Soda Springs facility[,]" *see id*, P4's all-or-nothing calculation stretches the realm of believability. In the absence of any background information on how Mr. Gibson reached his conclusion, the Court is left to speculate about the consequences of some "reduced interruption period." *Fifth Gibson Decl.*, ¶ 14, Dkt. 94-2. Simply put, P4 has not established that alleged economic consequences are the probable outcome of vacatur and, without having a clear picture of the potential economic harm or the likelihood it will actually occur, the Court is hesitant to find that the disruptive consequences outweigh the seriousness of the BLM's errors.

Second, even accepting Mr. Gibson's statements as true, the alleged economic harm alone is not the disruptive consequence that generally tips the scale

away from the presumed remedy of vacatur. *See Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 951 (N.D. Cal. 2010) ("Nevertheless, the Ninth Circuit has only found remand without vacatur warranted by equity concerns in limited circumstances, namely serious irreparable environmental injury."); *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 471 F. Supp. 3d 71, 84 (D.D.C. 2020), *aff'd in part, rev'd in part sub nom. Standing Rock Sioux Tribe v. United States Army Corps of Engineers*, 985 F.3d 1032 (D.C. Cir. 2021) ("while economic disruption is a proper consideration for the second *Allied-Signal* prong, it may not necessarily be 'determinative.'").

In its Response, P4 cites various cases to support its contention that the harm caused by vacatur in this matter is severe enough to warrant the imposition of a more tailored remedy. *See P4 Response* at 9, Dkt. 87. However, remand without vacatur was generally warranted in those cases because either the agency's errors were not serious or multiple significant consequences were likely to occur, one of which was almost always causing additional environmental harm. *See, e.g., Ctr. for Food Safety*, 56 F.4th at 668 (finding remand without vacatur was warranted because the "seriousness of [the] EPA's errors [did] not support vacatur" and maintained "the enhanced protection of the environmental values covered by [the registration]"); *California Communities Against Toxics*, 688 F.3d at 993 (finding

that the "delay and trouble" vacatur would cause—including potential blackouts

from lack of power, possible additional air pollution from generators, and the loss

of jobs and economic benefits—were severe enough to warrant remand without

vacatur); *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 103

(D.D.C. 2019) (finding vacatur inappropriate because of the significant social,

economic, and environmental costs)

      The cited authority does not persuade the Court because there are important

distinctions between those cases and this one. Unlike *Center for Food Safety*, the

first *Allied-Signal* factor weighs heavily in favor of vacatur in this case. *See* 56

F.4th at 668. Unlike *California Communities Against Toxics*, vacatur will not result

in substantial social costs by "risk[ing] that hundreds of thousands of people will

be left with an unreliable power source." 688 F.3d at 993; *see also Semonite*, 422

F. Supp. 3d at 101 ("One major consequence of vacatur would be the threat of

rolling blackouts in the region."); *Backcountry Against Dumps v. Perry*, No. 3:12-

CV-03062-L-JLB, 2017 WL 3712487, at *3 (S.D. Cal. Aug. 29, 2017) ("Vacatur

could also decrease power grid reliability."). Despite making sweeping conclusions

about the global supply chain, Mr. Gibson is not qualified to testify to matters

outside of his personal experience. There is no admissible evidence that that the

global supply chain will suffer.

Nor will vacatur result in massive waste, as was the case in *Semonite*. *See* 422 F. Supp. 3d at 102-103 (noting "the amount of waste that could result from vacatur is extreme" where the defendant was required by law to "dismantl[e] seventeen steel lattice towers and remov[e] 37.8 miles of conductor, 8.4 miles of fiber optic shield wire, 32 solar panels and solar lighting systems, and all associated hardware" only to be required to rebuild them if the project was re-approved). While P4 cautions that if the Court orders vacatur, it will be required to undo what it has already constructed, P4's argument is an unnecessarily destructive interpretation of the Project plan. That is, unlike the defendant in *Semonite*, who was required by law to dismantle and remove the project, nothing is stopping the BLM from allowing P4 to maintain the status quo of the road until the BLM has had sufficient time to complete the process following vacatur. *See Standing Rock*, 471 F. Supp. 3d at 87 (finding defendant's waste argument does not defeat vacatur where "the Court is not ordering that such step be taken [to remove a pipeline], and any decision to remove is entirely within the Corps' control.").

Finally, and most importantly, unlike many of the cited cases, allowing P4 to continue construction on the Project carries the risk of harmful impacts at the core of the NEPA violations. *See, e.g., California Communities Against Toxics*, 688 F.3d at 994 (allowing the defendant, despite violating the Clean Air Act, to

continue construction where the California Energy Commission already found that the construction harms were insignificant with mitigation, and commencement of the operation could not begin "without a new and valid EPA rule in place."); *Ctr. for Food Safety*, 56 F.4th at 668 ("Remand without vacatur here maintains 'the enhanced protection of the environmental values covered by [the registration][.]'"); *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 805 (D.C. Cir. 2022) ("[T]he environmental groups have identified no harm that flows from leaving the sales in place for now, when exploration and development cannot occur absent further regulatory approvals from Interior."). Here, the Court already noted that the FEIS concluded that noise from mining operations, construction, and reclamation could have negative impacts on the Dry Valley lek, but failed to take a hard look at the direct, indirect, and cumulative impacts on the sage-grouse population and habitat. *See Jan. 24, 2023 MDO at 21, Dkt.* 79. Thus, to allow P4 to continue construction with the acknowledged potential risks to sage-grouse while the BLM addresses its NEPA violations runs contrary to the purpose of NEPA. *See Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007) ("[A]llowing a potentially environmentally damaging program to proceed without an adequate record of decision runs contrary to the mandate of NEPA."); *Standing Rock*, 471 F. Supp. 3d at 85 ("When it comes to NEPA, it is better to ask for permission than forgiveness:

if you can build first and consider environmental consequences later, NEPA's action-forcing purpose loses its bite.").

In sum, the BLM and P4 fail to demonstrate that equity demands a more tailored remedy. As discussed, the first *Allied-Signal* factor weighs strongly in favor of vacatur, even if the second is a closer call. Although the Court has questioned P4's calculations of harm, it is mindful of the the potential financial burden that vacatur may impose. Nonetheless, to find P4's potential economic harm is sufficient alone to warrant remand without vacatur would incentivize agencies and third parties to "invest heavily in potentially-illegal projects upfront, only to claim later that the economic consequences in setting aside those projects would be [too great to ignore]." *W. Watersheds Project*, 441 F. Supp. 3d at 1088; *see also U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d at 106 ("[D]enying vacatur on the basis of alleged economic harm risks creating undesirable incentives for future agency actions. If projections of financial distress are sufficient to prevent vacatur, the Court fears that agencies and third parties may choose to devote as many resources as early as possible to a challenged project – and then claim disruption in light of such investments. Such a strategy is contrary to the purpose of NEPA, which seeks to ensure that the government 'looks before it leaps.'").

Accordingly, the Court will apply the presumptive remedy and vacate the

ROD, including the FEIS, and all decisions made in reliance on those documents, including the Phosphate Use Permit (IDI-38927), East Caldwell haul road right of way (IDI-038996), water pipeline right of way (IDI-38927), fiber optic line right of way (IDI-039280), and powerline right of way (IDI-039281).[8]

## ORDER

**IT IS ORDERED that:**

1.      The United States Bureau of Land Management's Final Environmental Impact Statement (FEIS) and 2019 Record of Decision (ROD), which approved a new open-pit phosphate mine in southeast Idaho—the Caldwell Canyon Mine Project, and all the decisions made in reliance on those documents are hereby **VACATED**.

2.      P4 Production's Motion for Leave to File the Fifth Declaration of Roger W. Gibson (Dkt. 94) is **GRANTED**.

3.      P4 Production's Motion to Take Notice of Adjudicative Facts (Dkt.100) is **DENIED**.

---

[8] While the Court recognizes that there may have been a potential to address the corresponding permits on a singular basis, which may have resulted in a more tailored remedy, it was not provided sufficient information to do so. Rather, the BLM and P4 exclusively presented an all or nothing approach—remand without vacatur of every aspect of the plan.

DATED: June 2, 2023

B. Lynn Winmill
U.S. District Court Judge